# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### Baltimore Division

| | |
|---|---|
| **RON L. LACKS, PERSONAL REPRESENTATIVE OF THE ESTATE OF HENRIETTA LACKS,** | |
| **Plaintiff,** | **Case No. 1:23-cv-02171-DLB** |
| **VS.** | |
| **ULTRAGENYX PHARMACEUTICAL, INC.,** | |
| **Defendant.** | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT ULTRAGENYX'S MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 3

    A.  Physicians at Johns Hopkins Unlawfully Violated Henrietta Lacks's Physical Person by Surgically Removing Her Tissue Without Her Consent ........................... 3

    B.  Mrs. Lacks's Cells Are One of the Most Important and Widely Used Tools in Modern Medical Research ............................................................................................. 4

    C.  Like the Rest of the Scientific Community, Ultragenyx Knew That HeLa Cells Were Ill Gotten and the Result of Non-Consensual and Non-Therapeutic Medical Experimentation ............................................................................................. 4

    D.  Ultragenyx Chose to Unfairly and Unjustly Profit from the Wrongful Conduct of Johns Hopkins' Physicians ...................................................................... 5

STANDARD OF REVIEW ................................................................................................. 8

ARGUMENT ....................................................................................................................... 9

   I.    THE COMPLAINT PLEADS A COGNIZABLE UNJUST ENRICHMENT CLAIM ............................................................................................. 9

    A.  Ultragenyx Received a Benefit from Henrietta Lacks ............................................ 10

    B.  The Benefit Conferred on Ultragenyx Was Not Remote ....................................... 13

    C.  Ultragenyx Was Not a Bona Fide Purchaser for Value ......................................... 18

    D.  Plaintiff Sufficiently Alleges Unjust Enrichment Based on Tortious Conduct ..... 22

   II.    PLAINTIFF TIMELY COMMENCED THIS ACTION .............................................. 25

    A.  Ultragenyx is Barred from Raising a Statute of Limitations Defense ................... 26

    B.  Even if Not Barred, Ultragenyx's Statute of Limitations Defense Is Unavailing .............................................................................................................. 28

        1.  The Statute of Limitations Is an Affirmative Defense, on Which Ultragenyx Has the Burden of Proof, and It Is Unsuitable for Resolution on This Rule 12(b)(6) Motion ...................................................... 28

        2.  Ultragenyx's Reliance on Public Records Is Misplaced ............................... 29

        3.  The Separate Accrual and Continuing Violations Doctrines Allow Ultragenyx to Be Held Accountable for Its Present and Future Conduct ..... 31

CONCLUSION .................................................................................................................. 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AAA Antiques Mall, Inc. v. VISA, USA, Inc.*,
  558 F. Supp. 2d 607 (D. Md. 2008)............................................................................. 33

*Amaya v. DGS Constr., LLC*,
  No. 22-1189, 2023 WL 3034326 (4th Cir. Apr. 21, 2023)................................... 22, 23

*American Hous. Pres., LLC v. Hudson SLP, LLC*,
  No. 1241, Sept. Term, 2015, 2016 WL 7496181 (Md. Ct. Spec. App. Dec. 20, 2016) ........... 33

*Anglemyer v. WCS Constr., LLC*,
  No. 8:18-CV-02198-PWG, 2019 WL 3458951 (D. Md. July 31, 2019)................................. 30

*ARCO Nat'l Constr., LLC v. MCM Mgmt. Corp.*,
  No. ELH-20-3783, 2021 WL 4148456 (D. Md. Sept. 10, 2021) ............................................ 28

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................................. 8

*Augenstein v. McCormick & Co.*,
  581 F. Supp. 452 (D. Md. 1984).......................................................................................... 9

*Baehr v. Creig Northrop Team, P.C.*,
  953 F.3d 244 (4th Cir. 2020) .............................................................................................. 12

*Bank of Am. Corp. v. Gibbons*,
  918 A.2d 565 (Md. Ct. Spec. App. 2007)............................................................................ 14

*Baten v. McMaster*,
  967 F.3d 345 (4th Cir. 2020) ............................................................................................... 9

*Bertovich v. Advanced Brands & Importing, Co.*,
  No. 5:05CV74, 2006 WL 2382273 (N.D. W.Va. Aug. 17, 2006)......................................... 18

*Blake v. JP Morgan Chase Bank NA*,
  927 F.3d 701 (3d Cir. 2019) ................................................................................... 31, 32, 33

*Bodner v. Banque Paribas*,
  114 F. Supp. 2d 117 (E.D.N.Y. 2000) ................................................................................ 33

*Canales v. Alicia Rest. Inc.*,
  No. JKS 14-3780, 2015 WL 4111608 (D. Md. July 7, 2015) ................................................ 16

*CASA de Maryland, Inc. v. Arbor Realty Tr., Inc.*,
   No. DKC 21-1778, 2022 WL 4080320 (D. Md. Sept. 6, 2022) ................................................. 32

*Catler v. Arent Fox, LLP*,
   71 A.3d 155 (Md. Ct. Spec. App. 2013) .................................................................................... 28

*City of Miami Gen. Employees' & Sanitation Employees' Ret. Trust v. RH, Inc.*,
   302 F. Supp. 3d 1028 (N.D. Cal. 2018) .................................................................................... 30

*Clark Off. Bldg., LLC v. MCM Cap. Partners, LLLP*,
   245 A.3d 186 (Md. Ct. Spec. App. 2021) ............................................................................ 11, 23

*Coakley & Williams, Inc. v. Shatterproof Glass Corp.*,
   706 F.2d 456 (4th Cir. 1983) ............................................................................................... 31, 32

*Com. Union Ins. Co. v. Porter Hayden Co.*,
   698 A.2d 1167 (Md. Ct. Spec. App. 1997) ............................................................................... 33

*De Sole v. United States*,
   947 F.2d 1169 (4th Cir. 1991) .................................................................................................... 9

*Dep't of Health & Mental Hygiene v. Kelly*,
   918 A.2d 470 (Md. 2007) .......................................................................................................... 21

*Diane Sales, Inc. v. Am. Express Centurion Bank*,
   No. GLR-14-1063, 2015 WL 10986308 (D. Md. Oct. 26, 2015) .............................................. 33

*Doe I v. Wal-Mart Stores, Inc.*,
   572 F.3d 677 (9th Cir. 2009) ............................................................................................... 17, 18

*Doe v. Archdiocese of Washington*,
   689 A.2d 634 (Md. Ct. Spec. App. 1997) ................................................................................. 25

*Doe v. Chesapeake Med. Sols., LLC*,
   No. SAG-19-2670, 2019 WL 6497962 (D. Md. Dec. 2, 2019) ................................................... 9

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
   637 F.3d 435 (4th Cir. 2011) .................................................................................................. 8, 9

*Ely v. Sci. Applications Int'l Corp.*,
   716 F. Supp. 2d 403 (D. Md. 2010) .......................................................................................... 33

*Fishman v. Murphy ex rel. Est. of Urb.*,
   72 A.3d 185 (Md. 2013) ............................................................................................................ 20

*Garcoa, Inc. v. Sierra Sage Herbs LLC*,
   No. 21-4672 PSG (SPX), 2022 WL 16548874 (C.D. Cal. Oct. 4, 2022) .................................. 30

*Goines v. Valley Cmty. Servs. Bd.*,
 822 F.3d 159 (4th Cir. 2016) ......................................................................... 9

*Goldstein v. Metro. Reg'l Info. Sys., Inc.*,
 No. TDC-15-2400, 2016 WL 4257457 (D. Md. Aug. 11, 2016) ........................ 9

*Goodman v. Praxair, Inc.*,
 494 F.3d 458 (4th Cir. 2007) ........................................................................ 28

*Grayson O Co. v. Agadir Int'l LLC*,
 856 F.3d 307 (4th Cir. 2017) ........................................................................ 34

*Great Am. Ins. Co. v. Nextday Network Hardware Corp.*,
 73 F. Supp. 3d 636 (D. Md. 2014) ................................................................. 20

*Grimes v. Kennedy Krieger Institute, Inc.*,
 782 A.2d 807 (Md. 2001) ......................................................................... 21, 22

*Haley v. Corcoran*,
 659 F. Supp. 2d 714 (D. Md. 2009) .......................................................... 15, 16

*Hill v. Cross Country Settlements, LLC*,
 936 A.2d 343 (Md. 2007) .................................................................. 15, 22, 23

*In re Birmingham*,
 846 F.3d 88 (4th Cir. 2017) ............................................................................ 8

*In re Guidant Corp. Implantable Defibrillators Products Liability Litigation*,
 484 F. Supp. 2d 973 (D. Minn. 2007) ........................................................... 17

*In re Kingsville Motors, Inc.*,
 No. 04-33755-DK, 2008 WL 686724 (Bankr. D. Md. Mar. 12, 2008) ............... 15

*Inmi-Etti v. Aluisi*,
 492 A.2d 917 (Md. Ct. Spec. App. 1985) ....................................................... 20

*J.C. Snavely & Sons, Inc. v. Wheeler*,
 538 A.2d 324 (Md. Ct. Spec. App. 1988) ....................................................... 27

*Jason v. Nat'l Loan Recoveries, LLC*,
 134 A.3d 421 (Md. Ct. Spec. App. 2016) ....................................................... 29

*Johnson v. Silver Diner, Inc.*,
 No. PWG-18-3021, 2019 WL 3717784 (D. Md. Aug. 7, 2019) ......................... 33

*Johnson v. Valu Food, Inc.*,
 751 A.2d 19 (Md. Ct. Spec. App. 2000) ......................................................... 25

*Knobel v. Shaw*,
    936 N.Y.S.2d 2 (N.Y. App. Div. 2011) ................................................................... 33

*Lawlor v. Nat'l Screen Serv. Corp.*,
    349 U.S. 322 (1955) ................................................................................................. 32

*Linton v. Consumer Prot. Div.*,
    225 A.3d 456 (Md. 2020) ................................................................................. 11, 12

*Litz v. Maryland Dep't of Env't*,
    76 A.3d 1076 (Md. 2013) ......................................................................................... 32

*Marchese v. JPMorgan Chase Bank, N.A.*,
    917 F. Supp. 2d 452 (D. Md. 2013) .......................................................................... 8

*Maryland Cas. Co. v. Blackstone Int'l Ltd.*,
    114 A.3d 676 (Md. 2015) ......................................................................................... 22

*McPherson v. Baltimore Police Dep't*,
    494 F. Supp. 3d 269 (D. Md. 2020) ......................................................................... 28

*Mehul's Investment Corp. v. ABC Advisors, Inc.*,
    130 F. Supp. 2d 700 (D. Md. 2001) ......................................................................... 15

*Mirjafari v. Cohn*,
    988 A.2d 997 (Md. 2010) ......................................................................................... 18

*Monterey Mushrooms, Inc. v. HealthCare Strategies, Inc.*,
    No. CCB-20-3061, 2021 WL 1909592 (D. Md. May 12, 2021) ....................... 23, 24

*Mylan Labs., Inc. v. Matkari*,
    7 F.3d 1130 (4th Cir. 1993) ....................................................................................... 8

*Neitzke v. Williams*,
    490 U.S. 319 (1989) ................................................................................................... 8

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) ............................................................................... 8, 19

*Ohio Valley Env't Coal. v. Aracoma Coal Co.*,
    556 F.3d 177 (4th Cir. 2009) ................................................................................... 32

*Owens v. Balt. City State's Att'ys Off.*,
    767 F.3d 379 (4th Cir. 2014) ..................................................................................... 8

*Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*,
    905 F. Supp. 2d 675 (D. Md. 2012) .......................................................................... 8

v

*Paragon Sys., Inc. v. Hughes*,
    No. SAG-20-1209, 2020 WL 6292728 (D. Md. Oct. 27, 2020)................................................. 30

*Peete-Bey v. Educ. Credit Mgmt. Corp.*,
    131 F. Supp. 3d 422 (D. Md. 2015)........................................................................................ 33

*Pennsylvania Employees Benefit Trust Fund v. Astrazeneca Pharmaceuticals LP*,
    No. 6:09-cv-5003-Orl-22DAB, 2009 WL 2231686 (M.D. Fla. July 20, 2009) ................. 16, 17

*Perry v. The American Tobacco Co.*,
    324 F.3d 845 (6th Cir. 2003) ................................................................................................. 16

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
    572 U.S. 663 (2014) ................................................................................................. 31, 34, 35

*Phreesia, Inc. v. Certify Glob., Inc.*,
    No. DLB-21-678, 2022 WL 911207 (D. Md. Mar. 29, 2022)................................................. 32

*Plitt v. Greenberg*,
    219 A.2d 237 (Md. 1966) ...................................................................................................... 15

*Quinteros v. Sparkle Cleaning, Inc.*,
    532 F. Supp. 2d 762 (D. Md. 2008)......................................................................................... 8

*Ryder v. Ryder*,
    No. 1726, Sept. Term, 2019, 2020 WL 3618918 (Md. Ct. Spec. App. July 2, 2020).............. 22

*Sard v. Hardy*,
    379 A.2d 1014 (Md. 1977) ............................................................................................. 24, 25

*Sensormatic Security Corp. v. Sensormatic Electronics Corporation*,
    249 F. Supp. 2d 703 (D. Md. 2003)................................................................................. 15, 16

*Singer Co., Link Simulation Sys. Div. v. Baltimore Gas & Elec. Co.*,
    558 A.2d 419 (Md. Ct. Spec. App. 1989)......................................................................... 29, 33

*Skinner v. Switzer*,
    562 U.S. 521 (2011) ............................................................................................................... 8

*SMG Holdings I, LLC v. Arena Ventures, LLC*,
    No. 1778, Sept. Term, 2016, 2018 WL 1391613 (Md. Ct. Spec. App. Mar. 20, 2018)........... 11

*Sperry v. Crompton Corporation*,
    863 N.E.2d 1012 (N.Y. 2007) ............................................................................................... 18

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*,
    171 F.3d 912 (3d Cir. 1999) ................................................................................................. 16

*Temescal Wellness of Maryland, LLC v. Faces Human Capital, LLC,*
 No. GLR-20-3648, 2021 WL 4521343 (D. Md. Oct. 4, 2021)................................................ 24

*Texas Star Nut & Food Co. v. Truist Bank,*
 632 F. Supp. 3d 664 (D. Md. 2022)......................................................................................... 24

*Thompson v. UBS Fin. Servs., Inc.,*
 115 A.3d 125 (Md. 2015) ......................................................................................................... 25

*Tiller Constr. Corp. v. Nadler,*
 637 A.2d 1183 (Md. 1994) ................................................................................................. 26, 27

*Troy Brave, LLC v. Grantsville Truck & Trailer, LLC,*
 No. 1:22-cv-02409-JMC, 2023 WL 6244658 (D. Md. Sept. 26, 2023) .................................. 12

*UBS Fin. Servs., Inc. v. Thompson,*
 94 A.3d 176 (Md. Ct. Spec. App. 2014)................................................................................... 25

*United States v. Fernandez Sanchez,*
 46 F.4th 211 (4th Cir. 2022) .................................................................................................... 34

*Upman v. Clarke,*
 753 A.2d 4 (Md. 2000) ............................................................................................................. 25

*Va. Citizens Def. League v. Couric,*
 910 F.3d 780 (4th Cir. 2018) ..................................................................................................... 8

*Washington Cnty. Bd. of Educ. v. Mallinckrodt ARD, Inc.,*
 431 F. Supp. 3d 698 (D. Md. 2020)......................................................................................... 24

*Washington Mut. Bank v. Homan,*
 974 A.2d 376 (Md. 2009) ......................................................................................................... 18

*William J. Lemp Brewing Co. v. Mantz,*
 87 A. 814 (Md. 1913) ............................................................................................................... 20

*Williamson v. Prince George's Cnty.,*
 No. DKC 10-1100, 2011 WL 280961 (D. Md. Jan. 26, 2011)................................................. 25

*Willow Grove Citizens Ass'n v. Cnty. Council of Prince George's Cnty.,*
 175 A.3d 852 (Md. Ct. Spec. App. 2017).................................................................................. 26

*Woods v. City of Greensboro,*
 855 F.3d 639 (4th Cir. 2017) ..................................................................................................... 8

*Zak v. Chelsea Therapeutics Int'l, Ltd.,*
 780 F.3d 597 (4th Cir. 2015) ............................................................................................... 9, 29

**Statutes:**

Md. Code Ann., Corps. & Ass'ns § 7-205 ................................................................ 26

Md. Code Ann., Corps. & Assn's § 7-301 ............................................................... 26

Md. Code Ann., Cts. & Jud. Proc. § 5-204 ......................................................... 26, 28

**Other Authorities:**

Doug Rendleman and Caprice Roberts, *Remedies:  Cases and Materials* (9th ed. 2018) .......... 23

*Restatement (Third) of Restitution and Unjust Enrichment* § 1 (Am. Law Inst. 2011) ................ 23

*Restatement (Third) of Restitution and Unjust Enrichment* § 3 (Am. Law Inst. 2011) ................ 14

*Restatement (Third) of Restitution and Unjust Enrichment* § 43 (Am. Law Inst. 2011) .. 12, 13, 14

*Restatement (Third) of Restitution and Unjust Enrichment* § 44 (Am. Law Inst. 2011) ........ 11, 12

*Restatement (Third) of Restitution and Unjust Enrichment* § 51(3) (Am. Law Inst. 2011) ......... 13

*Restatement (Third) of Restitution and Unjust Enrichment* § 52(1) (Am. Law Inst. 2011) ......... 13

*Restatement (Third) of Restitution and Unjust Enrichment* § 53 (Am. Law Inst. 2011) ........ 12, 13

*Restatement (Third) of Restitution and Unjust Enrichment* § 58(1) (Am. Law Inst. 2011) ......... 11

*Restatement (Third) of Restitution and Unjust Enrichment* § 66 (Am. Law Inst. 2011) .............. 20

*Restatement (Third) of Restitution and Unjust Enrichment* § 70 (Am. Law Inst. 2011) .............. 33

Evelyne Schuster, *Fifty Years Later:  The Significance of the Nuremberg Cod*e,
    337 New Eng. J. Med. 1436 (1997) ............................................................................. 23

## INTRODUCTION

Henrietta Lacks was a Black woman whose tissue was taken from her without her knowledge or consent during an unnecessary medical procedure at Johns Hopkins Hospital. The exploitation of Mrs. Lacks was not only a gross injustice; it was also extremely unethical and illegal, both today *and at the time*. Yet, despite *knowing* this dark history and failing to obtain permission from Mrs. Lacks's Estate, Defendant Ultragenyx Pharmaceutical, Inc. ("Ultragenyx"), a multibillion-dollar biopharmaceutical corporation, makes millions of dollars in profits by cultivating and selling Mrs. Lacks's genetic material. Among other things, Ultragenyx exploits Mrs. Lacks's genetic material as a manufacturing tool, utilizing her cells as factories for its *proprietary* adeno-associated virus ("AAV") vector-based gene therapy products. By continuing to cultivate, mass-produce, and profit off Mrs. Lacks's body while ignoring her Estate, Ultragenyx is making a conscious choice to embrace the legacy of racial injustice embedded in the U.S. research and medical systems. Put simply, Ultragenyx's ill-gotten gains rightfully belong to Mrs. Lacks's Estate.

Ultragenyx's contention that Plaintiff fails to state a claim for unjust enrichment is flawed. It twists allegations out of context, asserting that Plaintiff's unjust enrichment claim is based solely on the proceeds earned by Ultragenyx. As discussed below, Ultragenyx received a *direct* benefit to the detriment of Mrs. Lacks and her Estate; that benefit was not remote. Try as it may, Ultragenyx cannot remove Mrs. Lacks's identity from her cells, which Ultragenyx directly exploits *today* for its own profit. Nor, having been formed in 2010 and having specific knowledge of the deeply unethical and unlawful origins of HeLa cells, can Ultragenyx qualify as a bona fide purchaser for value. Moreover, although a separate cognizable tort claim need not be pleaded, tortious conduct underlying Ultragenyx's unjust enrichment is plainly alleged here.

The key legal dispute in this litigation, though, will be the statute of limitations. Ultragenyx asserts that even though its commercialization efforts continue (and will continue for the foreseeable future), the efforts of Mrs. Lacks's Estate to obtain redress are simply too late. Under Ultragenyx's view of the law, past injustices must stay buried, so it can go on cultivating, mass-producing, and selling for profit Ms. Lacks's genetic material *today and in perpetuity*, without just compensation. Maryland law, however, is clear: If Ultragenyx can mass-produce Mrs. Lacks' cells for profit today, then it can make restitution to her Estate today.

The Court, however, need not reach the statute of limitations question to sustain the Complaint. Ultragenyx is prohibited by a Maryland statute from even raising a statute of limitations defense because it has not registered as a foreign business with the Maryland Secretary of State's office. Even were Ultragenyx not barred from invoking the statute of limitations, a Rule 12(b)(6) motion is not the proper juncture for resolving the statute of limitations arguments that Ultragenyx raises. Plaintiff alleges that, in October 2022, Ultragenyx entered into a profitable licensing agreement, staking an intellectual property interest in Mrs. Lacks's cells and, in June 2023, it opened a manufacturing facility enabling it to mass-produce HeLa cells. ¶¶ 57-60.[1] Outside of these allegations, the Complaint does not set forth the date that Ultragenyx was unjustly enriched. Furthermore, despite its reliance on materials outside the Complaint (of which the Court cannot take judicial notice), not only has Ultragenyx failed to identify when it was enriched, it has not identified when any of the elements of Plaintiff's claim accrued. Thus, even if not statutorily precluded, Ultragenyx's statute of limitations defense cannot be resolved absent discovery.

---

[1] Unless otherwise noted, "¶" or "¶¶" refers to paragraphs of the Civil Complaint and Request for Jury Trial (ECF No. 1). "Mem." refers to pages of the Memorandum in Support of Ultragenyx's Motion to Dismiss (ECF No. 6-1). Except where otherwise indicated, citations, quotation marks, and footnotes are omitted from quotations and emphasis is added.

Nonetheless, should the Court reach the merits of Ultragenyx's statute of limitations defense, Plaintiff's unjust enrichment claim is not time-barred. It is not uncommon for cases to involve long-running improper conduct. Two related legal doctrines—the separate accrual doctrine and the continuing violations doctrine—operate to ensure that recent instances of ongoing wrongful conduct are not immunized from liability just because certain instances of unlawful conduct occurred outside of the limitations period. The separate accrual doctrine applies this rule where the wrongful conduct is made up of many discrete actions, while the continuing violations doctrine applies to continuous wrongdoing. Ultragenyx does not dispute that these doctrines are recognized in Maryland.

Whether Plaintiff's claim is examined under the former or the latter, the import of these doctrines is that the statute of limitations does not immunize Ultragenyx's recent commercialization of HeLa cells from liability. Plaintiff's unjust enrichment claim is based on Ultragenyx's ongoing ill-gotten gains *today*, not the initial assault of Mrs. Lacks at the hands of the physicians in whom she had placed her trust. Ultragenyx simply ignores *its* treatment of Henrietta Lacks's genetic material as chattel to be bought and sold *today*.

## FACTUAL BACKGROUND

### A.    Physicians at Johns Hopkins Unlawfully Violated Henrietta Lacks's Physical Person by Surgically Removing Her Tissue Without Her Consent

In 1951, at the age of 31, Henrietta Lacks, a Maryland resident, was diagnosed with cervical cancer and was treated in a racially segregated ward at Johns Hopkins Hospital. ¶¶ 5, 40-41. During a surgical procedure, and while she was under anesthesia, a white physician at Johns Hopkins cut away two parts of Mrs. Lacks's cervix. ¶¶ 5, 41-43. This surgical procedure to harvest her tissue was neither medically necessary nor a procedure to which she had consented. ¶¶ 5, 42. Importantly, Mrs. Lacks was never told why her tissue had been taken and never gave permission

3

for her cells to be used for any purpose.  *Id.*

At the time, Mrs. Lacks's cervical cancer was treated with exposure to radium.  ¶ 41.  Mrs. Lacks was never warned about the risks of the aggressive course of radium treatment for her cancer, which left her infertile.  ¶ 5.  Months later, when she was told that the course of treatment had left her infertile, Mrs. Lacks stated clearly that she would never have agreed to it had she been informed of the infertility risk.  *Id.*  The treatment proved completely ineffective, with Mrs. Lacks dying of cervical cancer on October 4, 1951.  ¶¶ 5, 45.

### B.    Mrs. Lacks's Cells Are One of the Most Important and Widely Used Tools in Modern Medical Research

The tissue wrongfully taken from Mrs. Lacks had unique properties.  ¶¶ 6, 44.  Whereas most tissue samples die shortly after they are removed from the body, Mrs. Lacks's cells survived and reproduced in the laboratory.  This exceptional quality meant that it was possible to cultivate Mrs. Lacks's cells into a cell line that could reproduce indefinitely—an immortal cell line.  *Id.*  Indeed, Mrs. Lacks's cells were the first known immortalized human cell line.  *Id.*

To conceal the use of her cells from Mrs. Lacks and her family, medical researchers referred to Henrietta Lacks's cell line as the "HeLa" cell line, using the first two letters of Mrs. Lacks's first and last names.  ¶ 6.  HeLa cells have had a profound impact on medical research and have contributed to numerous scientific discoveries and medical advancements, including the polio vaccine, gene mapping, in vitro fertilization, and many more.  ¶¶ 8, 47.

### C.    Like the Rest of the Scientific Community, Ultragenyx Knew That HeLa Cells Were Ill Gotten and the Result of Non-Consensual and Non-Therapeutic Medical Experimentation

The harvested tissue from Mrs. Lacks's unconscious body was not an isolated incident.  It was John Hopkins' well-known practice, to which the scientific community turned a blind eye.  ¶ 49.  While treating Black women in racially segregated wards, a group of white physicians at Johns

Hopkins routinely preyed on Black women suffering from cervical cancer.  ¶¶ 3-4, 33-36.  Johns Hopkins' physicians would cut away tissue samples from their patients' cervixes without their knowledge or consent.  *Id.*  They systematically assaulted their Black patients, who had placed their trust and lives in their physicians' care.  ¶¶ 4, 49.

A leading figure in this wrongdoing—Dr. George Gey, then head of tissue culture research at Johns Hopkins—once proclaimed himself "the world's most famous vulture, feeding on human specimens almost constantly."  ¶ 36.  Another leading figure, Dr. Richard Wesley TeLinde, then chair of gynecology at Johns Hopkins, faced widespread criticism for his practice of frequently removing the cervix, uterus, and substantial portions of the vagina of patients with carcinoma *in situ*, a condition not believed to be deadly at the time.  ¶¶ 33-35.  Indeed, as one physician acting under TeLinde's supervision callously summarized, "Hopkins, with its large indigent [B]lack population, had no dearth of clinical material."  ¶ 36.[2]

### D.    Ultragenyx Chose to Unfairly and Unjustly Profit from the Wrongful Conduct of Johns Hopkins' Physicians

Despite knowledge of the HeLa cell line's ignominious origins, Ultragenyx—which focuses on the market for treating "orphan" diseases, reaping hundreds of millions of dollars annually from the exploitation of vulnerable people suffering from them—has chosen to profit from that unlawful conduct *today* and to cultivate, mass-produce, and sell Mrs. Lacks's stolen

---

[2] This dehumanization of Black patients and abuse of trust sadly had all too much precedent. Medical research was often performed on marginalized communities, including Black Americans, without their consent.  The long list of abuses includes numerous studies, both documented and undocumented, such as the United States Public Health Service Syphilis Study at Tuskegee that earned notoriety for its unethical experimentation on Black men in the rural South, the systematic forced sterilization of poor Black women known as the "Mississippi Appendectomy," and the routine testing of mustard gas and other chemical agents on Black men during World Warr II.  ¶¶ 37-39.  Too often, the history of medical experimentation in the United States has been the history of medical racism.  ¶¶ 2, 37-39.  This was particularly true at Johns Hopkins.  ¶¶ 1, 3, 33-36, 49.

genetic material for its own profit without her Estate's permission. ¶¶ 1, 10-11, 18-23.

A substantial portion of Ultragenyx's product development is focused on gene therapy, which requires manufacturing AAV vectors. ¶ 10. Vectors act as vehicles that transport genetic cargo into cells, and once inside can release and enable the production of therapeutic proteins. *Id.* AAV vectors, though, are enormously challenging to manufacture at scale; they must be grown within cells. *Id.* Ultragenyx's answer to this challenge has been to commercialize for profit Mrs. Lacks's stolen cells so as to produce AAV vectors on a massive scale—and to be able to produce a range of different AAV vectors using the same production platform. ¶¶ 11, 14. This technique treats Mrs. Lacks's stolen cells like a dairy farm treats cows—it milks them for AAV vectors to sell as chattel. *Id.* Through this technique, Ultragenyx has been able to massively increase its AAV vector production yield, reaping huge profits that would never have been possible without Henrietta Lacks's cells. *Id.*

Ultragenyx has made AAV-based gene therapy—dependent on the mass-production of HeLa cells—central to its business model. ¶¶ 11, 64. It has received FDA approval of Investigational New Drug applications for at least four gene therapies. ¶ 68. Ultragenyx's gene therapy UX701 for Wilson's disease was developed on its trademarked HeLa PCL platform. ¶¶ 27, 56. After it announced positive top-line data from its HeLa PCL platform gene therapy trial, Ultragenyx's share price rose 27% in just one day, and its stock price rose 20% within 10 days following the FDA's clearance of UX701. ¶¶ 55, 66. Ultragenyx's proprietary HeLa PCL platform has proven successful in other ways, allowing it to enter into lucrative partnerships with multiple pharmaceutical companies. ¶ 58; *see* ¶¶ 64-67.[3]

---

[3] Nor are Ultragenyx's efforts to commercialize HeLa cells limited to the gene therapies it has disclosed to the FDA thus far. It improved and modified its HeLa PCL platform to increase its yield and production of HeLa cells and is currently conducting two additional preclinical studies

Ultragenyx has not been reticent about its successful commercial exploitation of the pilfered HeLa cell line. It proudly announces the centrality of Mrs. Lacks's cells to its business model, touting its development of the HeLa PCL line as having resulted in a cost-effective high product yield and quality. ¶¶ 12, 54. As Sam Wadsworth, Ultragenyx's Chief Scientific Officer, explained in an interview:

> [t]he HeLa platform is the most advanced platform that we have. It is a highly engineered system for manufacturing AAV gene therapy vectors using HeLa cells. The elements of the platform are finely tuned to work in concert to produce AAV vectors at the scale and quality required for our products. We like to think of this as letting biology do the work.

¶ 12. The undeniable fact, though, is that Ultragenyx never sought or received permission from Mrs. Lacks' Estate to use her cell line. ¶¶ 14, 53. It knew full well that the HeLa cells were stolen, publicly admitting its awareness that they were taken from Mrs. Lacks without her knowledge while she was being treated at Johns Hopkins. ¶¶ 13-14, 30, 51.

Because of Ultragenyx's actions, Mrs. Lacks's family members have been forced to live with the reality that a corporation *today* is exploiting the genetic material of their mother or grandmother for profit against her and her family's will. This robs the family of one of the most basic comforts any grieving person can ask for—the knowledge that a loved one's body has been treated with dignity. ¶ 62.[4] Put simply, Ultragenyx treats Henrietta Lacks's living cells as chattel to be bought and sold to add to the company's coffers. ¶ 15. Mrs. Lacks is behind every HeLa-based product sold by Ultragenyx—at extortionate prices that force patients to choose between

---

for investigational gene therapies employing its improved platform. ¶ 68.

[4] Beyond this harm, the widespread dissemination of Henrietta Lacks's genetic material means that her genetic information is now commonly available—and, as a consequence, some of the most private information about Mrs. Lacks and her family has been exposed to the general public. ¶ 63.

playing Russian Roulette with their lives and suffering financial ruin (¶¶ 71-72)—and the basis for every dollar made as a result.

## STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim, the issue is not whether the plaintiff "will ultimately prevail ... but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011).[5]  A court must "accept as true all of the factual allegations contained in the complaint." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).  It must read the complaint as a whole, *Marchese v. JPMorgan Chase Bank, N.A.*, 917 F. Supp. 2d 452, 463 (D. Md. 2013); *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675, 680 (D. Md. 2012), construing it liberally in the plaintiff's favor, *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 & n.4 (4th Cir. 1993), and drawing all reasonable inferences in his favor.  *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017).

"To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Va. Citizens Def. League v. Couric*, 910 F.3d 780, 783 (4th Cir. 2018).[6]  A district court "should be especially reluctant to

---

[5] *Accord Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance … dismissals based on a judge's disbelief of a complaint's factual allegations."); *Woods v. City of Greensboro*, 855 F.3d 639, 652 (4th Cir. 2017) ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."); *Quinteros v. Sparkle Cleaning, Inc.*, 532 F. Supp. 2d 762, 767 (D. Md. 2008) ("The issue in reviewing the sufficiency of … a complaint is not whether a plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support the claims.").

[6] A complaint is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and will not be dismissed "as long as [the plaintiff] provides sufficient detail … to show that he has a more-than-conceivable chance of success on the merits." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014); *accord Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256 (4th Cir. 2009) (complaint's

dismiss on the basis of the pleadings when the asserted theory of liability is novel or even extreme, since it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions."[7]

Importantly, in evaluating a complaint's sufficiency, a court is "generally limited to a review of the allegations of the complaint itself." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016). "Consideration of extrinsic documents … improperly converts the motion to dismiss into a motion for summary judgment." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015); *see also E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 450 (4th Cir. 2011) (district court erred in considering evidence beyond complaint and drawing inferences from it). Such a conversion "is not appropriate when the parties have not had an opportunity to conduct reasonable discovery." *Zak*, 780 F.3d at 606.

Ultimately, a plaintiff's burden at the 12(b)(6) stage "is quite minimal," *Doe v. Chesapeake Med. Sols., LLC*, No. SAG-19-2670, 2019 WL 6497962, at *5 (D. Md. Dec. 2, 2019), whereas a defendant bears a "heavy burden." *Augenstein v. McCormick & Co.*, 581 F. Supp. 452, 456 (D. Md. 1984). In all, a Rule 12(b)(6) motion "should be granted only in very limited circumstances." *De Sole v. United States*, 947 F.2d 1169, 1171 (4th Cir. 1991).

## ARGUMENT

## I.    THE COMPLAINT PLEADS A COGNIZABLE UNJUST ENRICHMENT CLAIM

Ultragenyx contends that Plaintiff fails to state a claim for unjust enrichment. Mem. at 7-

---

factual allegations need only "produce an inference of liability strong enough to nudge the plaintiff's claims across the line from conceivable to plausible").

[7] *Goldstein v. Metro. Reg'l Info. Sys., Inc*., No. TDC-15-2400, 2016 WL 4257457, at *9 (D. Md. Aug. 11, 2016) (citing authorities); *accord Baten v. McMaster*, 967 F.3d 345, 368 (4th Cir. 2020) ("[W]here Plaintiffs offer a novel legal theory that can best be assessed after factual development, dismissals at such an early stage are disfavored.").

15.  As discussed below, though, Ultragenyx received a benefit to the detriment of Mrs. Lacks or her Estate; that benefit was not remote; Ultragenyx does not qualify as a bona fide purchaser for value; and no separate cognizable tort claim need be pleaded but, to the extent that underlying tortious conduct must be alleged, it plainly is here.

### A.    Ultragenyx Received a Benefit from Henrietta Lacks

First, Ultragenyx argues that it could not have been unjustly enriched by receiving money from a third party.  Mem. at 7-10.  Plaintiff's allegations, however, show that Ultragenyx received a benefit to the detriment of Mrs. Lack and her Estate.

Underlying Plaintiff's claim are allegations concerning Ultragenyx's receipt of the HeLa cell line.  Plaintiff plainly alleges that Ultragenyx "*appropriated* Mrs. Lacks's genetic material for [its] own pecuniary gain" and "knew its *possession*, cultivation, and sale of HeLa cells was, is, and will continue to be unjust."  ¶¶ 52, 60.  Plaintiff also alleges that Ultragenyx "never paid fair or sufficient consideration for its HeLa cells." ¶ 52.  At a minimum, Ultragenyx's receipt of the HeLa cell line is an eminently reasonable, if not compelling, inference to be drawn from the Complaint's allegations concerning Ultragenyx's employment of Mrs. Lacks's cells in order to be able to mass-produce its AAV vectors.  To commercialize the HeLa cell line for the expansion of its gene therapy product line, doubtlessly Ultragenyx had to *have come into possession of it*.

At any rate, even were the benefit not the receipt of the HeLa cell line itself, a benefit was nonetheless conferred on Ultragenyx in that its commercialization of the HeLa cell line represents the traceable fruits of the wrongful removal of Mrs. Lacks's tissue.  Under the *Restatement (Third) of Restitution and Unjust Enrichment* ("*Third Restatement*"), to which Maryland courts look for

10

guidance,[8] "[a] claimant entitled to restitution from property may obtain restitution from any traceable product of that property, without regard to subsequent changes of form." *Third Restatement* § 58(1).  As articulated by the American Law Institute:

> (1) [a] person who obtains a benefit by conscious interference with a claimant's legally protected interests (*or in consequence of such interference by another*) is liable in restitution as necessary to prevent unjust enrichment, unless competing legal objectives make such liability inappropriate.
>
> (2) For purposes of subsection (1), interference with legally protected interests *includes conduct that is tortious, or that violates another legal duty or prohibition* (other than a duty imposed by contract), *if the conduct constitutes an actionable wrong to the claimant*.

*Id.* § 44.

Indeed, several of the Illustrations of this rule in the *Third Restatement'*s commentary involve fact patterns where, in the absence of wrongful monetization, the plaintiff would not have a cause of action, but because of the defendant's wrongful monetization the plaintiff had a valid unjust enrichment claim.  For example, Illustration 11 involves a physician who takes a sample of a patient's blood for medically appropriate reasons, but subsequently sells that sample to researchers for a profit of $25,000.  The commentary makes clear that even though the decision to take and retain the sample was medically appropriate, the patient can recover the $25,000 obtained through the wrongful monetization of his blood.  Similarly, Illustration 10 involves a local pharmacy which legitimately possessed patients' prescription records but wrongfully sold them to a national pharmacy.  The commentary makes clear that patients can sue the local pharmacy for the wrongful monetization of their records, and the national pharmacy for any additional profits it derived from the unlawful monetization.

---

[8] *See, e.g.*, *Linton v. Consumer Prot. Div.*, 225 A.3d 456, 466 (Md. 2020); *Clark Off. Bldg., LLC v. MCM Cap. Partners, LLLP*, 245 A.3d 186, 197 (Md. Ct. Spec. App. 2021); *SMG Holdings I, LLC v. Arena Ventures, LLC*, No. 1778, Sept. Term, 2016, 2018 WL 1391613, at *7 (Md. Ct. Spec. App. Mar. 20, 2018) (unpublished).

Under the rule that Ultragenyx proposes—where wrongful monetization cannot be a standalone benefit for purposes of an unjust enrichment claim—the *Third Restatement* is wrong and both *Third Restatement* § 44 Illustrations[9] should come out in exactly the opposite way.[10] Section 53 of the *Third Restatement*, cited by Ultragenyx (Mem. at 9-10), is not to the contrary. That section concerns the *measure* of what a successful plaintiff should be awarded, not about whether a plaintiff should prevail on his unjust enrichment claim.

The very cornerstone of unjust enrichment is that a defendant should "be stripped of a wrongful gain," even where that gain exceeds the plaintiff's provable loss. *Linton*, 225 A.3d at 466; *see also id.* at 467 ("Restitution requires full disgorgement of profit by a conscious wrongdoer, not just because of the moral judgment implicit [in the *Third Restatement* § 3] but because any lesser liability would provide an inadequate incentive to lawful behavior."). As the Fourth Circuit, citing Maryland caselaw, has explained, "[u]nlike a statutory cause of action that provides a damages remedy based on *a plaintiff's loss*, the touchstone of unjust enrichment is *a defendant's gain*." *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 257 (4th Cir. 2020). Here, Ultragenyx has undeniably realized a *huge* gain from the wrong inflicted on Mrs. Lacks.[11]

---

[9] That wrongful monetization of stolen or misused property alone provides a basis for a restitution claim for unjust enrichment is further demonstrated by Illustrations 5 (profits earned from a trustee's pledge of trust assets to secure a loan used for his own business venture), and 6 ($300,000 finder's fee earned by estate's executrix for returning a stolen Stradivarius found among the decedent's effects) of *Third Restatement* § 43, which is discussed in Section I.B, below.

[10] Ultragenyx will likely argue in its reply that both Illustrations involve wrongful conduct by an unjust enrichment defendant, but that is irrelevant. Neither Maryland law nor the *Third Restatement* requires that the defendant itself have engaged in the wrongful conduct for unjust enrichment liability; it is enough that it profits from such wrongful conduct. *See* Section I.D, *infra*.

[11] *See Troy Brave, LLC v. Grantsville Truck & Trailer, LLC*, No. 1:22-cv-02409-JMC, 2023 WL 6244658, at *7 (D. Md. Sept. 26, 2023) ("A person who receives a benefit by reason of an infringement of another person's interest, or of loss suffered by the other, owes restitution to him in the manner.").

12

### B.    The Benefit Conferred on Ultragenyx Was Not Remote

Second, Ultragenyx contends that the benefit that it received was too indirect or remote from the underlying wrong to Mrs. Lacks to be cognizable.  *See* Mem. at 10-11.  That, too, fails.

Under the *Third Restatement*, "a defendant who is enriched by misconduct and who acts [] with knowledge of the underlying wrong to the claimant" is a conscious wrongdoer liable for its profits.  *Third Restatement* § 51(3).  But even "[a] defendant who is not a conscious wrongdoer … may nevertheless be responsible for receiving, retaining, or dealing with the benefits that are the subject of a restitution claim … when a significant cause of the defendant's unjust enrichment is the defendant's … negligence; … unreasonable failure, despite notice and opportunity, to avoid or rectify the unjust enrichment in question; or … bad faith or reprehensible conduct."  *Id.* § 52(1); *accord id.* § 53, cmt. d ("A defendant who (though not liable in tort) is unjustly enriched as a result of bad-faith conduct may be liable to disgorge profits (including consequential gains) to the same extent as a conscious wrongdoer.").

Indeed, the *Third Restatement* makes clear that unjust enrichment as a result of *another's* wrongful conduct *can* indeed be a basis for recovery, provided that the defendant profited from the wrongful conduct.  Section 43 of the *Third Restatement* prescribes that the underlying wrongful conduct to support an unjust enrichment claim need not have been committed *by* the defendant, so long as the defendant profited from it:

> A person who obtains a benefit: (a) in breach of a fiduciary duty, (b) in breach of an equivalent duty imposed by a relation of trust and confidence, or (c) *in consequence of another's breach of such a duty*, is liable in restitution to the person to whom the duty is owed.

*Third Restatement* § 43.  The commentary to this section reinforces this important point:  "Benefits derived from a fiduciary's breach of duty may therefore be recovered from third parties, not themselves under any special duty to the claimant, who acquire such benefits with notice of the

breach." *Id.*, cmt. g.

Consistent with the *Third Restatement*, the Complaint amply alleges that Ultragenyx realized a benefit from Mrs. Lacks. The HeLa cell line mass-produced by Ultragenyx and folded into its gene therapy lines consists of genetic material wrongfully taken from Mrs. Lacks without her valid consent or knowledge. ¶¶ 5-7, 43-46. This highly valuable cell line is a benefit to Ultragenyx which has commercialized it for its own handsome profit. ¶¶ 10-15. What is more, the Complaint alleges that Ultragenyx has known and appreciated the unethical and unlawful origins of the HeLa cell line, and that it nonetheless accepted and retained the benefits. ¶¶ 13, 30, 51, 53-61. In essence, Ultragenyx's conduct is nothing more than a perpetuation of the theft of Mrs. Lacks's tissue and the harms that this theft inflicted on Mrs. Lacks and her family. Furthermore, as discussed in Section I.D below, undertaking a surgical procedure without Mrs. Lacks's knowledge or consent for no medically necessary reason was both a breach of the physician-patient relationship and otherwise tortious conduct, supporting a claim under Sections 44 and 43, respectively, of the *Third Restatement*. By its own public admission, Ultragenyx has profited from this wrongful conduct. ¶¶ 10, 16, 43-51, 64-70. Thus, black-letter law squarely defeats Ultragenyx's insistence that the benefit that it derived from the shameful invasion of Mrs. Lacks' person was too remote for it to be called to account.

Importantly, Maryland law does not require that the plaintiff have conferred a benefit *directly* on the defendant. "[A] cause of action for unjust enrichment may lie against a transferee with whom the plaintiff had no contract, transaction, or dealing, either directly or indirectly." *Bank of Am. Corp. v. Gibbons*, 918 A.2d 565, 571 (Md. Ct. Spec. App. 2007) (rejecting requirement that

parties be in privity).[12]   Even Ultragenyx concedes—as it must—the existence of Maryland authority rejecting a directness element.  *See* Mem. at 10 n.19 (citing *Plitt*).

Ultragenyx's reliance on four decisions from this District (Mem. at 8-9) is misplaced.  Not only do three of the cases predate the *Third Restatement*, but all four are factually wide of the mark because in none of them was *any* benefit received—even indirectly—from the opposing party.

In *Mehul's Investment Corp. v. ABC Advisors, Inc.*, 130 F. Supp. 2d 700 (D. Md. 2001), the plaintiff printing company complained that the defendant printing services broker was selling to rival printers Government Printing Office bid services that should rightfully have been steered to the plaintiff under a contract with the defendant's predecessor.  *Id.* at 703-04.  Judge Chasanow logically rejected the plaintiff's contention that it should receive the proceeds earned by the defendant from sales steered to the plaintiff's competitors, noting that the plaintiff did not even allege that it had conferred any benefit on the defendant.  *Id.* at 709.  In *Haley v. Corcoran*, 659 F. Supp. 2d 714, 726–27 (D. Md. 2009), Judge Quarles dismissed an unjust enrichment claim against a title insurer of an allegedly fraudulent foreclosure rescue sale because the plaintiffs did not allege they had paid or been responsible for the title policy premium that the insurer received.

The plaintiff security equipment franchisee in *Sensormatic Security Corp. v. Sensormatic Electronics Corporation*, 249 F. Supp. 2d 703 (D. Md. 2003), claimed entitlement to commissions earned by ADT, a wholly owned subsidiary of the company that had acquired the plaintiff's

---

[12] *Accord Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 353 (Md. 2007) ("[W]e have not required always that a benefit conferred in an unjust enrichment action come necessarily and directly to the defendant from the plaintiff[']s own resources."); *Plitt v. Greenberg*, 219 A.2d 237, 241 (Md. 1966) ("It is immaterial how the money may have come into the defendant's hands, and the fact that it was received from a third person will not affect his liability, if, in equity and good conscience, he is not entitled to hold it against the true owner."); *In re Kingsville Motors, Inc.*, No. 04-33755-DK, 2008 WL 686724, at *6 (Bankr. D. Md. Mar. 12, 2008) (analyzing Maryland law and concluding that unjust enrichment claims do not require "direct dealings between parties").

franchisor as a separate wholly owned subsidiary, alleging that ADT had wrongfully earned those commissions from sales and leases of security equipment within the plaintiff's exclusive franchise territory. *Id.* at 704-06. Similar to the reasoning in *Haley*, Judge Chasanow rejected the plaintiff's unjust enrichment claim for the straightforward reason that ADT's commissions did not derive from any benefit conferred by the plaintiff. *Id.* at 709. Finally, in *Canales v. Alicia Rest. Inc.*, No. JKS 14-3780, 2015 WL 4111608 (D. Md. July 7, 2015), the plaintiff sued his employers for unpaid wages and overtime and to recover nearly $11,000 that he had advanced them for restaurant goods and services. *Id.* at *1. The defendants counterclaimed, alleging that the plaintiff had entered into an "economic arrangement" with the restaurant's manager whereby the plaintiff would advance money to the manager in return for a share of the restaurant's profits. *Id.* They asserted that the plaintiff had been unjustly enriched by his share of the profits the manager wrongly diverted. *Id.* Magistrate Judge Schulze rejected the defendants' claim because it was the third-party manager, not they, who had conferred any benefit that the plaintiff received. *Id.* at *1-2.

Ultragenyx's reliance on cases involving third-party payor claims in the healthcare context (Mem. at 10) fares no better. In *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 917 (3d Cir. 1999), union health and welfare funds claimed that the defendant tobacco companies' and organizations' actions had prevented the reduction of smoking-related illness among the plaintiffs' participants. Health insurance subscribers alleged in *Perry v. The American Tobacco Co.*, 324 F.3d 845, 847-48 (6th Cir. 2003), that they had paid higher premiums because the insurance pool included smokers, whose smoking-related ailments were caused by the tobacco defendants' conduct. The state employee health plan in *Pennsylvania Employees Benefit Trust Fund v. Astrazeneca Pharmaceuticals LP*, No. 6:09-cv-5003-Orl-22DAB, 2009 WL 2231686, at *1 (M.D. Fla. July 20, 2009), asserted that the defendant pharmaceutical maker had,

through fraudulent marketing of its anti-psychotic drug (including promotion of unapproved uses), fueled millions of dollars' worth of unnecessary prescriptions for it, which the plan paid. Third-party payors in *In re Guidant Corp. Implantable Defibrillators Products Liability Litigation*, 484 F. Supp. 2d 973, 981-85 (D. Minn. 2007), alleged that the medical device maker had been unjustly enriched by their having paid for its defective devices implanted in their insureds.

These cases are far afield. Healthcare sector third-party payors wind up paying indirectly for virtually all misconduct that makes their insureds ill or which results in their insureds receiving unnecessary or defective drugs or medical devices. Third-party payors' (or their participants') unjust enrichment claims against industries engaged in the underlying misconduct thus raise important public policy questions about apportionment of culpability and healthcare system finance that are starkly dissimilar to the issues here. That aside, these healthcare-related cases involved attenuated causal relationships between the defendant's misconduct and the plaintiff's alleged financial costs. In contrast, Plaintiff's unjust enrichment claim neither involves a highly attenuated causal connection nor implicates knotty public policy questions. Plaintiff is not a distant party claiming that Ultragenyx's misdeeds ultimately inured to the financial detriment of Mrs. Lacks or her Estate. Rather, at the heart of his claim are allegations that Ultragenyx was *consciously aware* of the wrongful taking of Henrietta Lacks' bodily tissue—the source of the HeLa cell line that it obtained—but nonetheless chose to profit from the ignoble removal of her living tissue. *See* ¶¶ 1, 11-16, 27 51-54, 57-61, 65-71.

Finally, three cases involving parties quite removed from each other along the supply chain (Mem. at 11) likewise do not advance Ultragenyx's position. In *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 679-80, 684 (9th Cir. 2009), the plaintiffs were employees of Wal-Mart's foreign suppliers, asserting that it had benefitted at their expense by profiting from relationships with

suppliers that Wal-Mart knew to be engaged in substandard labor practices.  The Ninth Circuit saw no plausible basis "upon which the employee of a manufacturer, without more, may obtain restitution from one who purchases goods from that manufacturer." *Id.* at 685.  *Sperry v. Crompton Corporation*, 863 N.E.2d 1012, 1018 (N.Y. 2007), involved price-fixing allegations, and the court there concluded that the connection between a tire purchaser and producers of chemicals used in the rubber-making process was "simply too attenuated" to support an unjust enrichment claim.  In *Bertovich v. Advanced Brands & Importing, Co.*, No. 5:05CV74, 2006 WL 2382273 (N.D. W.Va. Aug. 17, 2006), the plaintiffs alleged economic injuries from expenditure of "family assets" on alcohol that their children had illegally purchased as underage drinkers, and invasion of their parental rights to protect their children from the defendants' marketing of alcoholic beverages.  *Id.* at *3.  The court noted that there was no allegation that directly linked the defendants' conduct to the plaintiffs' purely derivative injuries.  *Id.* at *9.  Unlike here, in all three cases, other legal theories failed because of limitations on the scope of the defendant's liability and unjust enrichment was resorted to as a workaround, and all involved attenuated causal relationships.

### C.    Ultragenyx Was Not a Bona Fide Purchaser for Value

Third, Ultragenyx also contends that Plaintiff pleads no facts showing that it was not a bona fide purchaser of the HeLa Cell line.  Mem. at 12-13.  Assuming that Maryland courts would even extend the bona fide purchaser doctrine to these extraordinary facts, Ultragenyx is not a bona fide purchaser because it had both notice and knowledge that its acquisition of HeLa cells was wrongful.  One cannot be a bona fide purchaser if he had notice or knowledge that his acquisition is wrongful.  *Mirjafari v. Cohn*, 988 A.2d 997, 1003 (Md. 2010); *Washington Mut. Bank v. Homan*, 974 A.2d 376, 390 (Md. 2009).  Plaintiff has plausibly alleged both notice and knowledge.

**Notice.** The Complaint alleges that Ultragenyx's commercial endeavors with HeLa cells began after widespread publicity regarding the origin of the HeLa cell line. ¶ 61 ("These lucrative commercial endeavors were pursued despite the widespread publicity surrounding the origins of the HeLa cell line.").[13]  It explains that "the origins of the HeLa cell line have become widely known in the scientific community," and substantiates that by noting that "more than 2,700 academic articles" have been published that discuss the origins of the HeLa cell line. ¶ 50.  Even in the absence of knowledge, that suffices to defeat bona fide purchaser status.

**Knowledge.**  The Complaint plainly alleges that Ultragenyx had knowledge of the origin of the HeLa cell line prior to its receipt of HeLa cells:  "Ultragenyx has been aware of the unjust and unethical HeLa cell line origin since the development of its manufacturing platform." ¶ 51.[14] That allegation is plausible based on the widespread publicity of the origins of the HeLa cell line alone. But the Complaint goes further and alleges smoking-gun evidence of knowledge: that Ultragenyx admitted that it knew of the origin of the HeLa cell line in promotional materials for its HeLa PLC platform published online. ¶ 51.[15]  That defeats bona fide purchaser status.

Although the Court's analysis can end here, Ultragenyx's bona fide purchaser argument fails for two further reasons.  *First*, Ultragenyx's argument ignores the distinction between

---

[13] This allegation was not present in Plaintiff's complaint against Thermo Fisher Scientific ("TFS").  There, Plaintiff argued that it did not matter whether TFS's acquisition of HeLa cells occurred before or after the public revelation of the HeLa cell line's origins because, even prior to that point, the scientific community understood enough about Johns Hopkins' practices to have notice that a cell line originating from it was suspect.  This case presents distinct issues.

[14] This allegation was also not present in Plaintiff's complaint against TFS.

[15] Ultragenyx dismisses this public admission because the Complaint does not specify that it was posted before it bought the HeLa cells.  Mem. at 13.  Even had Ultragenyx already purchased them, the allegation is still more (indeed, far more) than enough to "nudge[] [Plaintiff's] claims across the line from conceivable to plausible[.]"  *Nemet Chevrolet*, 591 F.3d at 256.

voidable and void title. *Second*, no authority suggests that Maryland courts would apply the bona fide purchaser doctrine to the non-consensual sale of a human being's living tissue.

**Voidable and Void Title.** "[T]he distinction between a void deed and a voidable deed is key in determining which protections, if any, are due to a bona fide purchaser[.]" *Fishman v. Murphy ex rel. Est. of Urb.*, 72 A.3d 185, 192 (Md. 2013). "A person otherwise qualifying as a bona fide purchaser under the recording act receives no protection under a void deed." *Id.* This distinction follows from the fact that the bona fide purchaser rule simply says that the purchaser receives "the legal interest that the grantor holds and purports to convey, free of equitable interests that a restitution claimant might have asserted against the property in the hands of the grantor." *Third Restatement* § 66. Put another way, the rule says that a bona fide purchaser's valid legal interest trumps a valid equitable interest—meaning that someone with void title (and thus no valid legal interest) cannot benefit from it. The *Third Restatement* demonstrates this point through two Illustrations—both involving void transfers—where unjust enrichment defendants who would otherwise be able to claim bona fide purchaser status were not protected precisely because they had no valid legal title. *Third Restatement* § 66, cmt. e, Illustrations 5 & 6.

Here, Ultragenyx has void title over HeLa cells. "The general rule, even as to sales and pledges of personal property, is that no one can transfer to another a better title than he has himself[.]" *William J. Lemp Brewing Co. v. Mantz*, 87 A. 814, 816 (Md. 1913). Put another way, "a possessor of stolen goods, no matter how innocently acquired, can never convey good title." *Inmi-Etti v. Aluisi*, 492 A.2d 917, 923 (Md. Ct. Spec. App. 1985). "If the goods are stolen, only void title is obtained, and the thief cannot pass along good title to a good faith purchaser." *Great Am. Ins. Co. v. Nextday Network Hardware Corp.*, 73 F. Supp. 3d 636, 641 (D. Md. 2014).

The Complaint plausibly alleges that Mrs. Lacks's cells were taken without her consent or knowledge by Johns Hopkins physicians using an unethical and unlawful biopsy. Ultragenyx cannot have obtained good title over these cells because no one in the chain of sale between Johns Hopkins and Ultragenyx has ever had good title. The consequence of this is that the bona fide purchaser rule offers Ultragenyx no protection.

**Human Dignity**. Beyond its many technical failings, Ultragenyx's bona fide purchaser argument is premised on a massive and indefensible leap: that Maryland courts would apply the bona fide purchaser rule to a claim involving the living tissue of a human being, taken without her consent as part of a racially discriminatory abuse of medical trust. The fundamental premise of Ultragenyx's contention is that Maryland courts would view Mrs. Lacks's living tissue like Ultragenyx views it: as mere chattel, free to be bought and sold for profit as property.

No Maryland precedent supports that view. Rather, the best evidence of how the Maryland Supreme Court would approach this problem is *Grimes v. Kennedy Krieger Institute, Inc.*, 782 A.2d 807 (Md. 2001), another case that presented a clash between the protection of human dignity and the needs of scientific researchers. *See also Dep't of Health & Mental Hygiene v. Kelly*, 918 A.2d 470, 481 (Md. 2007) (discussing how informed consent requirements "embody an individual's liberty interest in bodily integrity"). The court opened its decision by placing the dispute in historical context—noting the victims of improper scientific conduct, from Tuskegee to more modern abuses, were generally vulnerable people—people of color, or people seeking care in charity hospitals. *Grimes*, 782 A.2d at 817. It then repeatedly rejected the idea that the "greater good" could operate as a justification for harming vulnerable people and forcefully affirmed that

the principles of the Nuremberg Code[16] are part of Maryland law. *Id.* at 817-53. "To think otherwise, to turn over human and legal ethical concerns solely to the scientific community, is to risk embarking on slippery slopes, that all too often in the past, here and elsewhere, have resulted in practices we, or any community, should be ever unwilling to accept." *Id.* at 853. Similarly, the Maryland judiciary's deep and longstanding commitment to racial equality and to correcting past racial injustice weigh strongly against the application of the bona fide purchaser rule to these facts.[17] This Court should not stretch the bona fide purchaser doctrine in the unprecedented and unconscionable way that Ultragenyx insists.

### D.     Plaintiff Sufficiently Alleges Unjust Enrichment Based on Tortious Conduct

Finally, Ultragenyx maintains that Plaintiff's unjust enrichment claim fails because no actionable underlying tort is pleaded. Mem. at 14-15. That contention is unavailing for two independent reasons.

*First*, no underlying tort needs to be pleaded. Under Maryland law, unjust enrichment is a claim "that may not be reduced neatly to a golden rule"—it is a flexible doctrine that frequently depends on fact-specific inquiries. *Hill,* 936 A.2d at 351.[18] Restitution based on a defendant's

---

[16] Formulated in 1947—several years before the wrongful conduct by Johns Hopkins physicians—the Nuremberg Code is "the most important document in the history of the ethics of medical research." Evelyne Schuster, *Fifty Years Later: The Significance of the Nuremberg Cod*e, 337 New Eng. J. Med. 1436, 1436 (1997).

[17] *See Ryder v. Ryder*, No. 1726, Sept. Term, 2019, 2020 WL 3618918, at *6 (Md. Ct. Spec. App. July 2, 2020) (unpublished) ("Our duty and fealty to the constitutions of our state and country command that we strive toward equality. Let us, in reaffirming our commitment to equal justice under law for all, make it know that, in Maryland, the lives of people of color do matter.").

[18] *Accord Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 114 A.3d 676, 690 (Md. 2015) ("[U]njust enrichment is both elemental and elusive."); *Amaya v. DGS Constr., LLC*, No. 22-1189, 2023 WL 3034326, at *6 (4th Cir. Apr. 21, 2023) (unpublished) (unjust enrichment element of "whether it would be inequitable for defendants to retain the benefit conferred without payment—necessitates a fact-specific balancing of the equities").

unjust enrichment is an independent cause of action that does not depend on any other violation of the law.[19]  The central purpose of restitution is to undo a defendant's unjust enrichment:  "A person who is unjustly enriched at the expense of another is subject to liability in restitution."  *Third Restatement* § 1.  The Maryland Court of Appeals explained in *Hill* that "the basis for recovery in unjust enrichment is *not* based on fault," 936 A.2d at 352, and just recently the Fourth Circuit reaffirmed that "[t]hough any misconduct or fault by one of the parties may be *considered* under this element, a finding of fault is *unnecessary* to find a defendant unjustly enriched."  *Amaya*, 2023 WL 3034326, at *6.  Not surprisingly, then, "both the Maryland Court of Special Appeals and the United States District Court for the District of Maryland have permitted cases to go forward with a sole claim for unjust enrichment remaining."  *Monterey Mushrooms, Inc. v. HealthCare Strategies, Inc.*, No. CCB-20-3061, 2021 WL 1909592, at *3 (D. Md. May 12, 2021) (citing cases).

Requiring that an independent tort count be pled would thus contravene precedent establishing that fault is not an unjust enrichment prerequisite and would render such claims purely derivative, if not superfluous.  What is more, it would immunize those who, like Ultragenyx, knowingly benefit from misconduct committed against the plaintiff by an original wrongdoer who, for whatever reason, can no longer be held to account.

Here, Plaintiff sufficiently alleges that Ultragenyx has unjustly benefitted from commercializing Mrs. Lacks's bodily tissue for its own profit and unjustly retained those benefits without the consent of or compensation to Mrs. Lacks's Estate.  Thus, Plaintiff may obtain

---

[19]  *See Clark Office Building, LLC v. MCM Capital Partners, LLLP*, 245 A.3d 186, 190-91 (Md. Ct. Spec. App. 2021) (discussing development of unjust enrichment "as an *independent* basis of liability in the common law"); Doug Rendleman and Caprice Roberts, *Remedies: Cases and Materials* 517 (9th ed. 2018) ("A defendant's civil liability to a plaintiff for restitution based on the defendant's unjust enrichment is a substantive branch of the common law like property, contract, and tort.  The plaintiff may seek restitution *as a freestanding remedy based on the defendant's unjust enrichment alone*.").

disgorgement of Ultragenyx's ill-gotten gains without alleging any underlying tortious conduct by Ultragenyx or anyone else. The cases that Ultragenyx cites stand for a far narrower proposition: When a plaintiff alleges that a defendant was unjustly enriched *because of* an alleged underlying tort (rather than independent conduct), but the court determines that the conduct alleged was *not*, in fact, tortious, then the defendant cannot have been unjustly enriched. *See Monterey Mushrooms,* 2021 WL 1909592, at *3 (explaining this distinction) (citing cases).[20]

*Second*, to the extent that some cases require that tortious conduct be pled,[21] the Complaint does so. It unequivocally alleges gravely unethical and wrongful conduct by Johns Hopkins' physicians—both tortious conduct and breach of a confidential relationship. ¶¶ 3-5, 33-36, 40-43. The very genetic material that Ultragenyx now sells for profit was the product of a medically unnecessary surgical procedure by Mrs. Lacks's physicians without her knowledge or consent. ¶¶ 5, 41-43. Maryland courts have long recognized that physicians must obtain a patient's consent before they are legally entitled to perform medical procedures.[22]

---

[20] Ultragenyx suggests that certain cases are unpersuasive because the defendant there did not move to dismiss on the basis of no separate tort having been pleaded. Mem. at 15 n.23. Putting to one side the dubiousness of that distinction, Judge Blake's decision in *Monterey Mushrooms* was rendered on the defendant's motion to dismiss. *See* 2021 WL 1909592, at *1.

[21] Ultragenyx cites *Texas Star Nut & Food Co. v. Truist Bank*, 632 F. Supp. 3d 664 (D. Md. 2022) (Mem. at 14), but there, Judge Hazel held that an unjust enrichment claim should be dismissed if the plaintiff "has not stated a claim for *tortious conduct*.'" *Id.* at 671 (quoting *Washington Cnty. Bd. of Educ. v. Mallinckrodt ARD, Inc.*, 431 F. Supp. 3d 698, 718 (D. Md. 2020) (in turn citing cases)). Neither he nor the *Washington County* decision that he relied upon held that a separate tort *count* must be lodged. In any event, *Monterey Mushrooms*, *Hill*, *Clark Office Building*, and *Amaya* disprove generalizations in such cases as *Temescal Wellness of Maryland, LLC v. Faces Human Capital, LLC*, No. GLR-20-3648, 2021 WL 4521343 (D. Md. Oct. 4, 2021), that dismissal of standalone unjust enrichment claims is a "matter of practice." *Id.* at *8.

[22] *See, e.g.*, *Sard v. Hardy*, 379 A.2d 1014, 1019 (Md. 1977) ("The fountainhead of the doctrine of informed consent is the patient's right to exercise control over [her] own body, at least when undergoing elective surgery, by deciding for [her]self whether or not to submit to the particular

24

Such conduct by Mrs. Lacks's physicians also breached a confidential relationship. The doctor-patient relationship is confidential because it is "one in which 'two persons stand in such a relation to each other that one must necessarily repose trust and confidence in the good faith and integrity of the other.'"[23] The Johns Hopkins physicians' removal of their patient's tissue without her knowledge or consent and purely for their personal gain (¶¶ 3-5, 33-36,40-46) was a gross breach of that relationship. Alternatively, the Complaint's allegations make out the elements of the simple common law tort of battery. Johns Hopkins physicians' excision of tissue from Mrs. Lacks without her knowledge or permission represented non-consensual bodily trauma.[24]

Because the Complaint pleads tortious conduct as the underpinnings of Plaintiff's unjust enrichment claim, Ultragenyx's fallback suggestion in a footnote that a purported intra-District split warrants certification of a question to the Maryland Supreme Court (Mem. at 15 n.23) would be a pointless exercise that would frustrate principles of judicial efficiency and economy.

## II.    PLAINTIFF TIMELY COMMENCED THIS ACTION

Equally without merit is Ultragenyx's contention that, even if an unjust enrichment claim is properly pleaded, this action is time-barred. *See* Mem. at 15-21. It fails for multiple reasons.

---

therapy."); *id.* at 1021 (characterizing "protection of the patient's fundamental right of physical self-determination" as "the very cornerstone of the informed consent doctrine").

[23] *UBS Fin. Servs., Inc. v. Thompson*, 94 A.3d 176, 186 (Md. Ct. Spec. App. 2014) (quoting *Upman v. Clarke*, 753 A.2d 4, 9 (Md. 2000), *aff'd*, 115 A.3d 125 (Md. 2015)); *accord Sard*, 379 A.2d at 1019-20 (noting that some courts "have bottomed the physician's duty to disclose on the fiducial quality of the physician-patient relationship") (citing cases).

[24] *See Doe v. Archdiocese of Washington*, 689 A.2d 634, 640 (Md. Ct. Spec. App. 1997) ("A battery is the intentional, unpermitted touching of the body of another that is harmful or offensive to the person who was touched. The gist of the action is ... absence of consent to the contact on the plaintiff's part."); *Williamson v. Prince George's Cnty.*, No. DKC 10-1100, 2011 WL 280961, at *5 (D. Md. Jan. 26, 2011) ("'The elements of the tort of battery consist of the unpermitted application of trauma by one person upon the body of another person.'") (quoting *Johnson v. Valu Food, Inc.*, 751 A.2d 19, 21 (Md. Ct. Spec. App. 2000)).

A.    **Ultragenyx is Barred from Raising a Statute of Limitations Defense**

As a threshold matter, Ultragenyx is prohibited by statute from even raising a statute of limitations defense because it has not registered as a foreign business with the Maryland Secretary of State's office. Under Maryland law, "[a] foreign corporation or foreign limited partnership required by law to qualify or register to do business in the State ... may not benefit from any statute of limitations in an action at law or suit in equity: ... (2) [i]nstituted while the foreign corporation or foreign limited partnership is doing intrastate or interstate or foreign business in the State without having qualified or registered." Md. Code, Cts. & Jud. Proc. § 5-204. The registration requirements for a foreign business are hardly onerous, consisting primarily of filing a form with the Maryland Secretary of State's office and designating a registered agent for service of process. *See* Md. Code Ann., Corps. & Ass'ns § 7-205.[25]

Courts have construed the registration requirement strictly. For example, a company that "neither owned nor leased any property, real or personal, maintained no bank accounts, had no employees, and did not receive rental income from property in Maryland" was deemed to have violated the registration requirement, allowing dismissal of its suit under a provision similar to § 5-204,[26] because 2% of the company's annual revenue came from Maryland transactions, and it

---

[25] "A foreign corporation is doing business in Maryland [and is thus required to register] when it transacts some substantial part of its ordinary business therein." *Willow Grove Citizens Ass'n v. Cnty. Council of Prince George's Cnty.*, 175 A.3d 852, 858 (Md. Ct. Spec. App. 2017). "This inquiry takes into consideration the following factors: (1) whether the foreign corporation pays state taxes; (2) whether it maintains property, an office, telephone listings, employees, agents, inventory, research and development facilities, advertising and bank accounts in the state; (3) whether it makes contracts in the state; and (4) whether its management functions in the state are pervasive." *Id.* "The resolution of 'doing business' is on an ad hoc basis." *Tiller Constr. Corp. v. Nadler*, 637 A.2d 1183, 1187 (Md. 1994).

[26] Md. Code Ann., Corps. & Assn's § 7-301 prohibits unregistered businesses from bringing suit until in compliance with state registration requirements.

took a variety of minor steps—such as paying sales tax, having sales representatives respond to customer questions, and delivering materials to customers on properly registered trucks—to facilitate those transactions. *J.C. Snavely & Sons, Inc. v. Wheeler*, 538 A.2d 324, 328 (Md. Ct. Spec. App. 1988).  A few years later, the Maryland Court of Appeals approved *Snavely*'s reasoning and holding.  *Tiller*, 637 A.2d at 1188 ("*Snavely* accurately reflects what its ancestors in this Court and in the Court of Special Appeals have expressed and applied.").

Although it was required to, Ultragenyx has not registered as a foreign business with the Maryland Secretary of State's office.[27]  Ultragenyx has Maryland employees, including marketing personnel, who are based out of Maryland and who market the company's products to Maryland physicians.  ¶ 29.  It has sponsored marketing events in Maryland hospitals.  ¶ 26.  "Ultragenyx recruits patients and conducts clinical trials at the National Institutes of Health Clinical Center in Bethesda, Maryland."  ¶ 26.  "Ultragenyx conducts extensive research at John Hopkins Hospital, in Baltimore Maryland."  ¶ 28.  "Since 2018, Ultragenyx has paid doctors at John Hopkins over $1.1 million in consulting and research funding." *Id.*  "Ultragenyx also pays other doctors located in Maryland for various research." *Id.*  Also, Ultragenyx has entered into a complex array of contracts with Maryland biopharmaceutical companies.  ¶¶ 26-27.  That more than suffices to make it plausible that Ultragenyx was required to register—indeed, the contacts identified in the Complaint alone exceed those of the company in *Snavely*.  Ultragenyx did not do so by the date

---

[27] As the party seeking dismissal of the Complaint on the basis of an affirmative defense, Ultragenyx was obliged to demonstrate its compliance with the registration requirement as of the date of the filing of the Complaint, which it has not done (and cannot do because it was not in compliance).  *See* Section II.B.1, *infra* (citing cases holding that the burden rests with the movant invoking a statute of limitations defense); *but see J.C. Snavely & Sons*, 538 A.2d at 327 ("The burden of proving that the foreign corporation is doing business in the state rests with the proponent of that proposition.").  If the Court disagrees, Plaintiff respectfully requests leave to amend to include an allegation that Ultragenyx is not in compliance with the registration statute.

that this action was commenced:  August 10, 2023.  As a result, section 5-204 bars it from raising a statute of limitations defense.

### B.  Even if Not Precluded, Ultragenyx's Statute of Limitations Defense Is Unavailing

Putting aside that it is barred, there are at least three bases for rejecting Ultragenyx's statute of limitations defense.  *First*, it is an affirmative defense that is unsuitable for consideration on this Rule 12(b)(6) motion.  *Second*, it inappropriately rests on extrinsic documents.  *Third*, it fails given the separate accrual and continuing violation doctrines.

### 1.  The Statute of Limitations Is an Affirmative Defense, on Which Ultragenyx Has the Burden of Proof, and It Is Unsuitable for Resolution on This Rule 12(b)(6) Motion

To begin, because the statute of limitations argument that Ultragenyx raises is an affirmative defense, the burden rests with Ultragenyx to prove that Plaintiff's claim is time-barred. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (moving party has burden to establish affirmative defense of statute of limitations) (citing cases); *McPherson v. Baltimore Police Dep't*, 494 F. Supp. 3d 269, 284 (D. Md. 2020).  Ordinarily, that defense "is not considered in the context of a motion to dismiss."  *ARCO Nat'l Constr., LLC v. MCM Mgmt. Corp.*, No. ELH-20-3783, 2021 WL 4148456, at *13 (D. Md. Sept. 10, 2021) (citing cases); *accord Goodman*, 494 F.3d at 464.  A court may reach it only "if all facts necessary to the affirmative defense clearly appear[] *on the face of the complaint*."  *Goodman*, 494 F.3d at 464 (brackets and emphasis added by court); *accord McPherson*, 494 F. Supp. 3d at 284.  As discussed below, all of the facts necessary to Ultragenyx's statute of limitations defense do not appear on the face of the Complaint.

"[A] cause of action does not accrue until all of its elements are present[.]"  *Catler v. Arent Fox, LLP*, 71 A.3d 155, 171 (Md. Ct. Spec. App. 2013).  This means that the statute of limitations clock for an unjust enrichment claim cannot start running *until the defendant is enriched*, even if

the unjust conduct that led to the defendant's enrichment occurred before the statute of limitations period and the plaintiff had notice of the same. *Jason v. Nat'l Loan Recoveries, LLC*, 134 A.3d 421, 430 (Md. Ct. Spec. App. 2016). The discovery rule—which delays the running of the statute of limitations until a plaintiff has notice of a potential claim—does not shorten the statute of limitations, but only extends it. *Singer Co., Link Simulation Sys. Div. v. Baltimore Gas & Elec. Co.*, 558 A.2d 419, 425 (Md. Ct. Spec. App. 1989).

Ultragenyx concedes that "[t]he Complaint includes no information as to when Ultragenyx acquired access to HeLa-related materials" and implicitly concedes that it does not identify the dates on which it has been enriched by those materials. Mem. at 15. Moreover, the Complaint is devoid of allegations concerning when Plaintiff learned or reasonably should have learned that Ultragenyx, *specifically,* was enriched. Absent judicial notice of the truth of the extrajudicial documents' contents (which, for the reasons discussed in Section II.B.2 below, is improper here) and the drawing of inferences in Ultragenyx's favor (which is also improper here), this concession is fatal to its statute of limitations argument. Plaintiff is entitled to discovery and a complete record before the Court resolves Ultragenyx's affirmative defense on the merits.

### 2.    Ultragenyx's Reliance on Public Records Is Misplaced

Another flaw in Ultragenyx's bid for dismissal on timeliness grounds is that Ultragenyx relies on extrinsic materials that it maintains are subject to judicial notice as public records. *See* Mem. at 16-18. That is unavailing. Judicial notice is proper only when an adjudicative fact is not subject to reasonable dispute and as long as the noticed facts are construed in the light most favorable to the plaintiff. *Zak v. Chelsea Therapeutics Int'l, Ltd.,* 780 F.3d 597, 607 (4th Cir. 2015). The determination of whether a fact is properly considered depends on the manner in which the proponent seeks to use the information. *Id.* at 607-08, 611 (vacating and remanding where district court failed to construe facts from SEC documents in light most favorable to plaintiff).

Courts "frequently decline to take judicial notice of filings which are incomplete or truncated." *City of Miami Gen. Employees' & Sanitation Employees' Ret. Trust v. RH, Inc*., 302 F. Supp. 3d 1028, 1034 n.1 (N.D. Cal. 2018). That is because where an incomplete record or filing is sought to be judicially noticed, the adjudicative facts are subject to a reasonable dispute. *See*, *e.g.*, *Garcoa, Inc. v. Sierra Sage Herbs LLC*, No. 21-4672 PSG (SPX), 2022 WL 16548874, at *2 (C.D. Cal. Oct. 4, 2022) (declining to take judicial notice of online publication from NIH's library because exhibit "appear[ed] incomplete and [wa]s thus subject to reasonable dispute").

This is especially true here, where Ultragenyx asks the Court to take judicial notice of piecemeal public records. Ultragenyx points to a variety of patents to show that it had access to Mrs. Lacks's genetic material more than three years before the commencement of this action. But that ignores the fact that Ultragenyx is *currently* commercializing Mrs. Lacks's genetic material. Indeed, Ultragenyx fails to reference a March 2023 patent application for systems and methods for AAV manufacturing or a May 2023 patent for engineered cell lines for increased production of recombinant AAV—both employing Mrs. Lacks's genetic material.[28]

Moreover, where Maryland courts take judicial notice of a public record, they do so "*not for the truth of its contents, but for the fact that the record exists*." *Anglemyer v. WCS Constr., LLC*, No. 8:18-CV-02198-PWG, 2019 WL 3458951, at *5 (D. Md. July 31, 2019). Nor do they draw inferences from a judicially noticed document, especially where those inferences are hostile to the opposing party. *See Paragon Sys., Inc. v. Hughes*, No. SAG-20-1209, 2020 WL 6292728, at *2 (D. Md. Oct. 27, 2020).

---

[28] Worldwide Patent App. WO 2023/172491 A1 (Mar. 6, 2023) ("[T]he host cell can be a cell (or a cell line) appropriate for production of AAV (e.g., rAAV), for example, a HeLa cell."); Worldwide Patent No. WO 2023/077078 A1 (May 5, 2023) ("To assess the effect of siRNA-mediated knockdown of additional innate immune genes and/or combinations of innate immune genes on rAAV production from producer cell lines (PCLs) (e.g., HeLa PCLs).").

Contrary to Ultragenyx's contention, the only way that the "simple presence of words showing access to HeLa" (Mem. at 18) in the documents that Ultragenyx references would be relevant to this case is if those words are true.  Reading an assertion and drawing an inference that the matter asserted occurred when Ultragenyx says it did inherently requires a court to accept that assertion as true.  That is impermissible under the rules governing judicial notice of public records.  In short, judicial notice is inappropriate here.

### 3.    The Separate Accrual and Continuing Violations Doctrines Allow Ultragenyx to be Held Accountable for Its Present and Future Conduct

Setting aside the foregoing, Ultragenyx's limitations argument fails on account of the separate accrual and continuing violation doctrines.  A defendant who breaks the law and gets away with it because the statute of limitations runs on its initial lawbreaking does not secure a free pass to break the law in the same way in the future.  Two doctrines mandate this result.  The first is the separate accrual rule, which applies where the lawbreaking takes the form of many discrete acts.  The second is the continuing violations doctrine, which applies where the lawbreaking takes the form of an ongoing, continuous violation.  These intertwined doctrines ensure that past lawbreaking cannot insulate future lawbreaking.  Both doctrines are settled law in Maryland, and both can apply to unjust enrichment claims.  Either doctrine fairly describes the fact pattern before the Court:  Ultragenyx's continued, repeated, and conscious choice to profit from the living tissue of Henrietta Lacks.

Under the separate accrual rule, "when a defendant commits successive violations, the statute of limitations runs separately from each violation."  *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671 (2014); *accord Blake v. JP Morgan Chase Bank NA*, 927 F.3d 701, 706 (3d Cir. 2019) (discussing separate-accrual rule); *see also Coakley & Williams, Inc. v. Shatterproof Glass Corp.*, 706 F.2d 456, 463 (4th Cir. 1983) (permitting otherwise time-barred contract claim

to go forward by applying Maryland's separate accrual rule).  The continuing violation doctrine prevents statutes of limitations from commencing where the wrong is ongoing and has never ceased.  *See generally Litz v. Maryland Dep't of Env't*, 76 A.3d 1076, 1089 (Md. 2013).  "[E]very repetition of the wrong creates further liability and creates a new cause of action, and a new statute of limitations begins to run after each wrong perpetuated."  *Id.*

These two doctrines work in tandem to prevent future lawbreaking, regardless of form. The "separate-accrual approach to computing the limitations period is appropriate where the law forbids a discrete act, as most do."  *Phreesia, Inc. v. Certify Glob., Inc.*, No. DLB-21-678, 2022 WL 911207, at *9 (D. Md. Mar. 29, 2022) (citing cases).  "But if [the law] forbids diffuse conduct, comprising many acts at different times, then the continuing-violation doctrine applies."  *Blake*, 927 F.3d at 706.  Together, these two doctrines ensure, no matter what form current or future lawbreaking takes, that statutes of limitations do not act to shield ongoing wrongful conduct.[29]

Maryland has adopted both the separate accrual rule and the continuing violations doctrine. *E.g.*, *Litz,* 76 A.3d at 1089; *Coakley*, 706 F.2d at 463; *CASA de Maryland, Inc. v. Arbor Realty Tr., Inc.*, No. DKC 21-1778, 2022 WL 4080320, at *21-22 (D. Md. Sept. 6, 2022).  Applying either doctrine, Maryland federal and state courts have consistently held that claims involving an ongoing

---

[29] That an ongoing course of wrongful conduct is not shielded from liability through statutes of limitations is no accident.  In the analogous context of the application of res judicata to an ongoing course of wrongful conduct, the Supreme Court has explained that an ongoing course of wrongful conduct "may frequently give rise to more than a single cause of action" regardless of "whether the defendants' conduct be regarded as a series of individual torts or as one continuing tort[.]" *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 327-28 (1955).  This is because any alternative approach would grant lawbreakers "a partial immunity from civil liability for future violations." *Lawlor*, 349 U.S. at 329; *accord Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 211 (4th Cir. 2009).  Such immunity is inconsistent with the rule of law.

course of wrongful conduct are not time-barred.[30]  That approach tracks Maryland's adoption of the standard rule of accrual which, as *Blake* explains, implies the separate accrual rule as its logical corollary.  *Blake*, 927 F.3d at 706 ("A corollary of the standard rule is the separate-accrual rule.").  Both doctrines have been applied specifically to unjust enrichment claims[31]—consistent with the *Third Restatement*'s explanation that the "accrual of a claim in restitution or unjust enrichment is governed by the same general logic as any other sort of claim."  *Third Restatement* § 70, cmt. f. That is also consistent with apposite cases from other jurisdictions.[32]

---

[30] *E.g.*, *Peete-Bey v. Educ. Credit Mgmt. Corp.*, 131 F. Supp. 3d 422, 434 (D. Md. 2015) (where debt collector improperly garnished debtor's wages over multi-year period, debtor could sue for conversion based on garnishments occurring within preceding 3 years); *Johnson v. Silver Diner, Inc.*, No. PWG-18-3021, 2019 WL 3717784, at *6 (D. Md. Aug. 7, 2019) (treating separate wage and hour violations as distinct accruals, and permitting those that occurred within statute of limitations to move forward); *Ely v. Sci. Applications Int'l Corp.*, 716 F. Supp. 2d 403, 408 (D. Md. 2010) (same, but in a contract case); *Com. Union Ins. Co. v. Porter Hayden Co.*, 698 A.2d 1167, 1192 (Md. Ct. Spec. App. 1997) ("[T]he failure to perform that duty with respect to each separate claim would constitute a distinct breach."); *Singer Co.*, 558 A.2d at 424 (where electric company was sued under contract and negligence theories for repeatedly failing to provide power to customer, customer could sue for those outages occurring within preceding 3 years).  *American Hous. Pres., LLC v. Hudson SLP, LLC*, No. 1241, Sept. Term, 2015, 2016 WL 7496181, at *9 (Md. Ct. Spec. App. Dec. 20, 2016) (unpublished) ("Failure to assert a claim on an earlier breach of contract that occurred outside of the limitations period does not preclude a plaintiff from bringing a claim for a subsequent, separate, and independent breach of the same contract that occurred within the limitations period.").

[31] *E.g.*, *AAA Antiques Mall, Inc. v. VISA, USA, Inc.*, 558 F. Supp. 2d 607, 610 n.4 (D. Md. 2008) (recognizing continuing violations doctrine would apply to unjust enrichment claim); *Diane Sales, Inc. v. Am. Express Centurion Bank*, No. GLR-14-1063, 2015 WL 10986308, at *2 (D. Md. Oct. 26, 2015) (treating separate instances of unjust enrichment in multi-year fraud scheme as separate instances of unjust enrichment and applying separate accrual rule).

[32] *See Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 134-36 (E.D.N.Y. 2000) (applying continuing violations doctrine to unjust enrichment claim of Jewish victims and survivors of the Nazi Holocaust in France, and their heirs and beneficiaries, whose assets had been deposited in, processed by, or converted by defendant banks during or after the Holocaust and not returned); *Knobel v. Shaw*, 936 N.Y.S.2d 2, 6 (N.Y. App. Div. 2011) ("[T]he part of the [unjust enrichment] claim that is based on the individual defendants' keeping all the profits from the properties for themselves is viable for the six years preceding the commencement of this action.").

Ultragenyx is engaged in an ongoing wrongful course of conduct.  It is *currently* commercializing Mrs. Lacks's genetic material and is *currently* being unjustly enriched by such sales. Given this, either the separate accrual doctrine or continuing violations doctrine permits Plaintiff to sue over Ultragenyx's present and future conduct, as well as past conduct that falls within the limitations period.

Against the application of the separate accrual doctrine, Ultragenyx squeezes three arguments into the last seven lines of its memorandum, two express and one implied.  *See* Mem. at 21.  The first is to argue that proceeds cannot be a freestanding form of benefit—which fails for the reasons in Section I.A above.  Ultragenyx's second argument appears to be a simple reiteration of its theory that unjust enrichment requires a separate actionable tort—which conflates the statute of limitations and the merits and fails for the reasons noted in Section I.D above.[33]

The third, implied argument, is that the separate accrual and continuing violations doctrines cannot possibly work the way Plaintiff suggests because it would permit plaintiffs to sometimes adopt a wait-and-see approach to litigation.  This argument is akin to one the Supreme Court rejected in *Petrella*.  There, the movie studio making the film *Raging Bull* infringed the copyright of the screenplay's owner, who chose not to bring a copyright claim when she first learned the film was being made because she assumed it would be a commercial failure.  *Petrella*, 572 U.S. at 673-74, 682.  Nearly three decades later, and many years after having renewed the copyright, she sued.

---

[33] If Ultragenyx is making a different argument here, it has waived it. "A party waives an argument by failing to present it in its opening brief or by failing to develop [its] argument—even if [its] brief takes a passing shot at the issue." *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017).  A single sentence addressing a complex issue is insufficient to preserve an argument.  *United States v. Fernandez Sanchez*, 46 F.4th 211, 219 (4th Cir. 2022).

*Id.*  When the movie studio raised an argument similar to the one that Ultragenyx raises here,[34] the Supreme Court explained that the separate accrual rule does indeed allow a party to "defer suit until she can estimate whether litigation is worth the candle." *Id.* at 683.  That choice is not without a cost, the Court explained, because "[s]he will miss out on damages for periods prior to the three-year look-back," but recovery within the three-year period is allowed and "her right to prospective injunctive relief should, in most cases, remain unaltered." *Id.*

From the get-go, Ultragenyx is clear that what it wants is immunity for its actions now and in the future.  *See* Mem. at 1.  But statutes of limitations do not protect present and future conduct. This case is about what is happening today—Ultragenyx's current conduct.  The separate accrual and continuing violations doctrines prevent current and future conduct from being shielded by the statute of limitations.

## CONCLUSION

For the foregoing reasons, the Complaint sufficiently alleges an unjust enrichment claim, which is timely asserted.  Accordingly, the Court should deny Ultragenyx's motion.[35]

DATED:  November 3, 2023                      Respectfully submitted,

                                              /s/ Kim Parker
                                              _____
                                              Kim Parker
                                              Federal Bar No. 23894
                                              **LAW OFFICES OF KIM PARKER, P.A.**
                                              2123 Maryland Ave.
                                              Baltimore, MD 21218
                                              Telephone: 410-234-2621
                                              kp@kimparkerlaw.com

---

[34] The primary difference between the studio's argument and Ultragenyx's is that the studio argued that laches would plug the gap created by the separate accrual doctrine's effect on the statute of limitations, whereas Ultragenyx simply denies the separate accrual doctrine functions in the way Plaintiff argues.

[35] If the Court grants any part of Ultragenyx's motion, Plaintiff respectfully requests that he be afforded leave to amend because amendment would not be futile.

Christopher A. Seeger*
Christopher L. Ayers*
Nigel P. Halliday*
Hillary Fidler*
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone: 212-584-0700
cseeger@seegerweiss.com
cayers@seegerweiss.com
nhalliday@seegerweiss.com
hfidler@seegerweiss.com
*motion for pro hac vice admission pending*

Ben Crump**
Christopher O'Neal**
Nabeha Shaer**
**BEN CRUMP LAW, PLLC**
633 Pennsylvania Avenue, N.W.
Floor 2
Washington D.C. 20004
Telephone: 860-922-3030
court@ BenCrump.com
chris@BenCrump.com
Nabeha@BenCrump.com
**motion for pro hac vice admission to be filed*

ATTORNEYS FOR RON L. LACKS, PERSONAL
REPRESENTATIVE OF THE ESTATE OF
HENRIETTA LACKS

**HEARING REQUESTED**

Plaintiff requests that a hearing be held concerning Ultragenyx Pharmaceutical's Motion to Dismiss and the instant opposition to the same.

*/s/ Kim Parker*
Kim Parker

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 3rd day of November, 2023, a copy of Plaintiff's Opposition to the Defendant Ultragenyx's Motion to Dismiss was sent by this Court's electronic delivery system to all counsel of record.

*/s/ Kim Parker*
Kim Parker