**IN THE UNITED STATES DISTRICT COURT
<u>FOR THE DISTRICT OF MARYLAND</u>**

| | | |
|---|---|---|
| **RON L. LACKS, PERSONAL REPRESENTATIVE OF THE ESTATE OF HENRIETTA LACKS,** | * | |
| **Plaintiff,** | * | |
| | * | **Civ. No. DLB-23-2171** |
| **v.** | * | |
| **ULTRAGENYX PHARMACEUTICAL, INC.,** | * | |
| | * | |
| **Defendant.** | | |

**<u>MEMORANDUM OPINION</u>**

Over 70 years ago, Henrietta Lacks, a Black woman from Baltimore County, Maryland, entrusted doctors at Johns Hopkins Hospital with the treatment of her cervical cancer. She was admitted to a segregated ward and placed under general anesthesia. Then, without her knowledge and without any medical basis, doctors cut out samples of her cervical tissue and seized her cells. A few months later, her cancer ended her life. She was buried in an unmarked grave.

Yet the end of Henrietta Lacks' life was not the end of her story. As it turned out, her cells could replicate indefinitely under the right conditions. As a result, the "immortal" cells that now bear her name—HeLa cells—have enabled scientists around the world to conduct breakthrough medical research that has saved the lives of countless people Henrietta Lacks herself never knew.

The Estate of Henrietta Lacks, represented by her grandson Ron L. Lacks ("Lacks"), claims these HeLa cells also have made some pharmaceutical companies a lot of money—money rightly due Henrietta Lacks' family. On August 10, 2023, Lacks sued one of those companies, Ultragenyx Pharmaceutical, Inc. ("Ultragenyx"), for unjust enrichment. Ultragenyx has moved to dismiss the

one-count complaint for failure to state a claim. Ultragenyx's motion is denied. Lacks has stated a

claim for unjust enrichment. His case may proceed.

## I.    Background

These are the facts as Lacks alleges them.

Henrietta Lacks was a Black woman, a mother, and a community leader in Baltimore

County. ECF 1, ¶ 1. In January 1951, doctors at Johns Hopkins Hospital diagnosed her with

cervical cancer. *Id.* ¶ 40. Her treating physician recommended radium treatment—an aggressive

approach that would require surgery under general anesthesia. *Id.* ¶ 41. Her doctor did not tell her

that radium treatment would render her infertile. *Id.* He also did not tell her that the surgeon would

perform another procedure while she was anesthetized: cutting tissue from her cervix. *Id.* ¶ 42.

That seizure of Henrietta Lacks' tissue had nothing to do with treating her cervical cancer.

*Id.* Its purpose was to advance the research agendas of two white doctors at Johns Hopkins: Dr.

Richard Wesley TeLinde and Dr. George Gey. *See id.* ¶¶ 33–36, 41, 43–46. TeLinde, the hospital's

chair of gynecology, wanted cervical cancer samples he could use to justify his notoriously

aggressive treatment techniques by showing that the cancer he targeted was as deadly as other

forms of cancer. *Id.* ¶¶ 33–34. Gey, the hospital's head of tissue research, wanted samples of

human tissue he could use to cultivate a cell line—a culture of cells with a common lineage and

uniform makeup—capable of reproducing indefinitely under laboratory conditions. *Id.* ¶¶ 34–35.

Normally, cell samples die after they are removed from the human body. *Id.* ¶ 6. Cultivating a cell

line that could survive would enable scientists to study them and conduct experiments that would

otherwise be impossible. *See id.* ¶¶ 34–35, 47. Gey styled himself "the world's most famous

vulture, feeding on human specimens almost constantly." *Id.* ¶ 3.

Together, TeLinde and Gey devised a plan. *Id.* ¶¶ 34–36. Surgeons under TeLinde's supervision would take tissue samples from Black women with cervical cancer in the segregated wards at Johns Hopkins Hospital without the women's knowledge or consent. *Id.* ¶ 36. One of TeLinde's colleagues observed, "Hopkins, with its large indigent [B]lack population, had no dearth of clinical material." *Id.*

TeLinde, Gey, and their collaborating colleagues were not unique in seeing Black patients more as "clinical material" than as human beings. *See id.* ¶¶ 37–39. In this same era, the U.S. Public Health Service, working with the Tuskegee Institute in Macon, Alabama, denied hundreds of Black men treatment for syphilis to study how the disease progressed. *Id.* ¶ 37. Over two dozen of them died of syphilis and over 100 more died from complications. *Id.* Doctors systematically sterilized poor Black women through a procedure known as the "Mississippi Appendectomy": a hysterectomy under the pretense of an appendectomy. *Id.* ¶ 38. During the Second World War, the United States tested chemical agents on Black men and threatened to incarcerate any who objected. *Id.* ¶ 39.

On February 5, 1951, in a ward for Black women at Johns Hopkins Hospital in Baltimore, Maryland, a surgeon working for TeLinde cut two three-quarter inch samples of tissue from Henrietta Lacks' cervix—without her knowledge or consent—and gave them to Gey. *Id.* ¶ 43. As it happened, the radium treatment that she did consent to did her no good. *Id.* ¶ 5. On October 4, 1951, Henrietta Lacks died of cervical cancer. *Id.* ¶ 45.

Yet Henrietta Lacks' cells lived on after her death. *Id.* ¶¶ 44–46. For reasons unknown to Gey, her cells had the very quality Gey sought. *Id.* Unlike the other cells Gey had tested before, Henrietta Lacks' cells could reproduce indefinitely under laboratory conditions. *Id.* Eventually, her immortal cells came to be known as "HeLa cells." *Id.* ¶ 6.

In the years that followed, HeLa cells were distributed for free to scientists across the globe. *Id.* ¶ 47. The HeLa cell line became the foundation for countless medical research projects. *Id.* HeLa cells enabled—and still enable—transformative breakthroughs, from the polio vaccine to in vitro fertilization to treatment for sickle cell anemia. *Id.* ¶¶ 8, 47. Henrietta Lacks' contributions to medicine are incalculable. *See id.* ¶ 8.

Even as Gey promoted the HeLa cell line, he and Johns Hopkins endeavored to keep its real origins secret. *Id.* ¶¶ 46, 48. Gey claimed the cells came from a woman named Helen Lane. *Id.* ¶ 48. Despite these efforts to obscure the HeLa cell line's origins, the scientific community knew that the cell line originated in nonconsensual, non-therapeutic medical experimentation on Black patients. *Id.* ¶ 49. In more recent years, the story of Henrietta Lacks has become widely known to the scientific community and to the public. *Id.* ¶¶ 50, 61.

Ultragenyx is a pharmaceutical company that develops drugs to treat "orphan diseases." *Id.* ¶ 19. An orphan disease is a disease impacting so few people that developing treatments typically is not profitable. *Id.* ¶ 9. Much of Ultragenyx's drug development is focused on gene therapy. *Id.* ¶ 10. Gene therapy depends on the manufacture of adeno-associated virus ("AAV") vectors, which deliver into cells genetic material that enables them to produce therapeutic proteins. *Id.* AAV vectors are very difficult to produce at scale. *Id.*

To grow AAV vectors at scale, Ultragenyx relies on HeLa cells. *Id.* ¶¶ 11–12, 14, 53–61. The company has developed a proprietary HeLa cell platform for that purpose. *Id.* ¶¶ 12, 54, 56. In the words of Sam Wadsworth, Ultragenyx's Chief Scientific Officer:

> The HeLa platform is the most advanced platform that we have. It is a highly engineered system for manufacturing AAV gene therapy vectors using HeLa cells. The elements of the platform are finely tuned to work in concert to produce AAV vectors at the scale and quality required for our products. . . . We like to think of this as letting biology do the work.

*Id.* ¶ 12. By working with HeLa cells, Ultragenyx has been able to research, develop, and manufacture a range of gene therapies. *Id.* ¶¶ 64–68. Ultragenyx also has monetized its HeLa cell platform through partnerships with other pharmaceutical companies, including a $200 million licensing deal with Daiichi Sankyo Company. *Id.* ¶ 58. And Ultragenyx has secured millions of dollars of federal funding for AAV vector development. *Id.* ¶ 67. In these ways, Ultragenyx "reap[s] huge profits that would never have been possible without Henrietta Lacks's cells." *Id.* ¶ 14; *see also id.* ¶¶ 53–55, 61, 64. In 2022, Ultragenyx reported total revenues of $363 million and a year-end cash balance of $896.7 million. *Id.* ¶ 23.

On Lacks' account, Ultragenyx has known the story behind the HeLa cell line "since the development of its manufacturing platform." *Id.* ¶ 51; *see also id.* ¶ 13. Ultragenyx even acknowledges that the HeLa cell line originated with the wrongful seizure of tissue from Henrietta Lacks. *Id.* ¶ 13. When Henrietta Lacks "received treatment at then-segregated Johns Hopkins Hospital . . . tissue samples were collected and replicated without her knowledge," a page on Ultragenyx's website explains, "help[ing] scientists achieve numerous medical breakthroughs." *Id.* ¶ 51. Lacks also alleges Ultragenyx never paid the real value of the HeLa cells it acquired, *id.* ¶ 78; never compensated the Lacks Estate for their possession or use; *id.* ¶ 70; and never sought or received the permission of the Estate to use them, *id.* ¶ 14.

Ultragenyx is incorporated in Delaware and headquartered in California. *Id.* ¶ 18. Nevertheless, some of Ultragenyx's work takes place in Maryland. *Id.* ¶¶ 26–29. The company has employees based in Maryland, such as marketing personnel who promote the company's work to Maryland physicians. *Id.* ¶ 29. The company conducts research and drug development in Maryland as well. *Id.* ¶¶ 26–28. Ultragenyx has recruited patients for and conducted clinical trials at the National Institutes of Health Clinical Center in Bethesda. *Id.* ¶ 26. Since 2018, Ultragenyx has

paid doctors at Johns Hopkins Hospital over $1.1 million for research and consulting. *Id.* ¶ 28. In November 2021, Ultragenyx paid Johns Hopkins University $116,382.39 for a study. *Id.* Ultragenyx's Maryland research and development expenditures include payments for work to commercialize HeLa cells. *Id.* In addition, Ultragenyx partners with Maryland-based pharmaceutical companies on drug development. *Id.* ¶¶ 26–27. For instance, Ultragenyx maintains "a long-standing licensing partnership with Regenxbio, a Maryland corporation with a 132,000-square-foot, $65 million gene therapy manufacturing facility in Rockville." *Id.* ¶ 27. The partnership includes four exclusive worldwide licenses and requires Ultragenyx to pay Regenxbio a range of fees and royalties. *Id.* Ultragenyx also sponsors marketing events at Johns Hopkins Hospital. *Id.* ¶ 26.

Lacks has asserted a single cause of action: unjust enrichment. *Id.* ¶¶ 74–79. Lacks claims that Ultragenyx has been unjustly enriched by its acquisition, use, and sale of HeLa cells. To remedy this alleged unjust enrichment, Lacks seeks disgorgement of Ultragenyx's net profits from its commercialization of HeLa cells it acquired or possesses, a permanent injunction barring Ultragenyx from using these HeLa cells without the Estate's permission, and a constructive trust in favor of the Estate on all HeLa cells in Ultragenyx's possession, related intellectual property, and proceeds related to its use of the cells. *Id.* at 19–20.

In response to the complaint, Ultragenyx moved to dismiss for failure to state a claim under Rule 12(b)(6). ECF 6. Lacks filed an opposition. ECF 21. Ultragenyx replied. ECF 37. The Court accepted amicus briefs from civil procedure scholar Professor Suzette Malveaux of the University of Colorado Law School; the Lawyers' Committee for Civil Rights Under Law and other civil rights organizations; racial justice and medical ethics scholar Professor Deleso A. Alford of Southern University Law Center; and restitution scholars Professor Doug Rendleman of

Washington & Lee University School of Law and Professor Caprice Roberts of Louisiana State University Paul M. Hebert Law Center. ECF 24-1, 29-1, 30-1, & 31-1. No hearing on the motion to dismiss is necessary. *See* Loc R. 105.6. For the following reasons, the motion is denied.

## II.   Standard of Review

Federal Rule of Civil Procedure 8(a)(2) requires the plaintiff to include in their complaint a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The legal sufficiency of that statement may be challenged through a Rule 12(b)(6) motion to dismiss for failure to state a claim. *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); Fed. R. Civ. P. 12(b)(6). A court will deny a Rule 12(b)(6) motion if, but only if, the complaint contains sufficient factual allegations to "state a claim to relief that is plausible on its face." *Turner v. Thomas*, 930 F.3d 640, 644 (4th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In ruling on the motion, a court accepts the well-pleaded allegations as true, *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021), and draws all reasonable inferences in favor of the pleader, *Williams v. Kincaid*, 45 F.4th 759, 765, 777 (4th Cir. 2022). But a court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)). A complaint that merely recites the elements of the cause of action or couches legal conclusions as facts cannot overcome a Rule 12(b)(6) motion. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Turner*, 930 F.3d at 644.

## III.   Discussion

At this early stage in the case, the question before the Court is modest. The question is not whether Ultragenyx has been unjustly enriched by its acquisition and use of HeLa cells. The question is not whether Lacks' allegations are true. The question is whether, if what Lacks alleges

is true, it is plausible that Ultragenyx is liable to Lacks for unjust enrichment. The answer to that question is yes.

Under Maryland law, a claim for unjust enrichment has three elements: (1) a benefit conferred upon the defendant by the plaintiff, (2) an appreciation or knowledge by the defendant of the benefit, and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value. *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 351 (Md. 2007) (citing *Berry & Gould, P.A. v. Berry*, 757 A.2d 108, 113 (Md. 2000)).

Ultragenyx's primary arguments are not about these elements. Instead, Ultragenyx argues that Lacks filed his claim too late. But Ultragenyx may not, at the motion to dismiss stage, avail itself of the statute of limitations defense. Next, Ultragenyx argues Lacks' claim must be dismissed because Lacks has not pled that Ultragenyx was not a bona fide purchaser for value of HeLa cells. But bona fide purchaser for value is a defense to an unjust enrichment claim that Lacks need not plead, and even if Lacks needed to, he has. Ultragenyx also argues that Lacks must plead an independent tort against Ultragenyx to pursue a claim for unjust enrichment. Maryland law has no such requirement. Finally, Ultragenyx argues that its alleged enrichment from HeLa cells is too remote from the original wrongs against Henrietta Lacks to state a claim for unjust enrichment. This argument, too, has no basis in Maryland law.

Lacks has pled the three elements of unjust enrichment that do have a basis in Maryland law: that Henrietta Lacks conferred a benefit upon Ultragenyx, that Ultragenyx knew of that benefit, and that under the circumstances, it would be inequitable for Ultragenyx to retain that benefit without compensating Lacks. Lacks has stated a claim for unjust enrichment against Ultragenyx. His claim survives the motion to dismiss.

## A.  Statute of Limitations

The threshold question is whether Lacks waited too long to bring this case. Lacks filed his complaint over 70 years after Henrietta Lacks' cells were stolen. Ultragenyx says Lacks acted decades after he knew pharmaceutical companies were putting his grandmother's cells to commercial use and years after Ultragenyx acquired them. So Ultragenyx contends that Lacks' claim for unjust enrichment is barred by Maryland's statute of limitations.

In Maryland, the statute of limitations for an unjust enrichment claim is three years. *Cain v. Midland Funding, LLC*, 256 A.3d 765, 785 (Md. 2021) (citing *Ver Brycke v. Ver Brycke*, 843 A.2d 758, 775 (Md. 2004)). Ordinarily, "the running of limitations against a cause of action begins upon the occurrence of the alleged wrong[.]" *Poole v. Coakley & Williams Constr., Inc.*, 31 A.3d 212, 236 (Md. 2011); *see also Catler v. Arent Fox, LLP*, 71 A.3d 155, 171 (Md. App. Ct. 2013) (stating "a cause of action does not accrue until all of its elements are present"). However, Maryland's "discovery rule" starts the clock on the date the plaintiff "knew or reasonably should have known of the wrong." *Cain*, 256 A.3d at 783 (quoting *Poffenberger v. Risser*, 431 A.2d 677, 680 (Md. 1981)).

Lacks filed his complaint on August 10, 2023. According to Ultragenyx, the complaint and judicially noticeable documents reveal that Lacks filed more than three years after he knew or should have known about Ultragenyx's acquisition and use of HeLa cells.[1] All else equal, Lacks' claim is time-barred if it accrued before August 10, 2020 and the discovery rule does not delay the start of the limitations clock.

---

[1] The Court declines to take judicial notice of the materials Ultragenyx identifies because the Court does not reach the question of when Lacks' claim accrued.

All else is not equal in this case. Ultragenyx is a foreign corporation. Under Maryland law,

> [a] foreign corporation or foreign limited partnership required by law to qualify or register to do business in the State . . . may not benefit from any statute of limitations in an action at law or suit in equity: . . . (2) [i]nstituted while the foreign corporation or foreign limited partnership is doing intrastate or interstate or foreign business in the State without having qualified or registered.

Md. Code Ann., Cts. & Jud. Proc. § 5-204. Registration involves completing a form and designating an agent to receive service of process. *See* Md. Code Ann., Corps. & Ass'ns § 7-205. "[T]he legislative judgment expressed in § 5-204 is that the unregistered foreign corporation, not having made it easy for a plaintiff to serve it with process, should be completely barred from raising limitations." *Turner v. Smalis*, 622 F. Supp. 248, 254 (D. Md. 1985), *aff'd sub nom. Turner v. Byers*, 813 F.2d 403 (Table) (4th Cir. 1986). Simply put: Maryland's statute of limitations does not protect a foreign corporation if that corporation was supposed to qualify or register to do business in Maryland but did not.

Accordingly, Lacks contends that even if the statute of limitations would preclude his claim, § 5-204 bars Ultragenyx from benefitting from the defense now. Ultragenyx says that Lacks cannot rely on § 5-204 to block the company from raising the statute of limitations defense unless Lacks affirmatively pled in his complaint that § 5-204 applies. Ultragenyx is incorrect. And, even if Lacks had to plead that § 5-204 applies, he has.[2]

---

[2] There are very few decisions applying § 5-204. The Court finds only three from this district, *see Turner*, 622 F. Supp. 248; *Showpower, Inc. v. Mitsui O.S.K. Lines Ltd.*, No. WMN-97-4098, 1998 WL 1108946 (D. Md. 1998); *Rockstroh v. A.H. Robins Co.*, 602 F. Supp. 1259 (D. Md. 1985), and none from any Maryland appeals court, although it appears there have been a few more decisions in federal and Maryland courts that are no longer accessible online, *see Rockstroh*, 602 F. Supp. at 1263–64 (collecting cases). However, there is a significant body of Maryland law concerning the interpretation and applicability of a related statute that denies unregistered foreign corporations doing business in Maryland the privilege of initiating cases in Maryland courts. *See Turner*, 622 F. Supp. at 254 (citing *G.E.M. Inc. v. Plough, Inc.*, 180 A.2d 478, 480 (Md. 1962)).

### 1. Lacks need not plead § 5-204

Ultragenyx argues that Lacks may not rely on § 5-204 to deprive it of the benefit of the statute of limitations unless Lacks has pled that § 5-204 applies. The complaint is silent on Ultragenyx's registration status. And nowhere does the complaint mention § 5-204. According to Ultragenyx, that means § 5-204 may not bar dismissal on statute of limitations grounds.

Ultragenyx gets the law backwards. A Rule 12(b)(6) motion to dismiss "generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred," at all. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). A court may grant a motion to dismiss on the basis of an affirmative defense like the statute of limitations only in the rare case that "all facts necessary to the affirmative defense clearly appear on the face of the complaint." *Id.* (cleaned up). "[T]he burden of establishing the affirmative defense rests on the defendant." *Id.*

> If the defendant[] wishe[s] to dispose of the complaint on its face *before* asserting their affirmative defense, on the ground that their affirmative defense [is] evident in the complaint, they ha[ve] to show also that the plaintiff's potential rejoinder to the affirmative defense [is] foreclosed by the allegations in the complaint.

*Id.* at 466. "To require otherwise would require a plaintiff to plead affirmatively in his complaint matters that might be responsive to affirmative defenses even before the affirmative defenses are raised." *Id.*

The upshot is that Lacks need not allege facts anticipating and negating a statute of limitations defense. *See id.* at 464, 466; *see also Schmidt v. Skolas*, 770 F.3d 241, 248 (3d Cir. 2014) ("Under Federal Rule of Civil Procedure 8, a complaint need not anticipate or overcome affirmative defenses; thus, a complaint does not fail to state a claim simply because it omits facts that would defeat a statute of limitations defense."); *Sidney Hillman Health Ctr. v. Abbott Lab'ys*, 782 F.3d 922, 928 (7th Cir. 2015) ("As long as there is a conceivable set of facts, consistent with

the complaint, that would defeat a statute-of-limitations defense, questions of timeliness are left for summary judgment (or ultimately trial).”). Rather, Ultragenyx must show that every fact necessary to make out its statute of limitations defense is apparent on the face of the complaint (or judicially noticeable materials). Here, that means facts showing that Lacks' claim accrued before August 10, 2020, that he knew or reasonably should have known of Ultragenyx's acquisition and use of HeLa cells by then, and that Ultragenyx is eligible under § 5-204 to avail itself of the protection of the statute of limitations. In *Goodman*'s language, it is Ultragenyx's responsibility to show that Lacks' “potential rejoinder” to the statute of limitations defense is “foreclosed by the allegations in the complaint.” *See Goodman*, 494 F.3d at 466.

Evidently unable to make that showing, Ultragenyx instead demands that Lacks anticipate and negate its statute of limitations defense by plausibly alleging that Ultragenyx does business in Maryland without being registered. This purported pleading requirement is precisely what *Goodman* rejects. *See id.* In reality, a plaintiff need not plead in their complaint “matters that might be responsive to affirmative defenses.” *See id.* Ultragenyx cannot establish its statute of limitations defense at this juncture unless it is clear from the face of Lacks' complaint that the company was not required to register or that it was registered. *See id.* at 464. Since neither of those facts is obvious from the face of the complaint, Ultragenyx has not borne its burden of establishing a statute of limitations defense at the motion to dismiss stage.

To be sure, ultimately, “[t]he burden of proving that a foreign corporation is doing business in the State rests with the proponent of that proposition.” *Willow Grove Citizens Ass'n v. Cnty. Council of Prince George's Cnty.*, 175 A.3d 852, 858 (Md. App. Ct. 2017). Here, that is Lacks. At the motion to dismiss stage, however, the burden of establishing the affirmative defense that Lacks' claim is barred by the statute of limitations rests with Ultragenyx. *See Goodman*, 494 F.3d

at 464. So Ultragenyx bore the burden of showing that it is eligible for the protection of the statute of limitations in the first place. Ultragenyx has not made that showing. It is not apparent from the face of the complaint that the statute of limitations protects Ultragenyx.

At first glance, this result might seem counterintuitive. If an out-of-state corporate defendant cannot invoke the statute of limitations on a motion to dismiss unless the plaintiff alleges that the company is qualified or registered to do business in Maryland or that the company did not have to be, then no plaintiff would ever make those allegations—and no foreign corporate defendant would be protected by the statute of limitations at this stage. The truth is less surprising. Courts may take judicial notice of a defendant's qualification or registration status because that status is a "matter of public record" "that, under Federal Rule of Evidence 201, constitute[s] [an] 'adjudicative fact[].'" *Goldfarb v. Mayor of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015). Adjudicative facts are those "not subject to reasonable dispute" because they are "generally known within the court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015) (quoting Fed. R. Evid. 201(b)). Whether or not an out-of-state corporate defendant is registered to do business in Maryland is an adjudicative fact: It can be determined from public records whose accuracy is beyond reasonable dispute. For this reason, a plaintiff has no power to strip a corporate defendant of their right to invoke the statute of limitations in a motion to dismiss by omitting these allegations from their complaint. A registered corporate defendant need only ask the court to take judicial notice of their registration status.

As a defendant seeking to dismiss the complaint based on an affirmative defense, Ultragenyx bore the burden of showing that on the face of the complaint, Lacks' claim is barred by the statute of limitations. In Maryland, that includes showing that Ultragenyx, an out-of-state

corporation, is protected by the statute of limitations—whether because the company does not do business in Maryland or because the company is registered. Ultragenyx has not made that showing. That means the Court may not dismiss the complaint as time-barred now.

### 2.   Lacks has pled § 5-204 applies to Ultragenyx

Even if Lacks were required to plausibly allege facts that, if true, show Ultragenyx may not benefit from Maryland's statute of limitations, Lacks has done that.

Section 5-204 deprives an out-of-state corporation that is "required by law to qualify or register to do business in the State," but has not qualified or registered, of the benefit of the state's statute of limitations in a suit initiated while the corporation is unregistered. Md. Code Ann., Cts. & Jud. Proc. § 5-204; *see Turner*, 622 F. Supp. at 251. Lacks has alleged that Ultragenyx is a corporation registered in Delaware and headquartered in California. The Court takes judicial notice of the fact that Ultragenyx was not registered at the time Lacks filed his complaint. *Cf. Stewart v. Jayco, Inc.*, No. ELH-16-3494, 2017 WL 193296, at *2 n.4 (D. Md. Jan. 18, 2017) (taking judicial notice that the defendant was not registered or qualified to do business in Maryland because they were not listed in the state's online business database) (citation omitted). That leaves the question of whether Ultragenyx was required to qualify or register to do business in Maryland.

Lacks has plausibly alleged facts that make it reasonable to infer that Ultragenyx was required to register to do business in Maryland. A foreign corporation is required to register to do business in Maryland if, but only if, "it is doing intrastate business in Maryland." *Turner*, 622 F. Supp. at 254 (citing *G.E.M. Inc. v. Plough, Inc.*, 180 A.2d 478, 480 (Md. 1962)); *see also id.* at 252–53. A foreign corporation is doing intrastate business in Maryland "when it transacts some substantial part of its ordinary business therein." *Willow Grove*, 175 A.3d at 858 (quoting *Tiller Constr. Corp. v. Nadler*, 637 A.2d 1183, 1187 (Md. 1994)). "Whether the acts engaged in by the

14

foreign corporation are sufficient to constitute 'doing business' must be determined from the facts of each case, with particular emphasis on the nature and extent of the business and activities occurring in the forum state." *J.C. Snavely & Sons, Inc. v. Wheeler*, 538 A.2d 324, 327 (Md. App. Ct. 1988).

> Among the factors to be considered are: (1) whether the foreign corporation pays state taxes; (2) whether it maintains property, an office, telephone listings, employees, agents, inventory, research and development facilities, advertising and bank accounts in the state; (3) whether it makes contracts in the state; and (4) whether its management functions in the state are pervasive.

*Tiller*, 637 A.2d at 1187–88 (quoting *J.C. Snavely & Sons*, 538 A.2d at 327).

Focusing on the second and third factors, Lacks' allegations contextualize "the nature and extent of the business and activities" Ultragenyx conducts in Maryland. *See J.C. Snavely & Sons*, 538 A.2d at 327. Begin with the second factor. Lacks alleges that Ultragenyx has Maryland employees. He alleges that some of these employees market Ultragenyx products to doctors in Maryland. And he alleges that Ultragenyx conducts research and development in Maryland, including at Johns Hopkins Hospital. Ultragenyx's Maryland research and development work includes paying Johns Hopkins University $116,382.39 for a study in November 2021, paying physicians over $1.1 million for consulting and research in Maryland since 2018, and recruiting patients for clinical trials conducted at the National Institutes of Health Clinical Center in Bethesda. Turn to the third factor. Lacks alleges that Ultragenyx has contractual partnerships with biopharmaceutical companies headquartered in Maryland. As an example, the complaint details "a long-standing licensing partnership with Regenxbio, a Maryland corporation with a 132,000-square-foot, $65 million gene therapy manufacturing facility in Rockville"; the partnership includes four exclusive worldwide licenses and a system of payments from Ultragenyx to Regenxbio. ECF 1, ¶ 27.

Lacks has plausibly alleged that Ultragenyx does business in Maryland. On Lacks' allegations, Ultragenyx does substantially more intrastate business than the corporate defendants in cases holding that a corporation did not do enough business in the state to have to register. *See, e.g.*, *Willow Grove*, 175 A.3d at 858–59; *Turner*, 622 F. Supp. at 253. In *Willow Grove*, for example, the Maryland Appellate Court determined on summary judgment that the corporate defendant did not do business in the state because the plaintiff's position "appear[ed] to rest solely" on the fact that the defendant applied to the Maryland National Capital Park and Planning Commission for a special exemption to operate an assisted living facility. *Willow Grove*, 175 A.3d at 855, 858. An "isolated action[]" like applying for a planning exemption is "generally insufficient to constitute 'doing business.'" *Id.* at 858 (quoting *Aeropesca Ltd. v. Butler Aviation Int'l, Inc.*, 411 A.2d 1055, 1060 (Md. App. Ct. 1980)). Lacks does not allege merely that Ultragenyx conducted a single, "isolated" act in Maryland. Lacks alleges much more: that since at least 2018, Ultragenyx has conducted an array of its core activities in Maryland, including having employees in Maryland, conducting research in Maryland, marketing in Maryland, and contracting with Maryland companies. That is easily enough at this stage.

Consider another example. In *Turner v. Smalis*, a court in this district held on summary judgment that the corporate defendant was not doing business in Maryland because the evidence showed that the defendant had no employees or agents in Maryland, did virtually no marketing in Maryland, had no meetings in the state, and paid no state taxes. 622 F. Supp. at 253. It was not enough that three percent of the defendant's sales were to customers in the state, the defendant had ongoing sales relationships with a few Maryland clients, and the defendant sent mailers to its Maryland customers. *Id.* Lacks alleges some of the facts absent from *Turner*—and then some. Unlike in *Turner*, here Lacks alleges that Ultragenyx has Maryland employees working in

Maryland. Unlike in *Turner*, here Lacks alleges that Ultragenyx markets in Maryland, to Maryland physicians. And Lacks alleges Ultragenyx has extensive ongoing relationships with Maryland biopharmaceutical companies like Regenxbio, hosts regular events in Maryland, and conducts research activity in the state. Lacks comfortably clears *Turner*'s bar.

Moreover, Lacks has alleged that Ultragenyx does at least as much business in Maryland as the corporate defendant in *J.C. Snavely & Sons*, a Maryland Appellate Court decision later approved by the Maryland Supreme Court. *See J.C. Snavely & Sons*, 538 A.2d at 328; *Tiller*, 637 A.2d at 1188 ("*Snavely* accurately reflects what its ancestors in this Court and in the Court of Special Appeals have expressed and applied."). After the trial in that case, the circuit court found that the corporate defendant did business in the state, and the Maryland Appellate Court affirmed. *J.C. Snavely & Sons*, 538 A.2d at 325. The corporate defendant "neither owned nor leased any property, real or personal," in Maryland. *Id.* at 328. It "had no employees" in the state. *Id.* Its "Maryland transactions accounted, on the average, for a little more than two percent of [the defendant's] business," about $500,000 a year. *Id.* Occasionally, the corporate defendant's "representatives came into Maryland to provide potential customers with merchandising advice and, while here, accepted orders" and addressed complaints. *Id.* Those meager sales and outreach efforts, combined with the facts that the company paid Maryland sales taxes and used Maryland trucks to deliver its wares, sufficed. *Id.* On Lacks' account, Ultragenyx's Maryland ties are at least as extensive and enduring. Whereas the corporate defendant in *J.C. Snavely & Sons* had no permanent presence in Maryland—whether via property or in-state employees—Lacks alleges Ultragenyx routinely does its business in the state via its Maryland employees and its Maryland research and development endeavors. Whereas the in-state contracts in *J.C. Snavely & Sons* were discrete sales of building materials, Ultragenyx's alleged contracts are ongoing research and

licensing agreements with long-term obligations. Particularly given the "ad hoc," context-sensitive nature of the intrastate business inquiry, Lacks has alleged enough. *See Tiller*, 637 A.2d at 1187.

Under Maryland law, Lacks has plausibly alleged that Ultragenyx, an out-of-state corporation, conducts enough intrastate business to have an obligation to register to do business in Maryland. Ultragenyx did not register. Accordingly, at the motion to dismiss stage, Ultragenyx may not invoke the state's statute of limitations.

\*     \*     \*

Ultragenyx's bid to dismiss Lacks' complaint as time-barred fails for either of two independently sufficient reasons. First, Ultragenyx has not carried its burden of establishing all the facts necessary to its statute of limitations defense from the face of Lacks' complaint. Second, Lacks has plausibly alleged Ultragenyx was required to register to do business in Maryland. The Court takes judicial notice it did not. Whether or not Lacks' claim otherwise would be time-barred, the Court may not grant Ultragenyx's motion to dismiss it on that basis.

## B.  Ultragenyx's Illusory Requirements

Next, Ultragenyx contends that to survive a motion to dismiss, Lacks must do more than plead the three elements of an unjust enrichment claim. On Ultragenyx's account, Lacks also must plead that Ultragenyx is not a bona fide purchaser for value. Lacks further must plead that Ultragenyx committed an independent, underlying tort. And Lacks also must allege facts that, if true, show that Ultragenyx's enrichment is not too remote from the wrongs to Henrietta Lacks. Maryland law makes none of these demands.

### 1.  Bona Fide Purchaser

Ultragenyx argues that the complaint should be dismissed because Lacks has failed to plead that Ultragenyx was not a bona fide purchaser for value of the HeLa cells. "A *bona fide* purchaser,

or an 'innocent purchaser', exists when a party acquires property for valuable consideration, in

good faith, and without notice of another's prior claim to the property." *Fishman v. Murphy ex rel.*

*Estate of Urban*, 72 A.3d 185, 546–47 (Md. 2013) (citing *Julian v. Buonassissi*, 997 A.2d 104,

130 (Md. 2010) and *People's Banking Co. v. Fid. & Deposit Co.*, 170 A. 544, 547 (Md. 1934)).

"Value" (or "valuable consideration" and its synonyms) is a technical term. As the Restatement

(Third) of Restitution and Unjust Enrichment (hereinafter "Third Restatement") presents the rule,

a purchaser "gives value for rights if they are acquired in exchange for present value, excluding

nominal consideration." Restatement (Third) of Restitution and Unjust Enrichment § 68(1)(a). [3]

Generally, an unjust enrichment claim cannot succeed against a bona fide purchaser for value. But

bona fide purchaser status is a defense, not an element of an unjust enrichment claim that the

plaintiff must negate in their complaint. In any case, even if Lacks were required to plead around

this defense, Lacks has done so.

### a.    Bona fide purchaser for value is not a pleading requirement

"Unjust enrichment is notoriously difficult to define." *Hill*, 936 A.2d at 351 (cleaned up)

(quoting Daniel Friedmann, *Restitution of Benefits Obtained Through the Appropriation of*

---

[3] Notably, whereas the concept of "consideration" in contract law includes even nominal value, the concept of "value" in unjust enrichment law does not. *See* Restatement (Third) of Restitution and Unjust Enrichment § 68; Restatement (First) of Restitution § 173. Ultragenyx thinks *Poole v. Poole*, 99 A. 551 (Md. 1916), says otherwise. ECF 6, at 18. *Poole* does say that "[t]he presumption of law is that a deed made for a valuable consideration, however small, is valid and bona fide." *Poole*, 99 A. at 552. However, *Poole* was not an unjust enrichment case at all, but rather an action to vacate a deed. *See id.* In consequence, it says nothing about the specialized meaning of "valuable consideration" in unjust enrichment doctrine. In fact, this century-old case was decided before "[u]njust enrichment first was established as an independent basis of liability in the common law" in the wake of the Restatement (First) of Restitution. *See Clark Off. Bldg., LLC v. MCM Cap. Partners, LLLP*, 245 A.3d 186, 190 (Md. App. Ct. 2021). So even if *Poole* were ever relevant, it is not now. The Fourth Circuit recognizes the same principle. When evaluating bona fide purchaser for value status in bankruptcy cases, for example, the Fourth Circuit has held that "value" is at least 75 percent of the appraised value of the asset. *See Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Marjec, Inc.*, 833 F.2d 1005 (Table), at *1 (4th Cir. Nov. 12, 1987).

*Property or the Commission of a Wrong,* 80 Colum. L. Rev. 504, 504–05 (1980)). The Maryland Supreme Court did not adopt a unified formulation of the cause of action until 2000. *See id.* After decades of "chaotic and disjointed development" left "the body of law of unjust enrichment . . . both voluminous and disorganized," the Maryland Supreme Court drew on the then-current Tentative Restatement (Second) of Restitution (hereinafter "Tentative Second Restatement") to define unjust enrichment as

1. A benefit conferred upon the defendant by the plaintiff;

2. An appreciation or knowledge by the defendant of the benefit; and

3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.

*Id.* at 351 & 351 n.9 (quoting *Berry & Gould*, 757 A.2d at 113). That list plainly does not include a distinct requirement that the defendant is not a bona fide purchaser. The "knowledge" at issue in the second element is mere knowledge of receipt of the benefit, not knowledge that it came from the plaintiff or the circumstances that make its retention inequitable. *See id.* at 354–55; *Bank of Am. Corp. v. Gibbons*, 918 A.2d 565, 575–76 (Md. App. Ct. 2007).

Nevertheless, Maryland law—following the leading treatises on the subject—acknowledges that generally, a bona fide purchaser for value is not liable for unjust enrichment. *See, e.g., Hobbs v. St. Martin* ("*Hobbs III*"), 320 F. Supp. 3d 748, 755 (D. Md. 2018); *see also* Restatement (Third) § 66. The rationale for that rule is unclear. Some Maryland courts have suggested that if the defendant is a bona fide purchaser for value, the defendant did not receive any benefit from the plaintiff. *See Mid States Oil Refining, LLC v. Lorco, Inc.*, No. 0062, Sept. Term 2015, 2016 WL 704814, at *18 (Md. App. Ct. Feb. 23, 2016). As a bona fide purchaser for value, the defendant merely got what they paid for. Others have suggested that if the defendant is

a bona fide purchaser for value, the defendant did not accept the benefit under circumstances that would make it inequitable for them to retain it. *See Hobbs v. St. Martin* ("*Hobbs I*"), 198 F. Supp. 3d 530, 535 (D. Md. 2016) (citing *First Nat'l Bank v. Shpritz*, 493 A.2d 410, 419 (Md. App. Ct. 1985)). As a bona fide purchaser, the defendant came by the benefit fairly. Some courts have embraced both rationales. *See Gibbons*, 918 A.2d at 571–73, 576–78 (examining bona fide purchaser status within analysis of elements one and three). One thing is clear: Since the Maryland Supreme Court adopted the three-element formulation of unjust enrichment in 2000, no Maryland court ever has identified the fact that the defendant is not a bona fide purchaser for value as an element of a claim for unjust enrichment.

Ultragenyx's argument that Lacks must plead the company was not a bona fide purchaser for value rests on a Maryland Supreme Court case that long predates that court's cleanup of unjust enrichment doctrine: *Plitt v. Greenberg*, 219 A.2d 237 (Md. 1966). As Ultragenyx reads *Plitt*, the court held that an unjust enrichment plaintiff must plead that the defendant was not a bona fide purchaser for value. A close reading of the case shows otherwise. *Plitt* began with a scam. Attorney Melvin Blacker asked his client, Clarence Plitt, to loan Blacker, Blacker's wife, and Blacker's brother-in-law, Theodore Greenberg, the mysteriously precise sum of $38,333.34. *Id.* at 239–40. Plitt had never met Greenberg. *Id.* at 240. But Blacker assured Plitt that Greenberg and the Blackers would repay him. *Id.* As collateral, Blacker offered Plitt a $45,000 note from the Alsage Realty Corporation. *Id.* Plitt agreed. *Id.* at 239–40. He made out a check to the Blackers and endorsed it for transfer to Greenberg. *Id.* at 240. Blacker gave Greenberg the money. *Id.*

Then, nobody repaid Plitt. *Id.* The collateral proved worthless: The "Alsage Realty Corporation" turned out to be "a paper corporation with no assets." *Id.* For this and other "illegal

21

financial machinations," Blacker was disbarred and imprisoned. *Id.* The Blackers divorced. *Id.* Unfortunately for Plitt, the Blackers also declared bankruptcy. *Id.*

With no other way to recover his money, Plitt sued Greenberg for unjust enrichment. *Id.* At trial, Plitt called just two witnesses: himself and Greenberg. *Id.* The gist of Greenberg's "vague, indefinite, and somewhat contradictory" testimony was that he had paid Blacker back for the money. *Id.* at 240, 245. There was no evidence Greenberg knew the money Blacker gave him came from Plitt, let alone from Blacker's fraud. *Id.* at 240. After Plitt concluded his case, Greenberg moved for a directed verdict and the trial court granted his motion. *Id.* at 243. In the trial court's eyes, Greenberg's uncontradicted testimony that he had paid Blacker for Plitt's money precluded a verdict for Plitt. *Id.*

On appeal, the Maryland Supreme Court reversed the directed verdict for Greenberg. At the outset, the court found that Plitt "possesse[d] a colorable cause of action grounded on a theory of unjust enrichment." *Id.* at 241. "[T]he law implies a debt whenever the defendant has obtained possession of money which, in equity and good conscience, he ought not to be allowed to retain." *Id.* (quoting *State ex rel. Emp. Sec. Bd. v. Rucker*, 126 A.2d 846, 849 (Md. 1956)) (cleaned up). On that basis, "[i]t has been held that a plaintiff could recover money from even an innocent transferee who was without knowledge that he possessed the plaintiff's money." *Id.* (citing *In re Brereton's Estate*, 130 A.2d 453 (Pa. 1957)).

However, "if a transferee came into possession of a plaintiff's money after paying a good and valuable consideration for it, then the plaintiff could not prevail and recover back the funds." *Id.* (citations omitted). The Restatement (First) of Restitution (hereinafter "First Restatement")— then the only Restatement of the subject—articulated the rules of an unjust enrichment claim against a third-party transferee like Greenberg this way:

22

> A person who, non-tortiously and without notice that another has the beneficial ownership of it, acquires property which it would have been wrongful for him to acquire with notice of the facts and of which he is not a purchaser for value is, upon discovery of the facts, under a duty to account to the other for the direct product of the subject matter and the value of the use to him, if any.

*Id.* (quoting Restatement (First) § 123).

With these rules on the table, the Maryland Supreme Court turned to the question before it: "whether the plaintiff has met his burden of proof in establishing a prima facie case of unjust enrichment." *Id.* at 239. "In order to make out a case of unjust enrichment, the burden rested upon Plitt to prove that the proceeds of his check, which were deposited into Greenberg's account, were received without the payment of valuable consideration from Greenberg to Blacker." *Id.* at 241. Plitt carried that burden of proof, the court held, because even though Greenberg testified he repaid Blacker, "Plitt had presented sufficient evidence of lack of payment [by Greenberg] to Blacker for the proceeds of Plitt's check" by calling Greenberg's credibility into question and introducing Greenberg's bank statement. *Id.* at 243–45. So Plitt was entitled to have a jury decide his unjust enrichment claim.

Return to this case. On Ultragenyx's account, *Plitt* means that an element of the cause of action for unjust enrichment is that the defendant is not a bona fide purchaser for value. As Ultragenyx reads the case, *Plitt* held that the plaintiff must plead that negative in their complaint— before the defendant has invoked that status in defense. Maryland law, Ultragenyx urges, still makes that demand.

Not so. Ultragenyx's interpretation of *Plitt* brushes away three essential features of the case: its express recognition that Plitt stated a claim for unjust enrichment against Greenberg, *see id.* at 240–41 (finding at the outset that Plitt "possesse[d] a colorable cause of action grounded on a theory of unjust enrichment"); the fact that by its own terms, *Plitt*'s bona fide purchaser analysis

concerned the burden of proof at trial, not the requirements for stating a claim, *see id.* at 239 (framing the question as "whether the plaintiff has met his burden of proof"); and the fact that *Plitt* preceded the three-element reformulation of unjust enrichment doctrine in accordance with the Tentative Second Restatement. Any one of these distinctions is a sufficient reason to reject Ultragenyx's reading of *Plitt*. Together, these distinctions foreclose Ultragenyx's position completely.

It should be no surprise, then, that there is no Maryland authority for Ultragenyx's interpretation of *Plitt*. In the nearly 60 years since *Plitt*, no Maryland court ever has required an unjust enrichment plaintiff to plead in their complaint (as opposed to prove on summary judgment or at trial) that the defendant was not a bona fide purchaser for value. Never has a Maryland court granted a motion to dismiss an unjust enrichment claim because the plaintiff failed to plead this negative. Ultragenyx cites no Maryland case that did so. And this Court finds none.

To the contrary, the only Maryland court that has engaged directly with this question construed *Plitt*'s bona fide purchaser analysis as addressing a defense the plaintiff must surmount to obtain summary judgment or to prevail at trial. *See Gibbons*, 918 A.2d at 572–73. Like *Plitt*, *Gibbons* was an unjust enrichment case concerning a three-party transaction. *Id.* at 567. For years, Thomas Gibbons exploited his position at Bank of America to sell over $1.5 million in securities owned by Bank of America customers and pocket the proceeds. *Id.* Ultimately, Thomas deposited some of his ill-gotten gains in an account he held jointly with his wife, Lynne Gibbons. *Id.* Because Lynne was the primary person who drew on that account, Bank of America brought an unjust enrichment claim against her to recover the misappropriated money. *Id.* at 567–68.

On cross-motions for summary judgment, the circuit court granted judgment to Lynne. *Id.* at 568. The circuit court highlighted that Bank of America had failed to allege any direct dealings

with Lynne, *id.* at 569–70 ("[T]here is absolutely no allegation that the Plaintiff and this particular Defendant had any dealings with one another either directly or indirectly."), and that although Bank of America's complaint contained a conclusory allegation that Lynne knew of Thomas's wrongdoing, the bank "back[ed] this up with no facts," and affidavits from the Gibbonses contradicted the allegation, *id.* at 576. In other words, the circuit court—weighing whether Bank of America had stated a claim as a matter of law and whether the Bank had substantiated its allegations—granted summary judgment to the unjust enrichment defendant on the theory that the plaintiff needed to plead and prove either direct dealings with the defendant or that the defendant was not a bona fide purchaser for value.

The Maryland Appellate Court reversed, rejecting those propositions. *Id.* at 568, 578. First, the court observed that *Plitt* held that "a cause of action for unjust enrichment may lie against a transferee with whom the plaintiff had no contract, transaction, or dealing, either directly or indirectly." *Id.* at 571. Second, the court turned to *Plitt*'s bona fide purchaser for value analysis. Recounting *Plitt*, the *Gibbons* Court acknowledged *Plitt*'s determination that at trial "the burden rested upon Plitt to prove that the proceeds of his check . . . were received without the payment of valuable consideration from Greenberg to Blacker." *Id.* at 572 (quoting *Plitt*, 219 A.2d at 241). Yet the *Gibbons* Court framed bona fide purchaser for value as a defense Plitt bore the burden of overcoming at trial rather than an element of the claim Plitt bore the burden of pleading. On the *Gibbons* Court's account, the *Plitt* Court "explained that Greenberg's innocence could not *shield* him" from Plitt's unjust enrichment claim if the jury found that he had not paid value for Plitt's money:

> Although Greenberg claimed that he paid Blacker $38,333.34 in exchange for Plitt's check in that amount, Greenberg was "unable to produce any checks, check stubs or records" showing payments from Greenberg to Blacker totaling that amount. Pointing to bank statements that contradicted Greenberg's testimony, the

> Court of Appeals held that there was "sufficient evidence of lack of payment to Blacker for the proceeds of Plitt's check received into Greenberg's account as would justify taking the case to the jury." If the jury found that Greenberg did not pay for the $38,333.34 deposit from Plitt, *Greenberg could not establish an "innocent transferee for value" defense to Plitt's claim for unjust enrichment*.

*Id.* (quoting *Plitt*, 219 A.2d at 243) (emphasis added). Thus, the most recent word of the Maryland judiciary is clear: In *Plitt*, bona fide purchaser for value was a "defense" the defendant had to "establish." *Id.*

The *Gibbons* Court's application of *Plitt* to the case in front of it confirms that bona fide purchaser for value is a defense an unjust enrichment plaintiff must overcome rather than an element of the claim they must plead. Faulting the circuit court for thinking that the dispositive question was whether Bank of America had direct dealings with Lynne or whether Lynne knew of her husband's scheme, the Maryland Appellate Court held that in the absence of those two circumstances

> the dispositive question is whether Lynne Gibbons, as the defendant transferee, paid value for the funds transferred to her by Thomas Gibbons, the culpable third party. If the misappropriated Bank funds can be traced into her account, there was no consideration for such deposits, and there is no *other defense* to the Bank's claim for restitution, then the Bank could prevail on its unjust enrichment cause of action.

*Id.* at 573 (emphasis added).[4] "No *other defense*"—that is, other than the defense that "there was no consideration for such deposits." *Id.* (emphasis added). As if to dispel any remaining doubt, the court then cited "1 Dobbs § 4.6–4.7 (*defenses* of change of position, *bona fide purchase*)." *Id.* at 573 n.3 (emphasis added). An unjust enrichment plaintiff ultimately may have to prove that the

---

[4] By "the Bank's claim for restitution," the *Gibbons* Court meant the Bank's unjust enrichment claim. *See Bank of Am. Corp. v. Gibbons*, 918 A.2d 565, 573 (Md. App. Ct. 2007). Because "restitutionary remedies and unjust enrichment are simply flip sides of the same coin," *id.* at 569 (quoting *Alternatives Unlimited, Inc. v. New Balt. City Bd. of Sch. Comm'rs*, 843 A.2d 252, 275 (Md. App. Ct. 2004)), Maryland courts often refer to the cause of action (unjust enrichment) as "restitution" or by the names of the associated remedies (disgorgement, constructive trust, and the like), *see Alternatives Unlimited*, 843 A.2d at 275–76.

defendant was not a bona fide purchaser for value. But an unjust enrichment plaintiff need not plead that negative in their complaint.

The *Gibbons* Court's formulation of the cause of action for unjust enrichment is further evidence of this point. Instead of applying the archaic formulation from the First Restatement that *Plitt* invoked, the *Gibbons* Court applied the modern, three-element formulation from the Tentative Second Restatement that the Maryland Supreme Court adopted in 2000: a benefit conferred by the plaintiff on the defendant, with the knowledge of the defendant, and the defendant's retention of the benefit under inequitable circumstances. *Id.* at 569. Whereas the *Plitt* formulation expressly mentions bona fide purchaser status, *see Plitt*, 219 A.2d at 241, the *Gibbons* formulation does not, *see Gibbons*, 918 A.2d at 569. Of course, in recounting *Plitt*, *Gibbons* quoted the formulation *Plitt* used. *Id.* at 572 (quoting *Plitt*, 219 A.2d at 241). But that was to explain *Plitt*, not to define what counts as unjust enrichment today. *See id.*[5]

The Third Restatement confirms that bona fide purchaser status is an "affirmative defense" to an unjust enrichment claim, not an element of the claim itself. Restatement (Third) § 66. In fact, that is the first point in the first comment on the bona fide purchase rule:

> Section 66 presents the familiar rule of purchase for value without notice (or "bona fide purchase") *as an affirmative defense to a liability in restitution*. One who purchases an asset for value, without notice of competing claims, takes that asset subject to prior legal interests, but free of equitable interests to which the asset was

---

[5] As the word of Maryland's intermediate appellate court, *Gibbons* is entitled to this Court's respect. *See Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 957 F.2d 1153, 1156 (4th Cir. 1992). Of course, the "best evidence" of the answer to a question of state law is what the state's highest court has said about the question. *See id.* Nevertheless, when, as here, the state's highest court has left the answer unclear, a federal district court sitting in diversity must look to the rulings of the state's intermediate appellate court as "the next best indicia of what state law is." *See id.* (quoting 19 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Fed. Prac. & Proc.* § 4507, at 94–95 (1982)). "[O]nly if the decision of a state's intermediate court cannot be reconciled with state statutes, or decisions of the state's highest court, or both, may a federal court sitting in diversity refuse to follow it." *Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997, 1003 (4th Cir. 1998). That is not the case here, so this Court follows *Gibbons*.

subject in the hands of the grantor. Property-based restitution claims are among the most important examples of the equitable interests that *the defense of bona fide purchase* cuts off . . . .

*Id.* cmt. a (emphasis added); *see also* ECF 31-1 (brief of *amici curiae* Rendleman & Roberts), at 6–7 ("Defendant asserts that plaintiff must allege defendant's lack of *bona fide* purchaser status to state a restitution cause of action. This assertion is incorrect . . . The key point is that *bona fide* purchase is an affirmative defense.").

Today, Maryland courts look to the Third Restatement in assessing unjust enrichment claims. *See*, *e.g.*, *Linton v. Consumer Prot. Div.*, 225 A.3d 456, 466 (Md. 2020) (citing Restatement (Third) § 3); *Clark Off. Bldg., LLC v. MCM Cap. Partners, LLLP*, 245 A.3d 186, 196–97 (Md. App. Ct. 2021) (recognizing that "the Third Restatement clarified and restructured the concepts underlying restitution" and applying it accordingly); *Rockville City Police Dep't v. Trotter*, No. 156, Sept. Term 2021, 2023 WL 6210768, at *17 & n.17 (Md. App. Ct. Sept. 25, 2023) (advising that if "[n]either party has cited a Maryland appellate decision that is precisely on point, and our own research hasn't uncovered any," then "[t]he relevant legal principles, together with extensive commentary on how the principles should be applied in specific situations, can be found in the American Law Institute Restatement (Third) of Restitution and Unjust Enrichment"). The Maryland Appellate Court even has applied the Third Restatement's approach to bona fide purchaser for value analysis. *See SMG Holdings I, LLC v. Arena Ventures, LLC*, No. 1778, Sept. Term 2016, 2018 WL 1391613, at *7 (Md. App. Ct. Mar. 20, 2018) (citing Restatement (Third) § 66). Both the plaintiff, *see* ECF 21, at 19–20, 21, 22, 29, 32, and the defendant, s*ee* ECF 6-1, at 15, 19 n.22; ECF 37, at 8, 10, rely on the Third Restatement in their briefs as well.

Making matters even clearer, the Fourth Circuit recently read the relevant part of *Plitt* differently than Ultragenyx does. *See Amaya v. DGS Constr., LLC*, Nos. 22-1189 & 22-1232, 2023

WL 3034326 (4th Cir. Apr. 21, 2023). To repeat, on Ultragenyx's account, the pertinent passage in *Plitt* means that an unjust enrichment plaintiff effectively has to plead a fourth element of the cause of action: that the defendant is not a bona fide purchaser for value. On the Fourth Circuit's account, the same passage means only that a court *may* consider bona fide purchaser status in its analysis of the third element: whether it is equitable for the defendant to retain the benefit. *See id.* at *6. As the Fourth Circuit put it, "Whether a party is legally or otherwise entitled to the benefit may also factor into the weighing of the equities." *Id.* (citing *Plitt*, 219 A.2d at 241). Bona fide purchaser for value status may bear on the equities. But it is not a per se barrier to stating a claim. Ultragenyx would make much more of *Plitt* than the Fourth Circuit.

Other than *Plitt* itself, Ultragenyx cites only one authority for its position: *Haley v. Corcoran*, 659 F. Supp. 2d 714 (D. Md. 2009). Leaning on *Plitt*, *Haley* endorses Ultragenyx's position that an unjust enrichment plaintiff must plausibly allege that the defendant is not a bona fide purchaser for value. *See id.* at 724. But *Haley*'s interpretation of *Plitt* is unpersuasive.

*Haley* began with two homeowners, James and Peggy Haley, facing foreclosure on their home. *Id.* at 719. A man purporting to represent a foreclosure rescue service offered to arrange the sale of the home to a third party who would permit the Haleys to remain on the deed and continue to live there as renters. *Id.* The Haleys accepted the offer. *Id.* Michael Mattice bought the home with a purchase money loan from a company called Option One. *Id*. Mattice secured the loan with two mortgages on the property and directed the Haleys to make rental payments to Option One. *Id.* Shortly thereafter, the Haleys learned that they were not on the deed at all; only Mattice was. *Id.* The following year, Option One brought a foreclosure action against Mattice for nonpayment and ultimately purchased the home at auction. *Id.* at 719–20. The Haleys brought several claims

against Option One, including one for unjust enrichment. *Id.* at 720. Option One moved to dismiss the unjust enrichment claim. *See id.* at 723–24.

In two short paragraphs of analysis, the *Haley* Court granted Option One's motion to dismiss on the ground that "a plaintiff cannot state a claim for unjust enrichment against a *bona fide* purchase for value." *Id.* at 724. After reciting *Plitt*'s quotation of the First Restatement, the court reasoned that because "[a] *bona fide* purchaser . . . cannot be unjustly enriched," "[a] claim for unjust enrichment requires an allegation that the defendant was not a *bona fide* purchaser." *Id.* The Haleys had not alleged facts showing that Option One had notice of the fraud. *Id.* And the Haleys had alleged that Option One gave Mattice a purchase money loan in exchange for the two mortgages on their house. *Id.* The court concluded that, "[a]ccordingly, the Haleys' unjust enrichment claim must be dismissed." *Id.*

*Haley* was right to grant the motion to dismiss. But *Haley*'s rationale was wrong. First, *Haley*'s logic is unsound. From the fact that a bona fide purchaser for value cannot be unjustly enriched, it does not follow that a plaintiff fails to state a claim for unjust enrichment unless the plaintiff alleges that the defendant is not a bona fide purchaser for value. Defenses are bars to recovery, not elements of a claim that plaintiffs must plead. Consider an example. Under Maryland law, a plaintiff who pays the defendant's debt of their own free choice, without any legal obligation to do so or request from the defendant, is "prohibited from recovery in unjust enrichment." *Hill*, 936 A.2d at 355. But this "officious payor" status is a defense. *Id.* at 358. There is no requirement that every unjust enrichment plaintiff plead that they are not an officious payor. So one cannot soundly infer that if a party's status bars recovery, the plaintiff must allege the absence of that status. If bona fide purchaser for value status is a defense, then a bona fide purchaser for value

cannot be unjustly enriched, but a plaintiff does not fail to state a claim if they do not negate that defense in the complaint. *Haley* missed that possibility.

Second, *Haley*'s rule is unsupported by Maryland law. *Haley* ignored the Maryland Appellate Court's express statement in *Gibbons* that bona fide purchaser for value status is a defense. *See Gibbons*, 918 A.2d at 572–73. The *Haley* Court did not even cite *Gibbons*, let alone distinguish it. No convincing analysis of Maryland law can silently disregard its most recent authority on the case and question at issue. Other courts in this district have acknowledged *Gibbons*' statements that bona fide purchaser for value is a defense. *See Newcomb v. Babu*, No. GJH-19-2046, 2020 WL 5106714, at *5 (D. Md. Aug. 30, 2020) (quoting *Gibbons*, 918 A.2d at 573).

Third, *Haley* overgeneralized, drawing a needlessly broad rule from a narrow pleading defect. The Haleys' complaint did not merely omit an allegation that Option One was not a bona fide purchaser for value. The Haleys' complaint affirmatively alleged facts showing that Option One *was* a bona fide purchaser. They expressly alleged Option One gave value for the mortgages on their property: the purchase money loan. The Haleys pled themselves out of their claim. It is one thing to say that a plaintiff has failed to state a claim for unjust enrichment because they have alleged facts showing that the defendant is a bona fide purchaser for value. Of course, that is a sound basis for granting a motion to dismiss. It is another thing entirely to say that a plaintiff has failed to state a claim for unjust enrichment because they have *failed* to allege facts showing that the defendant is *not* a bona fide purchaser for value. That is an unwarranted demand that the

plaintiff anticipate and negate a defense.[6] Neither Maryland courts nor federal courts make that demand.

Ultragenyx's position that, under *Plitt*, Lacks must plead Ultragenyx is not a bona fide purchaser for value finds no support in the decisions of Maryland courts, the Third Restatement, or the most recent relevant opinion of the Fourth Circuit. *Plitt* concerned an unjust enrichment plaintiff's burden of proof at trial, not their pleading obligations. The Maryland Appellate Court recently interpreted *Plitt* as addressing a defense, not an element of the claim. And even if *Plitt* really meant that stating a claim for unjust enrichment required pleading that the defendant is not a bona fide purchaser for value, the Maryland Supreme Court has since reorganized the previously scattershot law of unjust enrichment into a three-element cause of action that contains no such requirement. Lacks need not plead that Ultragenyx was not a bona fide purchaser for value of the HeLa cells it acquired.

### b. Lacks has pled Ultragenyx is not a bona fide purchaser for value

Even if Lacks had to plead that Ultragenyx was not a bona fide purchaser for value, Lacks has done so. Here are the most relevant allegations:

> Ultragenyx is not bona fide purchasers for value [sic]. With knowledge of the horrific misconduct by physicians at Johns Hopkins, Ultragenyx knew its possession, cultivation, and sale of HeLa cells was, is, and will continue to be

---

[6] *Fidelity National Title Insurance Company v. Chicago Title Insurance Company*, 64 F.3d 656 (Table), 1995 WL 478028 (4th Cir. Aug. 14, 1995), is another case where an unjust enrichment plaintiff pled themselves out of a claim. In that unpublished table decision, the Fourth Circuit affirmed the district court's grant of a motion to dismiss a Maryland unjust enrichment claim in part because, by the plaintiff's own allegations, the defendant "gave value for the [plaintiff's] money." *Id.* at *4. Whereas *Haley* conflates the presence of an allegation that the defendant was a bona fide purchaser with the absence of an allegation that the defendant was not a bona fide purchaser, *Fidelity* is clear that the problem is that the plaintiff alleged facts that would prevent them from overcoming a bona fide purchaser defense. In any event, *Fidelity* predated *Gibbons*' clarification that bona fide purchaser status is a defense and the Maryland Supreme Court's 2000 reformulation of the cause of action for unjust enrichment.

unjust. Upon information and belief, at no time did Ultragenyx give fair or sufficient consideration for Mrs. Lacks's cells.

ECF 1, ¶ 52.

Upon information and belief, Ultragenyx is not a bona fide purchaser for value. Not only did Ultragenyx know that HeLa cells were wrongfully obtained by physicians at Johns Hopkins through unconsented-to non-therapeutic medical experimentation, it also never paid fair or sufficient consideration for its HeLa cells.

Ultragenyx's [sic] acted with knowledge of the underlying wrong to Henrietta Lacks or despite a known risk that the conduct in question violated the rights of Mrs. Lacks.

*Id.* ¶¶ 78–79.

As *Haley* suggests, Ultragenyx is not the first unjust enrichment defendant to try to persuade a federal court to dismiss a claim on bona fide purchaser grounds. There are several cases in this district applying Maryland law that have assessed, on a motion to dismiss, whether an unjust enrichment defendant was a bona fide purchaser for value. *See Haley*, 659 F. Supp. 2d at 724; *Fid. Nat'l Title Ins. Co. v. Chicago Title Ins. Co.*, 64 F.3d 656 (Table), 1995 WL 478028, at *4 (4th Cir. Aug. 14, 1995); *Newcomb*, 2020 WL 5106714, at *4–7; *Monterey Mushrooms v. Healthcare Strategies, Inc.*, No. CCB-20-3061, 2021 WL 1909592, at *2–3 (D. Md. May 12, 2021); *Hobbs I*, 198 F. Supp. 3d at 535; *Hobbs v. St. Martin* ("*Hobbs II*"), No. JKB-16-749, 2017 WL 105675, at *3–4 (D. Md. Jan. 11, 2017). Their analyses vary. Some courts, confronting facts like *Haley*'s, have found that unjust enrichment plaintiffs pled themselves out of their claims by inadvertently alleging that the defendants were bona fide purchasers for value. *See Haley*, 659 F. Supp. 2d at 723–24; *Fidelity*, 1995 WL 478028, at *4. Other courts, following *Haley*'s erroneous generalization, have thought a plaintiff must plead that the defendant is not a bona fide purchaser for value. *See Hobbs I*, 198 F. Supp. at 535–36; *Hobbs II*, 2017 WL 105675, at *3–4. What matters

here is that by the standards of these cases, Lacks has alleged enough to survive Ultragenyx's motion to dismiss.

Unlike the plaintiffs in *Haley* and *Fidelity*, Lacks has not alleged facts that indicate or make it reasonable to infer that Ultragenyx was a bona fide purchaser for value. In those cases, courts granted motions to dismiss unjust enrichment claims because the plaintiffs alleged facts showing that the defendant paid value for the benefit the plaintiff conferred. *See Haley*, 659 F. Supp. 2d at 724; *Fidelity*, 1995 WL 478028, at *4. That is not the case here. Nowhere has Lacks alleged that Ultragenyx gave value for the HeLa cells it acquired; in fact, Lacks has alleged Ultragenyx did not. What's more, nowhere has Lacks alleged that Ultragenyx was unaware of the cell line's origins; in fact, Lacks has alleged Ultragenyx was on notice of the wrongs to Henrietta Lacks when Ultragenyx obtained HeLa cells. So *Haley* and *Fidelity* do not support dismissing Lacks' complaint for failure to plead that Ultragenyx was not a bona fide purchaser for value.

The Court can find only one case where a court in this district granted a motion to dismiss an unjust enrichment claim because of the mere omission of a plausible allegation that the defendant was not a bona fide purchaser for value. In *Hobbs I*, Gary Hobbs brought an unjust enrichment claim against Sean St. Martin to recover $500,000 Hobbs loaned to another man, Richard Hagen. 198 F. Supp. 3d at 532. Presenting himself as a businessman with extensive ties to the intelligence community, Hagen persuaded Hobbs to give him $500,000 to invest in "companies with ties to the Central Intelligence Agency." *Id.* at 532–33. A few years later, Hagen returned to Hobbs, asking for a $500,000 loan to buy out other investors. *Id.* at 533. Hobbs agreed. *Id.* But Hagen had Hobbs' broker wire the money to St. Martin, who Hagen later told Hobbs was a "former black ops operative." *Id.* In the end, Hagen faced criminal charges and civil liability in state and federal court for what amounted to a Ponzi scheme. *Id.* When Hobbs tried to recover the

$500,000 "loan" that had ended up in St. Martin's hands, St. Martin refused to return the money. *Id.*

After Hobbs sued St. Martin for unjust enrichment (among other claims), St. Martin moved to dismiss the unjust enrichment claim on the ground that Hobbs had not alleged that St. Martin knew Hagen had procured the money from Hobbs by fraud or that St. Martin did not pay Hagen consideration for the money—in short, that Hobbs had not alleged that St. Martin was not a bona fide purchaser for value. *Id.* at 535. The court agreed. *Id.* Because Hobbs did not make "any allegations concerning the circumstances under which [St. Martin] received the wire transmission"—not even minimal ones—"the Court can only speculate as to whether Defendant gave good and valuable consideration for the funds; whether Defendant was Hagen's creditor or donee; and whether Defendant was involved with Hagen's apparent Ponzi scheme, ignorant of the scheme, or perhaps himself a victim of the scheme." *Id.* Hobbs' complaint said so little about St. Martin that "one might be forgiven for thinking [Hobbs] has sued Richard Hagen." *Id.* at 532. So the court granted the motion to dismiss. *Id.* at 537.

*Hobbs I* is not this case. Hobbs did not allege facts that would support the inference St. Martin accepted his money without giving value. *Id.* He did not allege facts that would support the inference St. Martin was in on Hagen's scheme. *Id.* He did not even assert, in any form, that St. Martin was not a bona fide purchaser for value. *Id.* His complaint was so focused on Hagen that the court could not determine anything material about St. Martin's role in the events at issue. *Id.* By contrast, Lacks has alleged plenty about Ultragenyx. Lacks has asserted expressly that Ultragenyx is not a bona fide purchaser for value. He has alleged that Ultragenyx did not pay valuable consideration for the HeLa cells it acquired and that scientists long distributed HeLa cells for free. He has alleged Ultragenyx knew the cell line's origins, pointing to the knowledge of those

origins within the scientific community, their subsequent widespread publicity, and Ultragenyx's own tribute to Henrietta Lacks on its website. Lacks has cleared the *Hobbs I* bar.

That is not the end of the *Hobbs* story, either. After *Hobbs I*, Hobbs moved to reopen the case and to file an amended complaint. *See* ECF 20-3, in *Hobbs II*, JKB-16-749. The proposed amended complaint contained two distinct new allegations that St. Martin did not give value for Hobbs' money. First, "Defendant knew when he received the funds from Plaintiff that Mr. Hagen was involved in a Ponzi scheme and he had not paid any consideration to either Mr. Hagen or Plaintiff for the funds." *Id.* ¶ 22, in *Hobbs II*. Second, "Defendant did not pay good and valuable consideration for the funds as he was neither Plaintiff's nor Mr. Hagen's creditor." *Id.* ¶¶ 33, 43 in *Hobbs II*. Relying on these two sparse allegations alone, the court held that Hobbs "can conceivably build a non-futile case on his allegation that no consideration was paid," permitted Hobbs to "proceed on this theory," and granted Hobbs' motion to reopen the case and amend his complaint. *Hobbs II*, 2017 WL 105675, at *4, *6 (citing ECF 20-3, ¶¶ 22, 33, 43 in *Hobbs II*). If those allegations were enough in *Hobbs II*, Lacks' more extensive and detailed allegations are enough here.

The *Newcomb* Court also found allegations significantly less specific than Lacks' sufficient to plead that the defendants were not bona fide purchasers for value. *See Newcomb*, 2020 WL 5106714, at *1–2. In *Newcomb*, the plaintiffs' financial advisor tricked them into borrowing several million dollars and depositing the money into an account with DH Investments, a company owned by Nirav Babu. *Id.* Nirav Babu then took some of the deposited funds for himself and distributed portions of the rest to his father, Bhupesh Babu, and his girlfriend, Bella Batra. *Id.* at *2. The plaintiffs did not expressly allege anything at all about whether DH Investments gave value for the plaintiffs' money or what DH Investments knew about the scheme. *See id.* at *5; *see*

*also* ECF 1 in *Newcomb*, GJH-19-2046. Nevertheless, at the motion to dismiss stage, the absence of any allegation that DH Investments was a bona fide purchaser for value was enough to permit the plaintiffs' unjust enrichment claim against the company to proceed. *See Newcomb*, 2020 WL 5106714, at *5. The *Newcomb* plaintiffs alleged little more about the bona fide purchaser status of the Babus and Batra, to whom DH Investments transferred some of the money: "The Defendants provided nothing of value to Defendant, DH Investments, LLC, in consideration for the monies that they received." ECF 1, ¶ 114 in *Newcomb*, GJH-19-2046. That's it. Nevertheless, this assertion sufficed to plausibly allege that these defendants were not bona fide purchasers for value. *See Newcomb*, 2020 WL 5106714, at *6. When these defendants objected that this allegation was conclusory, the court disagreed. *Id.* It was "not clear to the Court what more Plaintiffs could have alleged at this stage of the proceedings to demonstrate the absence of consideration." *Id.* While the plaintiffs "do have the burden to present evidence of lack of consideration[,] . . . whether Plaintiffs have done so strikes the Court as an inquiry better left for a later stage of the proceedings." *Id.* (citing *Plitt*, 219 A.2d at 241, 243).[7]

Lacks has alleged at least as much as the *Newcomb* plaintiffs alleged about Nirav Babu, Bhupesh Babu, and Batra, and more than they alleged about DH Investments. Lacks has alleged expressly that Ultragenyx did not pay value for its HeLa cells and that Ultragenyx knew the cell line's unjust origins when it acquired them. By *Newcomb*'s standard, that alone would be enough. *See id.* After all, at the motion to dismiss stage, it is difficult "to demonstrate the absence of consideration" and just as difficult to imagine "what more Plaintiffs could have alleged" on that front. *See id.* Yet Lacks goes further. He also alleges concrete facts that make his allegations

---

[7] The *Newcomb* Court acknowledged that *Gibbons* held bona fide purchaser for value is a defense, 2020 WL 5106714, at *5 (quoting *Gibbons*, 918 A.2d at 573), but it nevertheless considered whether the plaintiffs had adequately pled the defense as to the Babus and Batra, *id.* at *5–7.

plausible: above all, that scientists routinely distributed HeLa cells for free, that the story of Henrietta Lacks was widely known in the scientific community and ultimately to the broader public, and that at one time, Ultragenyx posted on its website a statement acknowledging that the HeLa cell line originated in the nonconsensual seizure of her cells. If the barebones allegations in *Newcomb* sufficed to permit the case to proceed past the motion to dismiss stage, so do the richer ones here.

Finally, Lacks has used information and belief pleading appropriately to shore up his allegations that Ultragenyx was not a bona fide purchaser for value. A complaint may state a claim using information and belief pleading where "the facts are peculiarly within the possession of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible," *Stone v. Trump*, 400 F. Supp. 3d 317, 341 (D. Md. 2019) (quoting *Malibu Media, LLC v. Doe*, No. PWG-13-365, 2014 WL 7188822, at *4 (D. Md. Dec. 16, 2014)), so long as the allegations are not "wholly conclusory," *Kashdan v. George Mason Univ.*, 70 F.4th 694, 701–02 (4th Cir. 2023).

The only court in this district facing a comparable bid to negate bona fide purchaser status with information and belief pleading approved that approach. In *Monterey Mushrooms v. Healthcare Strategies, Inc.*, the plaintiff alleged "on information and belief" that the defendant accepted and later solicited overpayments to which the defendant knew it was not entitled under the terms of the parties' agreement. 2021 WL 1909592, at *1, *4 n.4. Moving to dismiss the plaintiff's claim for unjust enrichment, the defendant argued that the plaintiff could not rely on information and belief pleading to establish its otherwise speculative allegation that the defendant knew it had no right to the payments and hence was not a bona fide purchaser for value. *Id.* at *4 n.4. The court rejected that argument. *Id.* The court reasoned that "the allegations in the complaint"

made it "appear[] plausible" that the plaintiff "lack[ed] personal knowledge" of whether the defendant altered its billing practices to elicit additional excess payments from the plaintiff—"facts which are within the control of [the defendant]." *Id.* And the court determined that the allegation that the defendant received overpayments made "plausible" the inference that the defendant knew the payments were excessive. *Id*. The court concluded: "This is a proper use of information and belief pleading." *Id.* (quotation omitted). For those two reasons, the court denied the motion to dismiss.

Lacks has used information and belief pleading in the same fashion. He alleges facts plausibly beyond his personal knowledge and squarely within the control of Ultragenyx: that Ultragenyx did not pay value for its HeLa cells and that Ultragenyx already knew of the cell line's sordid origins when the company first acquired them. And Lacks has made the inference of Ultragenyx's culpability plausible by alleging concrete facts that support his beliefs, particularly Ultragenyx's public admission on its website that it knew the HeLa cell line began with the nonconsensual seizure of cells from Henrietta Lacks and the widespread distribution of HeLa cells for free to scientists around the globe. On either ground—that the information is within Ultragenyx's control or that Lacks has based his belief on facts that make an inference of Ultragenyx's culpability plausible—Lacks has used information and belief pleading appropriately to plausibly allege that Ultragenyx was not a bona fide purchaser for value of the HeLa cells it acquired.

Here is where that leaves Lacks. Unlike the plaintiffs in *Haley* and *Fidelity*, Lacks has not inadvertently pled himself out of a claim by alleging facts that show Ultragenyx was a bona fide purchaser for value. Unlike the plaintiff in *Hobbs I*, Lacks has claimed expressly that Ultragenyx was not a bona fide purchaser for value, and he has supported that assertion with allegations of

specific facts that make it reasonable to infer he is correct. And Lacks has alleged at least as much about Ultragenyx's bona fide purchaser status as the plaintiffs whose unjust enrichment claims survived motions to dismiss in *Hobbs II*, *Newcomb*, and *Monterey Mushrooms*. In consequence, Lacks has plausibly alleged that Ultragenyx was not a bona fide purchaser for value.

*     *     *

Lacks is not required to plead that Ultragenyx was not a bona fide purchaser for value of the HeLa cells it acquired. Lacks has plausibly alleged that anyway. In the proceedings ahead, Lacks might be unable to substantiate that allegation. Ultragenyx might demonstrate that it paid value for its HeLa cells and knew nothing of their origins when it acquired them. But that is a question for another day.[8]

### 2.  Underlying Tort

Ultragenyx contends that Lacks' standalone unjust enrichment claim must be dismissed because Lacks "has not pleaded an actionable underlying tort" against Ultragenyx. ECF 6, at 19. Ultragenyx is incorrect. Under Maryland law, a plaintiff may pursue a claim for unjust enrichment without stating a claim for an underlying tort.

Unjust enrichment constitutes "an independent basis of liability." *Clark Office Bldg.*, 245 A.3d at 190. Accordingly, Maryland law does not require an unjust enrichment plaintiff to plead an underlying tort. *See Hill*, 936 A.2d at 352 ("[T]he basis for recovery in unjust enrichment is not

---

[8] Lacks also argues that Ultragenyx is not entitled to the protection of bona fide purchaser for value status at all because Ultragenyx obtained and now has void title to the HeLa cells it acquired. ECF 21, at 29–30. "[T]he distinction between a void deed and a voidable deed is key in determining which protections, if any, are due to a bona fide purchaser: '[A] person otherwise qualifying as a bona fide purchaser . . . receives no protection under a "void" deed.'" *Fishman v. Murphy ex rel. Estate of Urban*, 72 A.3d 185, 192 (Md. 2013) (quoting *Scotch Bonnett Realty Corp. v. Matthews*, 11 A.3d 801, 808 (Md. 2011)). Because the Court holds that Lacks need not plead that Ultragenyx is not a bona fide purchaser for value and that even if Lacks needed to, Lacks has, the Court need not and does not decide whether Ultragenyx may invoke the bona fide purchaser defense.

based on fault . . . ."); *Berry & Gould*, 757 A.2d at 116 ("[R]estitution is not limited to situations in which the defendant has acquired a benefit by wrongful means . . . ."). In multiple cases, modern and antiquated, the Maryland Supreme Court and Maryland Appellate Court have permitted unjust enrichment claims to proceed unaccompanied by any tort claims. In *Dolan v. McQuaide*, 79 A.3d 394 (Md. App. Ct. 2013), for example, plaintiff Effie Dolan sued the defendant, Christopher McQuaide, for unjust enrichment and a host of tort and contract claims. *Id.* at 397. The circuit court granted McQuaide's motion for summary judgment on all counts, but the Maryland Appellate Court reversed as to the unjust enrichment claim and three others. *Id.* On remand, the circuit court granted summary judgment on all of the remaining counts save unjust enrichment. *Id.* After McQuaide moved to alter or amend the judgment and the circuit court disposed of the unjust enrichment claim too, Dolan appealed. *Id.* The Maryland Appellate Court held that there was a genuine dispute of material fact as to whether Dolan conferred a benefit upon McQuaide and reversed the entry of summary judgment for the defendant on the unjust enrichment count. *Id.* at 403–04. As a result, the case was remanded to proceed with one count remaining: unjust enrichment. *See id.* On Ultragenyx's account of Maryland law, that could not have happened. Nevertheless, it did.

*Gibbons* and *Plitt* had the same result. In *Gibbons*, Bank of America filed a two-count complaint for unjust enrichment and conversion. *Gibbons*, 918 A.2d at 568. After the circuit court granted summary judgment to the defendant on both counts, Bank of America appealed only the grant of summary judgment on its unjust enrichment claim. *Id.* The Maryland Appellate Court reversed, permitting the unjust enrichment claim to proceed alone. *Id.* at 578. Similarly, in *Plitt*, the plaintiff brought two claims against the defendant: one for fraudulent conversion and another for unjust enrichment. 219 A.2d at 240–41. On the plaintiff's appeal from a directed verdict for

the defendant, Greenberg, the Maryland Supreme Court held that Plitt had "no grounds for an action of fraudulent conversion against Greenberg" but that Plitt "does possess a colorable cause of action grounded on a theory of unjust enrichment." *Id.* An unjust enrichment claim may stand on its own.

Not only do these three cases show that Maryland courts do not require unjust enrichment claimants to plead an accompanying tort. They also show that Maryland courts permit unjust enrichment claims to proceed even when they have found as a matter of law that the defendant did not commit the only tort or torts the plaintiff alleged.

Courts in this district and the Fourth Circuit also have recognized that a plaintiff may state a Maryland claim for unjust enrichment without stating a claim for any tort. *See Monterey Mushrooms*, 2021 WL 1909592, at *3 (citing *Dolan*, 79 A.3d at 397, and *Newcomb*, 2020 WL 5106714, at *10–11) ("[B]oth the Maryland Court of Special Appeals [now the Maryland Appellate Court] and the United States District Court for the District of Maryland have permitted cases to go forward with a sole claim for unjust enrichment remaining."). Conceding that some courts in this district had concluded that an unjust enrichment claim may not proceed without an accompanying tort claim, the *Monterey Mushrooms* Court nevertheless was "not persuaded that an action for unjust enrichment may not lie in the absence of an underlying tort claim." *Id.* So the court held that the complaint there—which advanced a single claim for unjust enrichment—stated a claim. *Id.* at *4. The Fourth Circuit recently said much the same, affirming a judgment for the plaintiff on a Maryland unjust enrichment claim where the defendant had prevailed on all other causes of action. *See Amaya*, 2023 WL 3034326, at *6 ("a finding of fault is unnecessary to find a defendant unjustly enriched").

Secondary authority is in accord. The Third Restatement opens with an acknowledgment that unjust enrichment has been identified "as an independent basis of liability" since the publication of the First Restatement in 1937. Restatement (Third) § 1. As Judge Learned Hand recognized in a storied defense of unjust enrichment, "in many cases . . . there is no contract or tort that could plausibly explain the source of the obligation to make restitution." Note, *The Intellectual History of Unjust Enrichment*, 133 Harv. L. Rev. 2077, 2088–89 (2020) (citing Learned Hand, *Restitution or Unjust Enrichment*, 11 Harv. L. Rev. 249, 257 (1897)). "[T]he defendant now simply holds what he has wrongfully" and "that is the whole story." *Id.* (quoting Hand, *Restitution*, 11 Harv. L. Rev. at 257); *see also* ECF 31-1 (brief of *amici curiae* Rendleman & Roberts), at 5 ("No tort is required.").

Ironically, the cases Ultragenyx cites for this supposed tort requirement expose how little authority there is for the company's position. Ultragenyx leads with *Texas Star Nut and Food Co. v. Truist Bank*, a case from this district that says that "the 'standard approach' in Maryland and this District is for courts to dismiss an unjust enrichment claim if the plaintiff 'has not stated a claim for tortious conduct.'" 632 F. Supp. 3d 664, 671 (D. Md. 2022) (quoting *Washington Cnty. Bd. of Educ. v. Mallinckrodt ARD, Inc.*, 431 F. Supp. 3d 698, 718 (D. Md. 2020)). The *Texas Star* Court claimed that the District of Maryland case it quoted, *Washington County*, "collect[ed] cases" for that proposition. *See id.* In fact, *Washington County* conceded that Maryland courts had not answered this question expressly at all:

> It is not clear to the Court whether it is permissible under Maryland law for a suit to consist of a single claim for unjust enrichment without an accompanying underlying tort. It does not appear that the Maryland appellate courts have directly addressed the question, and other states are split on the matter.

*Washington Cnty.*, 431 F. Supp. 3d at 718. Far from "collecting cases," *Washington County* cites only one case for the notion that the "standard approach" is to require an independent, underlying

tort. *See id.* (citing *State Farm Mut. Auto. Ins. Co. v. Carefree Land Chiropractic, LLC*, No. CCB-18-1279, 2018 WL 6514797, at *4 (D. Md. Dec. 11, 2018)).

That lone case, *State Farm*, does not support that "standard approach" either. There, the plaintiff insurance company brought a fraud claim and an "unjust enrichment claim predicated upon its fraud claim" against a chiropractic practice, alleging the practice tried to bilk the insurer with false or exaggerated benefits claims. *State Farm*, 2018 WL 6514797, at *1, *3. The court granted the defendant's motion to dismiss both counts. *Id.* at *4. First, the court granted the motion to dismiss the fraud claim for failure to meet the heightened pleading requirements of Rule 9(b). *Id.* at *3–4. Second, the court granted the motion to dismiss the unjust enrichment claim because it depended on the fraud claim. *Id.* at *4. Here is *State Farm*'s unjust enrichment analysis:

> State Farm argued that, even if the court dismisses its fraud claim, its unjust enrichment claim should proceed as a separate and independent claim for relief. While parties generally are permitted to plead claims in the alternative, Fed. R. Civ. P. 8(d)(3), State Farm has premised its unjust enrichment claim on its allegation that Carefree unlawfully obtained the insurance payments through the scheme alleged in its fraud claim. The "unjust enrichment" at issue in the complaint is the money Carefree received from State Farm pursuant to the alleged fraudulent scheme. For the same reasons the fraud claim must be dismissed, the unjust enrichment claim also must be dismissed.

*Id.* This analysis provides no support whatsoever for the assertion that an unjust enrichment claim must be accompanied by a tort claim. The court dismissed State Farm's fraud claim for failure to meet the heightened pleading requirements of Rule 9(b). *Id.* at *3. State Farm's unjust enrichment claim rested on the same allegations of fraud, so it had to meet the same demanding pleading standard. *See id.* at *3, *4. Because the unjust enrichment claim was nothing more than the fraud claim with a different label, the dismissal of State Farm's fraud claim required the dismissal of the associated unjust enrichment claim. *See id.* Dismissal was not required because an unjust enrichment claim must be accompanied by a tort claim. Thus, *State Farm* does not support the

notion that Maryland law requires the dismissal of an unjust enrichment claim in the absence of a tort claim.

All told, *Texas Star* derived the putative "standard approach" of Maryland courts from a single District of Maryland case, *Washington County*. *Washington County* conceded that Maryland courts had not actually adopted that approach and relied on a single District of Maryland case, *State Farm*, instead. *State Farm* does not stand for the proposition that an unjust enrichment claim must be accompanied by a tort claim; at most, it stands for the proposition that an unjust enrichment claim that rests entirely on allegations of fraud must meet the heightened pleading requirements of Rule 9(b). None of these cases provides a convincing reason to think that stating a claim for unjust enrichment under Maryland law requires stating a claim for an independent, underlying tort. Ultragenyx's cases are less a line of authority than a house of cards.

Perhaps aware of the lack of authority for its position, Ultragenyx warns that permitting independent unjust enrichment claims without tort claims would open the courthouse doors to unjust enrichment claims against defendants for "entirely legal conduct on principles of justice and fairness alone." ECF 6-1, at 20. That policy argument is best addressed to the Maryland Supreme Court or the Maryland legislature, not this Court. It is also unwarranted. *See* Restatement (Third) § 1 ("In reality, the law of restitution is very far from imposing liability for every instance of what might plausibly be called unjust enrichment."); *id.* § 2 ("Limiting Principles"). Unjust enrichment claims are beholden to law the same way tort claims are beholden to law. True, each may involve "principles of justice and fairness." Yet each also involves the traditional considerations that distinguish law from morality: the necessity of authority, the constraints of precedent, and the primacy of public values over any judge's personal values. Unjust enrichment is not actionable whenever it is wrong, because it is wrong; it is actionable when and because Maryland courts

recognize it as a legal claim. What matters is which "forms of enrichment [] the law treats as 'unjust' for purposes of imposing liability." *See* Restatement (Third) § 1. And that is only "enrichment that lacks an adequate legal basis." *Id.*

Lacks is not required to state a claim for an independent, underlying tort to pursue a claim for unjust enrichment.

### 3.  Remoteness

Ultragenyx contends that its alleged enrichment is "too remote" from the nonconsensual seizure of Henrietta Lacks' cells in 1951 for the claim to proceed. ECF 6-1, at 15 (quoting Restatement (Third) § 51). Under the Third Restatement, remoteness typically means that "the causal connection with wrongdoing is unduly attenuated." Restatement (Third) § 51 cmt. f.[9] Of course, there is something intuitive about Ultragenyx's remoteness argument. Seven decades separate the wrongs against Henrietta Lacks and the claim against Ultragenyx. And Lacks does not allege Ultragenyx has any direct relationship with the physicians who took his grandmother's cells. But intuition is not law. The law is that remoteness limits unjust enrichment remedies, not unjust enrichment liability. *See id.* § 51; *SMG*, 2018 WL 1391613, at *8–9; *LVNV Funding, LLC v. Finch*, No. 1075, Sept. Term 2016, 2017 WL 6388959, at *14, *18–28 (Md. App. Ct. Dec. 14, 2017), *vacated on other grounds*, 207 A.3d 202 (Md. 2019).

---

[9] However, the Third Restatement cautions that "issues of causation may not be strictly involved." Restatement (Third) § 51 cmt. f.

> Where causation is not the issue, an objection that profits are "remote" may mean simply that they are impossible to measure with sufficient accuracy; or that they are the product of legitimate contributions by the defendant that should not, in justice, be awarded to the claimant; or that liability for the profits so designated would be unacceptably punitive, being unnecessary to accomplish the object of the disgorgement remedy in restitution.

*Id.*

Ultragenyx's remoteness argument rests on a flawed reading of the Third Restatement. Ultragenyx claims that remoteness constrains whether a plaintiff has stated a claim for unjust enrichment at all. In reality, remoteness informs how much of a particular form of enrichment (net profit) a plaintiff may recover by means of a particular remedy (disgorgement). *See* Restatement (Third) § 51. The context makes that clear. The Third Restatement's discussion of remoteness is in the chapter dedicated to unjust enrichment remedies, specifically the topic on "Restitution Via Money Judgment: The Measure of Unjust Enrichment." The sections within that topic supply "rules for the measurement of unjust enrichment," not the "basis of liability." *Id.* § 53 cmt. a. Remoteness has a specific role: "determining net profit," that is, how much the defendant made by their wrongdoing, which is the amount that can be disgorged. *Id.* § 51(4)–(5). When it is difficult to discern "what portion of the defendant's assets or income is properly attributable to the underlying wrong to the claimant," the court may consider whether a specific portion of the defendant's profits is too remote from the wrong to the plaintiff to be attributable to that wrong and hence too remote to be disgorged in an unjust enrichment action. *Id.* § 51 cmt. e. Remoteness is a consideration that bears on how much to disgorge, not a barrier to stating an unjust enrichment claim.

Here is a telling illustration of Ultragenyx's confusion. Ultragenyx asserts that the Third Restatement provides that "[w]hen a claim is 'too remote from the underlying wrong to be subject to restitution,' or not 'directly attributable to the underlying wrong,' the claim should be dismissed." ECF 6-1, at 15 (quoting Restatement (Third) § 51). Neither of the passages Ultragenyx quotes in that sentence says anything about the dismissal of a claim. The first passage concerns the "[c]alculation of profits" when the defendant's enrichment is not reducible to the possession of the plaintiff's property. *See* Restatement (Third) § 51 cmt. e. "Even if all relevant facts can be

ascertained, the problem of attribution may involve questions that facts cannot answer," the Restatement explains. *Id.* "Such questions include: (1) How far to follow a chain of causation before deciding that *a particular element of profit* is too remote from the underlying wrong *to be subject to restitution . . .*" *Id.* (emphasis added). So the first passage Ultragenyx quotes does not concern the remoteness of "a claim" from an original wrong, but rather the remoteness of "a particular element of profit." *See id.* § 51 cmts. e & f. And that passage does not provide that an unduly remote claim must be dismissed, but rather provides that an unduly remote element of profit may not be recoverable by a particular remedy: "restitution" (here meaning disgorgement). *See id.* The second passage Ultragenyx quotes is similarly off point. The complete sentence reads, "To say that a profit is directly attributable to the underlying wrong, or (as sometimes expressed) that the profit is the 'proximate consequence' of the wrong, does not mean that the defendant's wrong is the exclusive or even the predominant source of the defendant's profit." *Id.* § 51 cmt. f. That hardly helps Ultragenyx either. This passage concerns how to trace profits the defendant derived from the underlying wrong, not whether the wrong was so remote from the profits that the plaintiff cannot recover at all. Ultragenyx's reading of the Third Restatement distorts the passages it quotes beyond recognition.

The Third Restatement's illustrations of remoteness demonstrate that the concept is not about whether the temporal or transactional distance between the wrong to the plaintiff and a transferee's acquisition of the plaintiff's property precludes a claim for unjust enrichment. Consider two illustrations:

> 12. Director borrows corporate funds to finance the private purchase of property which he subsequently resells to Corporation, realizing from this disloyalty a profit of $300,000. Director thereafter reinvests the $300,000 in an unrelated venture, producing a further gain of $700,000. Director is liable to Corporation for $300,000 in any event. The additional $700,000 is a consequential gain for which Director is also liable to Corporation, unless the court finds that the profit from this subsequent

transaction is unduly remote from the underlying wrong. The causal connection between the wrong to Corporation and Director's consequential gain might be broken, for example, if Director could prove that he had alternative sources of financing from which he both could and would have made the subsequent investment in any event.

13. Edwards discovers on his property an entrance to the Great Onyx Cave, which he explores and develops as a successful tourist attraction. As Edwards is aware, 30 percent of the exhibited portion of the cave lies under the adjoining land of Lee. In litigation after these facts come to light, Edwards is held liable to Lee for 30 percent of the net profits realized from exhibiting the cave. Lee seeks, in addition, 30 percent of the net profits from operation of a nearby hotel, built by Edwards to serve visitors to the cave. The court denies recovery of any part of the hotel profits, on the ground that such profits are unduly remote from the underground trespass. The conclusion might be further explained by observing that the hotel profits are visibly and predominantly the product of factors other than the underground trespass, with the consequence that an award to Lee of a share of these profits would subject Edwards to a remedy that was confiscatory rather than restitutionary.

*Id.* § 51 cmt. f, illus. 12–13. Notice what these illustrations are about: which of the profits the defendant made with the benefit conferred by the plaintiff may the plaintiff recover. Notice too what these illustrations are not about: how much time has elapsed between the wrong to the plaintiff and the defendant's acquisition of the plaintiff's property. They are not about the number of intervening transactions between the plaintiff's initial conferral of the benefit and the defendant's possession of it. They are not about whether the defendant "had any relationship" with the plaintiff or "owed any duty" to the plaintiff. *See* ECF 6, at 16; *see also* ECF 37, at 10. By the light of these illustrations, remoteness does not even necessarily cut off recovery of money the defendant has made by their use of the plaintiff's property. In fact, the illustrations take for granted that the plaintiff may recover from the defendant for the value of the initial benefit conferred (the use of the corporation's funds and the plaintiff's share of the cave, respectively). If remoteness were about what Ultragenyx believes it is about, one would have expected a single illustration to address those issues. None does. Remoteness is about which gains are attributable to the defendant's acquisition of the benefit from the plaintiff; remoteness is not about the temporal or

transactional distance between the benefit conferred by the plaintiff and the defendant's acquisition of that benefit.[10]

In accordance with the Third Restatement, Maryland courts have addressed remoteness and § 51 only in the context of calculating net profits, never in the context of weighing whether to dismiss a claim. *See, e.g.*, *SMG*, 2018 WL 1391613, at *8–9 (affirming judgment of liability for unjust enrichment and then applying § 51, including "remoteness," to determine net profits); *LVNV*, 2017 WL 6388959, at *14, *18–28 (affirming judgment of liability for unjust enrichment and then vacating restitution award on the ground that certain profits were too remote to be disgorged). In *LVNV*, for example, a jury found LVNV liable for unjust enrichment and violation of a Maryland statute to a class of consumers whose debts LVNV had purchased. 2017 WL 6388959, at *1. The jury awarded the consumers over $38 million in restitution: the profit LVNV made collecting their debts and the profit LVNV made by reinvesting the money it collected. *Id.* On appeal, the Maryland Appellate Court affirmed the judgment of liability for unjust enrichment but vacated the second component of the damages award because that portion of LVNV's profits was "too remote" from its wrongful debt collection practices. *Id.* at *19. While the circuit court properly permitted the jury to determine whether to disgorge the profits LVNV earned by

---

[10] The Third Restatement's analysis of remoteness may not apply to this case anyway. Remoteness is not even relevant where the enrichment "is captured in the ownership, possession, or disposition of specific property." Restatement (Third) § 51 cmt. e. And the Restatement's analysis of remoteness applies only to unjust enrichment cases against those who have consciously wronged the plaintiff themselves—which may not be the case where, as here, the plaintiff sues a third-party transferee rather than the perpetrator of the alleged original wrong. *See id.* § 51 cmt. a (noting that "[t]his profit-based measure of unjust enrichment determines recoveries against conscious wrongdoers and defaulting fiduciaries," so "a defendant without fault who is unjustly enriched by the misconduct of a third person may be an innocent recipient, whose unjust enrichment is measured by the rule of § 50 rather than the rule of this section"); *SMG Holdings I, LLC v. Arena Ventures, LLC*, No. 1778, Sept. Term 2016, 2018 WL 1391613, at *8 (Md. App. Ct. Mar. 20, 2018).

collecting their debts, *id.* at *20–23, the circuit court erred in permitting the jury to award the consumers the profits LVNV made by reinvesting the money it collected from them, *id.* at *23–24. The latter "profits on profits" were too remote because the portion attributable to the wrong could not be calculated "with any reasonable certainty." *See id.* Under Maryland law, remoteness limits disgorgement, not liability. And when remoteness applies at all, it does not preclude the disgorgement of the value of the plaintiff's property, but only certain further profits the defendant made with the plaintiff's property.

There is no Maryland law to support the notion that a plaintiff fails to state a claim for unjust enrichment when the original harm is too remote from the defendant's enrichment in the sense Ultragenyx means. No Maryland authority. No Fourth Circuit authority. No District of Maryland authority. Ultragenyx does not cite a single case from any jurisdiction applying Maryland law holding that an unjust enrichment claim must be dismissed for failure to state a claim when the originating wrong to the plaintiff is too remote from the defendant's enrichment.

Finding no support in Maryland law, Ultragenyx resorts to citing a few out-of-state cases that conflict with Maryland law, turn on distinguishable facts, or both. Two of the cases required an unjust enrichment plaintiff to allege a direct connection or transaction between the plaintiff and the defendant—a requirement Maryland courts have disavowed. In *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677 (9th Cir. 2009), the employees of international companies that sold goods to Wal-Mart sued the retailer for unjust enrichment on the ground that their working conditions in factories abroad were in violation of Wal-Mart's own labor standards. *See id.* at 679–80. Applying California law, the Ninth Circuit held that "[t]he lack of any prior relationship between Plaintiffs and Wal-Mart precludes the application of an unjust enrichment theory here." *Id.* at 685. The workers were not Wal-Mart's employees, and they had no other direct relationship with the retailer.

*Id.* The court, therefore, found "the connection between Plaintiffs and Wal-Mart [was] simply too attenuated to support an unjust enrichment claim." *Id.*

Similarly, in *Bertovich v. Advanced Brands & Importing, Co.*, No. 5:05CV74, 2006 WL 2382273 (N.D. W. Va. Aug. 17, 2006), two parents sued a coalition of alcohol companies for a bevy of West Virginia statutory and common law claims, including unjust enrichment. *Id.* at *1–3. The Bertoviches claimed that the defendants' advertising of alcoholic beverages to minors led kids to spend "family assets" on illegal alcohol purchases, invaded parental rights, and harmed public health. *Id.* at *3. Following *Eisenberg v. Anheuser-Busch, Inc.*, No. 1:04 CV 1081, 2006 WL 290308, at *1–3 (N.D. Ohio Feb. 2, 2006), *vacated & remanded sub nom. Alston v. Advanced Brands Importing Co.*, 494 F.3d 562 (6th Cir. 2007), a case concerning a nearly identical complaint, the court granted the alcohol companies' motion to dismiss all counts. *See Bertovich*, 2006 WL 2382273, at *3–4. With barely any analysis of unjust enrichment, the court implied that the problem was that the Bertoviches had not plausibly alleged that they had conferred a benefit upon the defendants. *See id.* at *4. "Under West Virginia law, each cause of action requires a cognizable injury and a causal connection between that injury and the Defendants' conduct." *Id.* For unjust enrichment, that means the plaintiff must confer the benefit on the defendant directly. *Id.* (citing *United States v. Massenburg*, No. Civ.A.2:03–0437, 2004 WL 2370694, *6 (S.D. W. Va. Oct. 21, 2004)). Relying on *Eisenberg*, which applied "virtually identical" Ohio law, the court found that "because the plaintiffs had failed to allege any economic transaction between the defendants and them, or even between the defendants and their children," the plaintiffs had failed to allege that they had conferred any benefit on the defendant. *Id.* at *4 (citing *Eisenberg*, 2006 WL 290308, at *1–3). So the *Bertovich* court granted the motion to dismiss the unjust enrichment claim. *See id.*

The problem for Ultragenyx is that *Doe I* and *Bertovich* conflict with Maryland law. Under Maryland law, the lack of a prior relationship or transaction between an unjust enrichment plaintiff and an unjust enrichment defendant is no bar to recovery. *See, e.g.*, *Hill*, 936 A.2d at 353 (citing *Plitt*, 219 A.2d at 241); *Gibbons*, 918 A.2d at 571 ("[A] cause of action for unjust enrichment may lie against a transferee with whom the plaintiff had no contract, transaction, or dealing, either directly or indirectly[.]"). So these cases are irrelevant.

Another case Ultragenyx cites affirmed the dismissal of an unjust enrichment claim on the basis of an underlying tort requirement—a requirement Maryland law also does not have. *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912 (3d Cir. 1999), concerned a suit by seven union health and welfare funds against several tobacco companies over the costs the funds incurred covering members' smoking-related illnesses. *Id.* at 917–18. The funds brought claims under the federal RICO and antitrust statutes, tort claims under Pennsylvania law, and a Pennsylvania unjust enrichment claim. *Id.* The district court dismissed the RICO and antitrust claims as "too remote from any alleged wrongdoing of defendants" and dismissed the state law claims as "concomitantly lacking in merit." *Id.* at 918. The Third Circuit affirmed. *Id.* The Third Circuit held that remoteness was "the key problem" fatal to the federal law claims. *Id.* at 921. "Remoteness is an aspect of the proximate cause analysis . . . a requirement that the Supreme Court has adopted for federal antitrust and RICO claims." *Id.* If an antitrust or RICO plaintiff's injuries are too remote from the defendant's wrongdoing, the plaintiff lacks statutory standing to bring their claims. *Id.* That doomed the funds' federal claims. *See id.* at 921–34. Next, the Third Circuit turned to the Pennsylvania tort claims. *See id.* at 934–36. Noting that tort claims, like federal antitrust and RICO claims, require proximate causation, the Third Circuit dismissed the tort claims for failure to plausibly allege that element. *See id.* at 934–36, 937 n.23.

Then the Third Circuit turned to the unjust enrichment claim. *See id.* at 936–37. Ultragenyx quotes the Third Circuit as holding: "We can find no justification for permitting plaintiffs to proceed on their unjust enrichment claim . . . because of the remoteness of plaintiffs' injuries from defendants' wrongdoing." ECF 6-1, at 15 (quoting *Steamfitters*, 171 F.3d at 937) (ellipsis in ECF 6-1). That elision is misleading. Filling in what Ultragenyx elides suggests a different holding:

> In the tort setting, an unjust enrichment claim is essentially another way of stating a traditional tort claim . . . We can find no justification for permitting plaintiffs to proceed on their unjust enrichment claim once we have determined that the District Court properly dismissed the traditional tort claims because of the remoteness of plaintiffs' injuries from defendants' wrongdoing.

*Steamfitters*, 171 F.3d at 937. The Third Circuit does not appear to have held that the unjust enrichment claim was subject to the proximate cause analysis of a tort claim. Having dismissed the plaintiffs' tort claims for lack of proximate causation, the Third Circuit thought it was obligated to dismiss the plaintiffs' unjust enrichment claim as a matter of course. *See id.* As the Third Circuit interpreted Pennsylvania law, an unjust enrichment claim predicated on the defendants' tortious conduct could not survive the dismissal of the associated tort claims. *See id.* Maryland law is different. As this Court has explained already, Maryland permits freestanding claims for unjust enrichment to survive the dismissal of the associated tort claims. *See Dolan*, 79 A.3d at 403–04; *Gibbons*, 918 A.2d at 568, 578; *Plitt*, 219 A.2d at 240–41.

Even if *Steamfitters* is better read as affirming the dismissal of the unjust enrichment claim on the same ground as the antitrust, RICO, and tort claims—that is, for lack of proximate cause— Ultragenyx's argument fares no better. The reason is simple: There is no proximate cause requirement for a Maryland unjust enrichment claim. *See Hill*, 936 A.2d at 351 (listing the three elements of unjust enrichment). That is as it should be. Proximate cause analysis concerns the connection between the defendant's wrongdoing and the injury to the plaintiff. *Steamfitters*, 171

F.3d at 921. An unjust enrichment claim need not involve wrongdoing by the defendant or injury to the plaintiff, let alone a certain connection between them; what matters is whether the plaintiff conferred a benefit upon the defendant that it would be inequitable for the defendant to keep. *See Hill*, 936 A.2d at 351. Either way one interprets it, because *Steamfitters* rests on putative Pennsylvania law requirements Maryland law does not have, *Steamfitters* does not support the dismissal of the unjust enrichment claim in this case.[11]

The other case Ultragenyx cites applies inapplicable law to distinguishable facts. In *Sperry v. Crompton Corporation*, 863 N.E.2d 1012 (N.Y. 2007), a consumer who purchased tires sued the producers of several chemicals used in tire manufacturing for unjust enrichment and violating the state's antitrust and consumer protection statutes. *Id.* at 1013–14. On the plaintiff's account, the defendants had a price-fixing agreement with one another that drove up the prices tire manufacturers had to pay for the chemicals and "the overcharges trickled down the distribution chain to [tire] consumers." *Id.* at 1014. In one brief paragraph of analysis, the New York Court of Appeals affirmed the dismissal of the unjust enrichment claim:

> While we agree with Sperry that a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment, we nevertheless conclude that such a claim does not lie under the circumstances of this case. Here, the connection between the purchaser of tires and the producers of chemicals used in the rubber-making process is simply too attenuated to support such a claim.

---

[11] Ultragenyx cites three other cases that follow *Steamfitters*. *See* ECF 6-1, at 15–16. In relevant part, *In re Guidant Corp. Implantable Defibrillators Prods. Liability Litigation*, 484 F. Supp. 2d 973 (D. Minn. 2007), simply applied *Steamfitters* to another Pennsylvania law claim for unjust enrichment. *Id.* at 985. In *Perry v. American Tobacco Co.*, 324 F.3d 845 (6th Cir. 2003), the Sixth Circuit, applying Tennessee law, adopted *Steamfitters*' putative "remoteness" analysis. *Id.* at 851. In *Pennsylvania Employees Benefit Trust Fund v. Astrazeneca Pharmaceuticals LP*, No. 6:09-cv-5003-Orl-22DAB, 2009 WL 2231686 (M.D. Fla. July 20, 2009), the court deferred to *Steamfitters* as well, but recognized that the issue was that "the plaintiffs' unjust enrichment claims [could not] go forward once all traditional tort claims had been dismissed." *Id.* at *6. *Guidant*, *Perry*, and *Pennsylvania Employees* are unpersuasive for the same reasons *Steamfitters* is.

*Id.* at 1018. *Sperry* involved a different sort of remoteness than this case involves. There, the attenuated connection between the alleged price-fixing by the chemical manufacturers and the alleged overpayment by the tire consumer would make it nearly impossible to tell whether the plaintiff had conferred a benefit upon the defendants at all, let alone how much. And what was passed along was money—a notoriously fungible form of property—rather than an identifiable asset. Here, there is no such difficulty tracing the HeLa cells in Ultragenyx's possession. They originated with Henrietta Lacks. In any event, two sentences citing no authority and applying New York law are hardly persuasive grounds to impose a novel remoteness requirement on unjust enrichment liability absent from Maryland law and the Third Restatement.

In sum, Ultragenyx asks this Court to find that its acquisition and use of HeLa cells is too remote from the seizure of cells from Henrietta Lacks for Lacks to state a claim for unjust enrichment. That is not the law. Remoteness is not about unjust enrichment liability. Remoteness is about unjust enrichment remedies—how much of the defendant's profit is attributable to the benefit conferred and hence subject to disgorgement. Ultragenyx's alleged enrichment from HeLa cells is not too remote from the wrongs against Henrietta Lacks to proceed.

### C.  Unjust Enrichment

Now that it is clear what is not required to plead an unjust enrichment claim, turn to what is. To reiterate, under Maryland law a claim for unjust enrichment has three elements: (1) a benefit conferred upon the defendant by the plaintiff, (2) an appreciation or knowledge by the defendant of the benefit, and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value. *Hill*, 936 A.2d at 351 (citing *Berry & Gould*, 757 A.2d at 113). Lacks has plausibly alleged all three elements.

### 1.  Benefit

Lacks has alleged the conferral of a benefit upon Ultragenyx by Henrietta Lacks. Unjust enrichment "is concerned with the receipt of benefits that yield a measurable increase in the recipient's wealth," so "the benefit that is the basis of a restitution claim may take any form." Restatement (Third) § 1 cmt. d. In the similarly sweeping terms of the First Restatement,

> A person confers a benefit upon another if he gives to the other possession of or some other interest in money, land, chattels, or choses in action, performs services beneficial to or at the request of the other, satisfies a debt or a duty of the other, or in any way adds to the other's security or advantage. He confers a benefit not only where he adds to the property of another, but also where he saves the other from expense or loss. The word "benefit," therefore, denotes any form of advantage.

Restatement (First) § 1 cmt. b. Maryland courts have long embraced this broad definition of "benefit" as encompassing anything that "in any way adds to the other's security or advantage." *See, e.g.*, *Hamilton & Spiegel, Inc. v. Bd. of Educ. of Montgomery Cnty.*, 195 A.2d 710, 712 (Md. 1963) (quoting Restatement (First) § 1 cmt. b); *State, Cent. Collection Unit v. Kossol*, 771 A.2d 501, 506 (Md. 2001) (quoting Restatement (First) § 1 cmt. b). The benefit need not come directly or immediately from the plaintiff to the defendant. *Hill*, 936 A.2d at 353–54; *Gibbons*, 918 A.2d at 571 ("[A] cause of action for unjust enrichment may lie against a transferee with whom the plaintiff had no contract, transaction, or dealing, either directly or indirectly.").

Lacks identifies two putative benefits conferred: the HeLa cells that Ultragenyx acquired and the money that Ultragenyx has made from its commercial use and sale of HeLa cells. The first is sound: These HeLa cells are a benefit Henrietta Lacks conferred upon Ultragenyx. The second

is not: The money that Ultragenyx has made from its commercial use of HeLa cells is not a benefit Henrietta Lacks conferred on Ultragenyx.[12]

### a. HeLa cells

Lacks has plausibly alleged the conferral of a benefit on Ultragenyx: HeLa cells. Maryland law has long recognized that an unjust enrichment plaintiff conferred a benefit upon the defendant where the defendant came to possess a tangible, valuable item that originated with the plaintiff. *See, e.g.*, *Hamilton & Spiegel*, 195 A.2d at 712. Moreover, the Maryland Supreme Court has recognized that "'a living cell line is a property interest capable of protection' and as such, there is 'no reason why a cell line should not be considered a chattel.'" *Yuan v. Johns Hopkins Univ.*, 157 A.3d 254, 270 (Md. 2017) (quoting *United States v. Arora*, 860 F. Supp. 1091, 1099 (D. Md. 1994), *aff'd*, 56 F.3d 62 (4th Cir. 1995)). The HeLa cells in Ultragenyx's possession are part of the HeLa cell line—that very sort of chattel. Lacks alleges that the HeLa cell line originated in the tissue doctors wrongfully seized from Henrietta Lacks, that Ultragenyx acquired HeLa cells that are part of the HeLa cell line, and that the cells are now extremely valuable to Ultragenyx. So Lacks has pled the first element of an unjust enrichment claim.

The Third Restatement confirms that these HeLa cells are a benefit conferred by Henrietta Lacks upon Ultragenyx. One illustration expressly provides for unjust enrichment liability for the conferral of the plaintiff's biological material:

> Patient consults Doctor for treatment of a rare blood disorder. Doctor recognizes that certain characteristics of Patient's blood cells make them unusually valuable

---

[12] The complaint could be read to suggest a third putative benefit. Lacks alleges that "Ultragenyx was, is and will continue to be unjustly enriched because it received and continues to receive a benefit from Henrietta Lacks every time it acquires, cultivates, sells, and receives payment for newly-replicated HeLa cells." ECF 1, ¶ 74. That sentence could be read to suggest that Henrietta Lacks confers a benefit upon Ultragenyx every time a HeLa cell in its possession replicates. In briefing, however, Lacks does not identify that theory, let alone defend it. In the absence of any argument or authority for that theory, the Court declines to consider it.

for research purposes. Without request or disclosure to Patient, Doctor retains the blood samples taken from Patient on subsequent visits and sells them to interested researchers, realizing a total of $25,000. Doctor's decision to examine samples of Patient's blood is medically appropriate; the same amount of blood would have been drawn from Patient in any event; and Patient suffers no physical injury from Doctor's activities. By the law of the jurisdiction, Patient cannot maintain an action for conversion of blood or other tissue removed from his body for medical purposes. . . . Patient may recover $25,000 from Doctor by the rule of this section.

Restatement (Third) § 44 cmt. b, illus. 11. The theory here is simple: The benefit is the valuable blood and tissue the doctor extracted from the patient. Notably, the Third Restatement's recognition of the patient's biological materials as a benefit does not rest on the premise that the patient has any property interest in them after their removal from their body. The illustration makes no reference to the patient's property interests at all. And the illustration is careful to note that under the law of the patient's jurisdiction, a conversion claim is off the table. It is enough that the patient conferred upon the doctor personal biological material of value. *See also Greenberg v. Miami Child.'s Hosp. Rsch. Inst., Inc.*, 264 F. Supp. 2d 1064, 1072 (S.D. Fla. 2003) (holding plaintiff's blood and tissue samples constituted a benefit under the same three-element cause of

action for unjust enrichment). A plaintiff may state a claim for unjust enrichment where the sole benefit conferred is the plaintiff's biological material.[13]

Ultragenyx does not deny that the HeLa cells it acquired would be a benefit. To the extent Ultragenyx directly addresses this benefit at all, its sole responses are that the company is a bona fide purchaser of the cells and that its acquisition and possession of them is too remote from the original taking of the tissue from Henrietta Lacks. *See* ECF 37, at 5–6, 7. The Court already has addressed those arguments.

Lacks has plausibly alleged the conferral of a benefit on Ultragenyx: the HeLa cells.

---

[13] The Court does not decide whether Henrietta Lacks had a property interest in her tissue after its removal. Whether a human being has an enduring property interest in their biological materials appears to be an open question under Maryland law and the law of most states. The only state supreme court to squarely consider it held that a patient did not have a property interest in their own extracted blood and tissue capable of sustaining a conversion claim against a physician who used them for profitable research without the patient's consent. *See Moore v. Regents of the Univ. of Cal.*, 793 P.2d 479, 487–97 (Cal. 1990). The only court in this district to consider that ruling while applying Maryland law cast some doubt on it but did not actually decide what Maryland law is. *See United States v. Arora*, 860 F. Supp. 1091, 1098 (D. Md. 1994), *aff'd*, 56 F.3d 62 (4th Cir. 1995). In addition, one Maryland court has suggested that a person may have an enduring property interest in their biological materials. *See Venner v. State*, 354 A.2d 483, 498 (Md. App. Ct. 1976), *aff'd*, 367 A.2d 949 (Md. 1977) ("It could not be said that a person has no property right in wastes or other materials which were once a part of or contained within his body . . . . It is not unknown for a person to assert a continuing right of ownership, dominion, or control, for good reason or for no reason, over such things as . . . blood, and organs or other parts of the body, whether their separation from the body is intentional, accidental, or merely the result of normal body functions."). This open question need not be answered to resolve the motion to dismiss. Ultragenyx did not argue that the HeLa cells could not be a benefit because Henrietta Lacks did not retain a property interest in her cervical tissue after her doctors seized it. Lacks does not argue that the HeLa cells are a benefit by virtue of Henrietta Lacks' persistent property rights to her tissue. And applying the definition of "benefit" that appears in Maryland law and the First and Third Restatements does not require the Court to answer this question. It is enough that the HeLa cell line originated with Henrietta Lacks and cells that are part of that line are now the valuable property of Ultragenyx.

### b. Profits

Lacks' second putative benefit conferred is the money Ultragenyx has made commercializing HeLa cells. These profits may bear on the value of the cells—the measure of what Lacks may recover if Ultragenyx is found liable for unjust enrichment. But these profits are not themselves an independent benefit giving rise to an unjust enrichment claim of their own, above and beyond the benefit of the HeLa cells themselves. Tellingly, Lacks cites no Maryland case that he even claims so held.

Lacks first argues that he may recover the money Ultragenyx has made from its commercial use of HeLa cells because the Third Restatement provides that a plaintiff "entitled to restitution from property may obtain restitution from any traceable product of that property." ECF 21, at 20 (quoting Restatement (Third) § 58(1)). Lacks reads that line to mean that "any traceable product" of the plaintiff's original asset—here, the money Ultragenyx has made from its use of HeLa cells—is a benefit conferred by the plaintiff. That is not what § 58 means. Section 58 appears in Part III of the Third Restatement—"Remedies"—in the topic on "Restitution via Rights in Identifiable Property." This section warns that the principle it articulates "is neither a source of liability nor a distinct restitutionary remedy," but rather "an adjunct remedial device or technique" for specifying which assets in the defendant's hands a plaintiff who is already "entitled to restitution" may recover. *See* Restatement (Third) § 58 cmt. a. The language Lacks quotes confirms as much: It concerns recovery for a plaintiff who is "entitled to restitution." *See id.* § 58(1). Section 58 guides the identification of which property in a liable defendant's hands is sufficiently connected to the original benefit conferred to count as that same asset. It does not provide for an independent basis of liability for any profit the defendant procured by putting the underlying benefit from the plaintiff to use.

Consider the first illustration of § 58. *See id.* § 58 cmt. a, illus. 1. Someone misappropriates bonds from a decedent's house. *Id.* She gives the bonds to her uncle. *Id.* Her uncle exchanges the bonds for a cashier's check. *Id.* Then her uncle uses the cashier's check to purchase a house. *Id.* Because "[t]he house is the traceable product of decedent's bonds," the estate may "recover ownership of the house from Uncle via constructive trust." *Id.* The point of § 58 is that the fact that the misappropriated property has changed form—from bonds to a cashier's check to a house— does not preclude the plaintiff from recovering the property, even from a third party. There is not so much as a hint, let alone a declaration, that the benefit conferred is anything other than the misappropriated bonds. Section 58 is about *what* the plaintiff may recover, not *whether* the plaintiff may recover. In misconstruing what § 58 means, Lacks has conflated liability and remedies—a version of the error Ultragenyx made in its remoteness argument.

To salvage his argument that the money Ultragenyx has made from its commercialization of HeLa cells is a benefit, Lacks point to illustrations in a different section of the Third Restatement, § 44. This time, Lacks conflates another pair of unjust enrichment concepts: what the benefit *is* and what the benefit *is worth*. According to Lacks, § 44, Illustration 11—the case of the patient whose blood and tissue are removed and commercialized by a doctor—stands for the proposition that the money the doctor made selling the patient's biological material is the benefit conferred by the patient. *See id.* § 44, illus. 11. Lacks reads Illustration 10 of that section the same way. There, a local pharmacy sells its customers' data to a national chain in violation of the customers' privacy rights. *See id.* § 44, illus. 10. According to the Third Restatement, the customers may bring an unjust enrichment claim against the local pharmacy or the national chain and recover the amount the defendant made from selling or using the data. *See id.* Lacks suggests

that in Illustration 10, what either defendant made from selling or using the data is the benefit conferred.

Lacks' reading is unsupported by the text and context. The Third Restatement prefaces these illustrations with the statement that "[p]rofitable interference with other protected interests, such as the claimant's right to privacy, gives rise to a claim under § 44 if the benefit to the defendant is susceptible of measurement." *Id.* § 44, cmt. b. In each illustration, the benefit is what the defendant acquired as a result of their interference with the plaintiff's rights: the patient's biological material and the customers' data. The amount the defendant made selling the benefit is merely what makes the value of the antecedent benefit "susceptible of measurement." *See id.* Lacks is correct that "in the absence of wrongful monetization," the plaintiffs in these illustrations might not have causes of action. *See* ECF 21, at 20. But that is because in the absence of wrongful monetization, the value of the benefit might not be measurable. It is not because the payments from third parties are the benefit.

Last, Lacks emphasizes that under the Third Restatement and Maryland law, the aim of the cause of action for unjust enrichment is to deprive the defendant of their wrongful gains, not to compensate the plaintiff for their losses. True enough. But that truth is no help to Lacks here. All that aim demands is that unjust enrichment remedies reflect the value to the defendant of the benefit conferred. That aim does not demand that each payment the defendant reaps from the benefit counts as a new, additional benefit itself.

Maryland law confirms that the money Ultragenyx has made from HeLa cells is not an independent benefit conferred by Henrietta Lacks. *See, e.g.*, *Sensormatic Sec. Corp. v. Sensormatic Elec. Corp.*, 249 F. Supp. 2d 703, 704–06 (D. Md. 2003); *Mehul's Inv. Corp. v. ABC Advisors, Inc.*, 130 F. Supp. 2d 700, 708–09 (D. Md. 2001). For example, in *Sensormatic Security*

*Corporation v. Sensormatic Electronics Corporation*, Sensormatic Security Corporation ("SSC") sued Sensormatic Electronics Corporation ("SEC") and ADT, a security company SEC owned. 249 F. Supp. 2d at 704–06. SSC alleged that its franchise agreement with SEC gave SSC the exclusive right to sell SEC equipment in Maryland, Washington, D.C., and Virginia—including a right to commissions from SEC on each sale. *See id.* According to SSC, ADT was selling SEC equipment in SSC's territory in defiance of that agreement and reaping the commissions accordingly. *See id.* at 706, 708. Applying Maryland law, the court held that the commissions ADT received from SEC on each sale were not benefits conferred by SSC on ADT because those payments were not SSC's "own money fraudulently paid to ADT" but rather "a portion of fees paid to ADT by others." *Id.* at 708–09. That doomed SSC's claim for unjust enrichment. *See id.*

To be sure, sometimes a third-party payment to the defendant may count as a benefit conferred by the plaintiff. Maryland courts "have not required always that a benefit conferred in an unjust enrichment action come necessarily and directly to the defendant from the plaintiff's own resources." *Hill*, 936 A.2d at 353. And the Third Restatement identifies scenarios in which a defendant is liable to the plaintiff for unjust enrichment solely by virtue of the defendant's receipt of payments from a third party. *See* Restatement (Third) Part II, ch. 6 ("Benefits Conferred by a Third Person") §§ 47–48. But Lacks does not rest his claim on this foundation. Nor could he. These scenarios are far afield:

> 1. A owes B $500. Intending to pay this debt, A sends $500 by mistake to C, to whom A has no obligation. C is liable to . . . B by the rule of this section.
>
> . . .
>
> 13. Owner's fur coat is insured against loss by Insurer to the declared value of $25,000. The terms of the policy make no reference to subrogation. Owner stores her coat for the summer with Warehouse. Warehouse advises Owner that the coat has been lost. Owner makes a claim under the policy, which Insurer pays in full. One week later, Warehouse pays Owner $10,000, representing the limits of its

liability under the bailment contract. . . . Insurer is entitled to recover $10,000 from Owner by the rule of this section.

. . .

27. A and B are the shareholders of X Corporation. X is dissolved, and its assets are distributed to A and B. C is an unpaid creditor of X. To the extent of C's claim against X, C has a claim against A or B (or both of them) to recover the assets distributed to each.

Restatement (Third) § 48 cmt. b, illus. 1; cmt. e, illus. 13; cmt. h, illus. 27. These are not cases where, as here, the plaintiff conferred a benefit upon the defendant with which the defendant subsequently made money from third parties.

The money Ultragenyx has made from its commercial use of HeLa cells does not constitute an independent benefit conferred by Henrietta Lacks. At this stage, the Court does not decide whether these profits bear on the value of these HeLa cells—the actual benefit conferred—and hence on the remedies available to Lacks.

### 2. Knowledge

Lacks has alleged that Ultragenyx knew it possessed HeLa cells. "The essence of the requirement that the defendant have knowledge or appreciation of the benefit is that the defendant have an opportunity to decline the benefit." *Hill*, 936 A.2d at 354. All the plaintiff needs to allege is that the defendant knows that they possess the benefit, "not necessarily . . . that [it was] obtained by wrongful conduct against the plaintiff." *Gibbons*, 918 A.2d at 575. Lacks alleges that Ultragenyx acquired, possesses, and uses HeLa cells. On Lacks' account, Ultragenyx has acknowledged its possession of HeLa cells repeatedly—and even distributed them to others. These allegations make it reasonable to infer that Ultragenyx could have declined to receive this benefit: by not acquiring HeLa cells in the first place or by subsequently returning them. Ultragenyx does not argue otherwise. Lacks has alleged the second element of an unjust enrichment claim.

### 3.  Inequity

Lacks has alleged that it would be inequitable for Ultragenyx to retain these HeLa cells under these circumstances without paying the Lacks Estate their value. "The task is to determine whether the enrichment is unjust." *Hill*, 936 A.2d at 355 (quotation omitted). That question turns on "a fact-specific balancing of the equities." *Id.* "The balancing of equities and hardships looks at the conduct of both parties and the potential hardships that might result from a judicial decision either way." *Royal Inv. Grp., LLC v. Wang*, 961 A.2d 665, 685 (Md. App. Ct. 2008) (cleaned up) (quoting 1 Dan B. Dobbs, Law of Remedies § 2.4(5) (2d ed. 1993)). "[S]uch an inherently fact-specific question is the province of the jury, for the 'very essence' of a jury's fact-finding function 'is to select from among conflicting inferences and conclusions that which it considers most reasonable.'" *See Amaya*, 2023 WL 3034326, at *6 (quoting *Tennant v. Peoria & P. U. Ry.*, 321 U.S. 29, 35 (1944)). There is no requirement that the defendant be at fault. *See Hill*, 936 A.2d at 352. While the defendant's "good faith is a highly relevant factor," their good faith alone is no obstacle to a finding that their retention of the benefit is inequitable. *Gibbons*, 918 A.2d at 577.

The facts as Lacks alleges them resemble three fact patterns in which it is prima facie inequitable for a defendant to retain the possession of a benefit conferred by the plaintiff without paying its value: when the defendant acquires a benefit wrongfully taken from the plaintiff in violation of their property rights, when the defendant acquires a benefit wrongfully taken from the plaintiff in a breach of fiduciary duty or confidential relationship, and when the defendant acquires a benefit in consequence of tortious or otherwise actionable interference with the plaintiff's legally protected interests.

Begin with the property approach. Pursuant to the Third Restatement, "[a] person who obtains a benefit by an act of trespass or conversion, by comparable interference with other

protected interests in tangible property, or in consequence of such an act by another, is liable in restitution to the victim of the wrong." Restatement (Third) § 40. For example, if someone's car is stolen and the converter sells the car to a car dealer for less than its full value, the original owner has a claim for unjust enrichment against the car dealer—even if the dealer acquired the stolen car in good faith, without knowledge of the theft. *Id.* § 40, illus. 13.

Maryland law supports the same approach. Return to *Plitt* and *Gibbons*. Recall that in *Plitt*, the defendant, Greenberg, obtained Plitt's money from Blacker, after Blacker defrauded Plitt. *See Plitt*, 219 A.2d at 239–40. Whatever else the Maryland Supreme Court may have held in that decision, one thing is clear: Unless Greenberg was a bona fide purchaser for value of Plitt's money, it would be inequitable for Greenberg to retain it. *See id.* at 241. As someone who "non-tortiously" "acquire[d] property" that was rightfully Plitt's, Greenberg would be "under a duty to account to [Plitt] for the direct product of the subject matter and the value of the use to him, if any." *Id.* (quoting Restatement (First) § 123).

*Gibbons* is even clearer. Recall that the defendant, Lynne Gibbons, obtained money in consequence of her husband's acts of conversion from his employer, Bank of America. *See Gibbons*, 918 A.2d at 567–68. The circuit court held that as a matter of law, Lynne had not converted the money and that it was not inequitable for Lynne to retain the money because there were only conclusory allegations (and no evidence) that she knew of its sordid origins. *Id.* at 568, 576–77. The Maryland Appellate Court reversed. *Id.* at 577–78. "The innocence of Mrs. Gibbons, by itself, does not preclude a claim for unjust enrichment," the court held, *id.* at 578; typically, "an innocent recipient benefitted by third party wrongdoing" may not retain the benefit, *id.* at 577. Unless Lynne could "establish a change of circumstances that makes it inequitable to order restitution"—that is, that restitution would cause her a "net loss" rather than merely return her to

the status quo before her husband's wrongdoing—it would be inequitable for her to retain the money her husband converted. *Id.* at 577 (quoting *Hilliard v. Fox*, 735 F. Supp. 674, 678 (W.D. Va. 1990)).

Applying *Plitt*, *Gibbons*, and the Third Restatement here, Lacks has plausibly alleged that it would be inequitable for Ultragenyx to retain HeLa cells without compensating the Lacks Estate. Lacks alleges that the HeLa cells Ultragenyx acquired originated in the taking of cells from Henrietta Lacks by physicians at Johns Hopkins Hospital without her consent. This nonconsensual exercise of dominion over the property of another, with the intent to exercise control over the property, is the essence of conversion. *See Darcars Motors of Silver Spring, Inc. v. Borzym*, 841 A.2d 828, 835–36 (Md. 2004); *Inmi-Etti v. Aluisi*, 492 A.2d 917, 920 (Md. App. Ct. 1985) (citing *Bender v. Bender*, 471 A.2d 335 (Md. 1984)); *Saunders v. Mullinix*, 72 A.2d 720, 722 (Md. 1950). So the wrong Lacks alleges these physicians committed against his grandmother is akin to conversion or a comparable interference with Henrietta Lacks' rights. On Lacks' account, Ultragenyx possesses HeLa cells in consequence of that wrongful taking; if it had never happened, no one would possess the cells. By plausibly alleging that Ultragenyx obtained property by virtue of Henrietta Lacks' doctors' conversion of her cells or comparable impairment of her rights, Lacks has pled that it would be inequitable for Ultragenyx to retain these cells without paying the Lacks Estate their value.

Next consider the fiduciary duty approach. "Gain resulting from breach of fiduciary duty is a prime example of the unjust enrichment that the law of restitution condemns." Restatement (Third) § 43 cmt. b. Liability for unjust enrichment originating in a breach of fiduciary duty extends beyond the original violator to subsequent transferees with notice of the breach or who did not give value for the benefit:

> Once property has been transferred in breach of the transferor's fiduciary duty, the beneficiary may obtain restitution from any subsequent transferee who does not qualify as a bona fide purchaser. Benefits derived from a fiduciary's breach of duty may therefore be recovered from third parties, not themselves under any special duty to the claimant, who acquire such benefits with notice of the breach.

*Id.* cmt. g; *see also Perez v. Chimes D.C., Inc.*, No. RDB-15-3315, 2016 WL 5938827, at *6 (D. Md. Oct. 12, 2016) (citing Restatement (Third) § 43 cmt. g). This rule reaches far.

Maryland law recognizes the same principles. It is prima facie inequitable to retain a benefit "arising out of . . . the violation of any fiduciary duty or any other wrongdoing." *See Gibbons*, 918 A.2d at 569 (quoting *Bailiff v. Woolman*, 906 A.2d 409, 414 (Md. App. Ct. 2006)). A doctor and their patient have a fiduciary or confidential relationship. *See Roebuck v. Steuart*, 544 A.2d 808, 821 (Md. App. Ct. 1988) ("[I]t is the fiduciary relationship between the doctor and the patient which imposes upon the doctor an obligation to disclose to the patient all material facts necessary to an informed intelligent decision."); *Lemon v. Stewart*, 682 A.2d 1177, 1183 (Md. App. Ct. 1996). While Maryland courts never have addressed expressly whether a physician's seizure and commercialization of a patient's cells without the patient's consent or knowledge is a breach of fiduciary duty, even those other courts that have denied that such an action constitutes conversion have recognized that it constitutes a breach of fiduciary duty. *See Moore v. Regents of the Univ. of Cal.*, 793 P.2d 479, 497 (Cal. 1990) ("[W]e hold that the allegations of Moore's third amended complaint state a cause of action for breach of fiduciary duty or lack of informed consent, but not conversion.").

Lacks plausibly alleges that the HeLa cell line originated in a breach of fiduciary duty to Henrietta Lacks. "To establish a breach of fiduciary duty, a plaintiff must demonstrate: (1) the existence of a fiduciary relationship; (2) breach of the duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary." *Plank v. Cherneski*, 231 A.3d 436, 442 (Md. 2020).

Lacks alleges that Henrietta Lacks was the patient of the physicians who cut cells from her cervix—giving rise to a fiduciary or confidential relationship for her benefit. Lacks alleges that while his grandmother was in their care, her doctors removed tissue from her cervix without her consent or her knowledge—"an abuse of trust" all too common against Black patients. *See* ECF 1, ¶ 37. And Lacks alleges that his grandmother was harmed: She was subjected to a medically unnecessary procedure that removed part of her body—a procedure to which she never would have consented had her doctors given her the chance. On Lacks' account, physicians then transferred HeLa cells cultivated from the seized tissue to other doctors and researchers until, decades later, Ultragenyx acquired them on notice of their origins. In sum, Lacks has plausibly alleged that Ultragenyx is the "subsequent transferee" of cells that Ultragenyx knew were "derived from a fiduciary's breach of duty." *See* Restatement (Third) § 43 cmt. g. Even if the Lacks Estate has no property interest in the HeLa cells, it would be inequitable for Ultragenyx to retain the cells it possesses because they originated in a breach of Henrietta Lacks' doctors' fiduciary duty to her and Ultragenyx acquired the cells with notice of their origins. *See* ECF 31-1 (brief of *amici curiae* Rendleman & Roberts), at 6 (citing Restatement (Third) of Torts: Liability for Economic Harm § 16; Restatement (Second) of Torts § 874 cmt. b).

Last, consider interference with legally protected interests. In the terms of the Third Restatement: "A person who obtains a benefit by conscious interference with a claimant's legally protected interests (or in consequence of such interference by another) is liable in restitution as necessary to prevent unjust enrichment, unless competing legal objectives make such liability inappropriate." Restatement (Third) § 44(1). In this context, "interference with legally protected interests includes conduct that is tortious, or that violates another legal duty or prohibition (other than a duty imposed by contract), if the conduct constitutes an actionable wrong to the claimant."

*Id.* § 44(2). Similarly, Maryland law expressly recognizes that it is prima facie inequitable to retain a benefit originating in tortious wrongdoing—a significant subset of interference with legally protected interests. *See Gibbons*, 918 A.2d at 569 ("[A] constructive trust [may] be imposed to avoid unjust enrichment arising out of . . . any other wrongdoing.") (quoting *Bailiff*, 906 A.2d at 414).

The complaint depicts wrongs to Henrietta Lacks that are tortious under Maryland law. Not only does it implicate the torts of conversion and breach of fiduciary duty as described above. It implicates the tort of battery. At the time Henrietta Lacks' doctors removed her cervical tissue, performing a medical procedure without the patient's consent constituted a battery. *See Mole v. Jutton*, 846 A.2d 1035, 1044 (Md. 2004) (collecting cases). In 1977, Maryland recognized for the first time an independent cause of action for breach of informed consent, grounded in negligence. *See Sard v. Hardy*, 379 A.2d 1014, 1019–20, 1020 n.4 (Md. 1977); *see also Mole*, 846 A.2d at 1042. Today, the two torts are distinct. *See McQuitty v. Spangler*, 976 A.2d 1020, 1037 (Md. 2009). If the claim is that "a doctor perform[ed] an operation to which the patient has not consented," then the claim sounds in battery. *Id.*; *see Mole*, 846 A.2d at 1046–47 ("The battery theory should be reserved for those circumstances when a doctor performs an operation to which the patient has not consented," including "[w]hen the patient gives permission to perform one type of treatment and the doctor performs another. . ."). If the claim is that a doctor failed to provide the patient with information essential to making an informed decision about whether to consent to a procedure or that "the patient consent[ed] to certain treatment and the doctor perform[ed] that treatment but an undisclosed inherent complication" occurs, then the claim sounds in informed consent. *McQuitty*, 976 A.2d at 1037.

Lacks alleges that physicians at Johns Hopkins Hospital performed a procedure on Henrietta Lacks—the removal of cervical tissue—to which she did not consent. Accordingly, Lacks has plausibly alleged that the HeLa cell line originated in a battery. *See also* ECF 31-1 (brief of *amici curiae* Rendleman & Roberts), at 6 ("[A]n unconsented-to operation like that performed on Henrietta Lacks, alleged as the origin of defendant's unjust enrichment, constitutes the tort of battery.") (citing Restatement (Second) of Torts § 13). On that basis, Lacks has plausibly alleged that it would be inequitable for Ultragenyx to retain HeLa cells because the company possesses them by virtue of another's interference with Henrietta Lacks' legally protected interests. *See* Restatement (Third) § 44.

Section 44's illustration involving a doctor taking a blood sample from a patient, quoted earlier in this opinion, confirms that this principle applies to this case. *See id.* § 44 cmt. b., illus. 11. In the illustration, a physician procured a benefit from a patient without the patient's knowledge or consent: the patient's blood. *Id.* Because the benefit originated in that violation of the patient's legally protected interests, the physician in the illustration was liable to the patient for unjust enrichment. *Id.* Yet the circumstances in the illustration are much less inequitable than those at issue in this case. In the illustration, the physician performed a medically appropriate procedure and a medically appropriate examination of the blood sample. *Id.* ("Doctor's decision to examine samples of Patient's blood is medically appropriate; the same amount of blood would have been drawn from Patient in any event[.]"). The patient was not injured. *Id.* In this case, Henrietta Lacks' physicians performed a medically inappropriate procedure (removal of her cervical tissue), without her consent, under the pretext of performing a different procedure (radium treatment), and she was injured (part of her cervix was gone). Since it would be inequitable for the physician to retain the

benefit of the patient's blood sample, it would be inequitable for Ultragenyx to retain the benefit of the HeLa cells in its possession.

Of course, in the illustration, the patient brings an unjust enrichment claim against the doctor who committed the originating wrong, whereas here, Lacks brings an unjust enrichment claim against a subsequent holder of the benefit the doctors obtained in violation of the patient's rights. But the principle of this section of the Third Restatement expressly embraces that alternative by providing for an unjust enrichment claim against a third-party transferee who holds the benefit "in consequence of interference by another." *See* Restatement (Third) § 44. That distinction does not cut off Lacks' claim for unjust enrichment—at least not as a matter of law, at this stage of the proceedings.

Ultragenyx counters that § 44 does not apply here at all. It says § 44 applies only to an unjust enrichment claim accompanied by an additional claim that the defendant committed a tort against the plaintiff. Ultragenyx draws that conclusion from a comment that says § 44 does not apply to "[1] a case in which the sole predicate of the restitution claim is unjust enrichment—[2] without separately identifiable misconduct on the part of the defendant." *Id.* § 44 cmt. a. As Ultragenyx interprets that comment, Lacks may not draw on § 44 unless Lacks has [1] accompanied his cause of action for unjust enrichment with a cause of action for a wrong against Henrietta Lacks [2] by Ultragenyx. However, neither clause means what Ultragenyx claims. The first clause—specifying that § 44 does not apply to "a case in which the sole predicate of the restitution claim is unjust enrichment," *id.*—merely reiterates the section's core rule that it applies when there has been "conscious interference with a claimant's legally protected interests," *see id.* § 44(1). "Interference with legally protected interests" is defined as encompassing only tortious conduct or conduct that violates another non-contractual legal duty or prohibition. *See id.* § 44(2).

In that sense, of course the plaintiff must predicate their unjust enrichment claim on some legal wrong. But that is not to say that, under § 44, the plaintiff must plead two separate counts against the defendant: one for unjust enrichment and the other for, say, a tort. Ultragenyx's reading of the comment would vitiate the rule that § 44 applies even when the defendant merely acquires the benefit "in consequence of such interference by another." *Id.* § 44(1).

The fact that § 44 imposes unjust enrichment liability upon a defendant who acquires a benefit "in consequence of such interference by another" is essential to reading the second clause too—the clause that says § 44 does not apply to a case "without separately identifiable misconduct on the part of the defendant." *See id.* § 44 cmt. a. If that clause meant what Ultragenyx says—that Lacks has to plead that Ultragenyx itself wronged Henrietta Lacks—then the comment would erase the rule. It would no longer be true that an unjust enrichment plaintiff may predicate their claim on the defendant's receipt of a benefit "in consequence of such interference by another." *Id.* § 44(1). The only way to read the comment as consistent with the controlling rule is that the comment uses "on the part of the defendant" to shorthand the actual rule, which permits the claim to rest on misconduct by the defendant or by another. The section's illustrations confirm that it applies to unjust enrichment claims against a defendant in the absence of any claim that the defendant wronged the plaintiff. Recall Illustration 10: A local pharmacy violated its customers' privacy rights by selling their data to a national chain without their knowledge or consent. *Id.* § 44, illus. 10. The Third Restatement expressly provides that the customers may bring an unjust enrichment claim against the local pharmacy (the original wrongdoer) or the national chain (the ultimate beneficiary of the wrongdoing). *See id.*

Even if Ultragenyx is right that this comment overrides the rule—which it is not—what ultimately controls the disposition of this case is Maryland law. Again, Maryland law expressly

recognizes that enrichment originating in wrongdoing against the plaintiff is prima facie unjust. *See Gibbons*, 918 A.2d at 569 (quoting *Bailiff*, 906 A.2d at 414). *Gibbons* applied that principle in a case where the defendant had been found as a matter of law not to have committed the only tort the plaintiff attributed to her. *Id.* at 567. Maryland law recognizes that in general, it is inequitable for a defendant to retain a benefit that originated from the wrongdoing of a third party against the plaintiff.

To be sure, there are countervailing equities apparent in the complaint. The complaint is clear that Ultragenyx did not itself wrong Henrietta Lacks. The complaint illustrates that the HeLa cells in Ultragenyx's possession play a significant role in the development of new drugs that may help many people. At this stage of the case, however, those circumstances do not preclude Lacks' unjust enrichment claim as a matter of law.

Lacks has pled the third element of a claim for unjust enrichment: that it would be inequitable for Ultragenyx to retain HeLa cells without paying their value.

*     *     *

Lacks has stated a claim for unjust enrichment against Ultragenyx. First, Lacks has plausibly alleged that Henrietta Lacks conferred a benefit upon Ultragenyx: HeLa cells. Second, Lacks has plausibly alleged that Ultragenyx is aware of that benefit. Third, Lacks has plausibly alleged that under the circumstances, it would be inequitable for Ultragenyx to retain these HeLa cells without compensating the Estate for their value because Ultragenyx possesses them by virtue of tortious wrongdoing to Henrietta Lacks—conversion, breach of fiduciary duty, and battery.

## IV.    Conclusion

Over seven decades ago, doctors at Johns Hopkins Hospital removed tissue from Henrietta Lacks' cervix without her knowledge or consent. The immortal cell line that resulted has

75

transformed medicine—saving lives and profiting pharmaceutical companies. Now, Henrietta Lacks' grandson, Ron Lacks, says Ultragenyx unjustly reaps some of the benefits of the wrongs against his grandmother. Ultragenyx says it has done nothing wrong and Lacks has no viable claim against it. Today, the Court reaches one modest conclusion about this dispute: If what Lacks alleges is true, it is plausible that Ultragenyx is liable to Lacks for unjust enrichment. For the reasons explained in this opinion, Ultragenyx's motion to dismiss is denied. A separate order follows.

Date:   May 20, 2024

_____
Deborah L. Boardman
United States District Judge