## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **RON L. LACKS, PERSONAL** * | |
| **REPRESENTATIVE OF THE** | |
| **ESTATE OF HENRIETTA LACKS,** * | |
| | |
| **Plaintiff,** * | |
| | **Civ. No. DLB-23-2171** |
| **v.** * | |
| | |
| **ULTRAGENYX PHARMACEUTICAL,** * | |
| **INC.,** | |
| * | |
| **Defendant.** | |
| * | |

### MEMORANDUM OPINION

Ron L. Lacks ("Lacks"), the grandson of Henrietta Lacks and the personal representative of her estate ("Lacks Estate"), has sued Ultragenyx Pharmaceutical, Inc. ("Ultragenyx") for unjust enrichment. Henrietta Lacks was a Black woman from Baltimore County. She died from cervical cancer in 1951. Shortly before her death, physicians at Johns Hopkins Hospital seized tissue from her cervix without her knowledge or consent. Scientists soon discovered that Henrietta Lacks' cells were able to replicate indefinitely under laboratory conditions. These cells, known as "HeLa cells," live on today. HeLa cells have been used by medical researchers and pharmaceutical companies around the world and have enabled major scientific breakthroughs.

One of the companies that uses HeLa cells is Ultragenyx, a biopharmaceutical company that develops therapies for "orphan diseases"—rare diseases that impact a small number of people. Lacks claims that Ultragenyx knew Henrietta Lacks' cells were seized without her consent when the company obtained HeLa cells, that Ultragenyx uses HeLa cells to develop its products, that Ultragenyx profits from the use of HeLa cells, and that Ultragenyx has not compensated the Lacks

Estate for its use of the cells. According to Lacks, Ultragenyx is liable for unjust enrichment under Maryland law.

Ultragenyx denies the allegations. One of Ultragenyx's defenses is that Lacks filed the unjust enrichment claim after the three-year statute of limitations period expired. Ultragenyx argues that, by the time Lacks filed this lawsuit, he had known about the commercial use of HeLa cells for decades and about Ultragenyx's use of HeLa cells for more than three years and that Lacks filed suit too late. In response, Lacks argues Ultragenyx cannot invoke a statute of limitations defense. Lacks claims that, under § 5-204 of Maryland's Courts and Judicial Proceedings Article, foreign corporations (corporations not formed under the laws of Maryland) that do intrastate business in Maryland without registering to do so cannot benefit from a statute of limitations defense. In a prior ruling denying Ultragenyx's motion to dismiss the complaint, the Court found Lacks has alleged that Ultragenyx, a foreign corporation, does intrastate business in Maryland but did not register with the state. In consequence, the Court concluded that if Ultragenyx was engaged in intrastate business as Lacks alleged, § 5-204 would deny it the benefit of the statute of limitations defense.

Now, in a motion for judgment on the pleadings, Ultragenyx argues that § 5-204 is unconstitutional because it violates the Commerce Clause of the United States Constitution. In Ultragenyx's view, because § 5-204 is unconstitutional, the statute cannot deny Ultragenyx the benefit of a statute of limitations defense, and the Court should dismiss Lacks' complaint on statute of limitations grounds. The Court disagrees. Section 5-204 is constitutional. If Lacks can prove that Ultragenyx was engaged in intrastate business in Maryland, § 5-204 would deny Ultragenyx the benefit of the statute of limitations defense. Ultragenyx's motion for judgment on the pleadings is denied. Discovery on Lacks' unjust enrichment claim will proceed.

I.      **Background**

A.  **Lacks' Complaint**

Lacks filed a complaint against Ultragenyx on August 10, 2023. The following allegations from the complaint are accepted as true.

In January 1951, Henrietta Lacks was diagnosed with cervical cancer. ECF 1, ¶ 40. She underwent treatment at Johns Hopkins Hospital in Baltimore County. *Id.* ¶¶ 5, 30. On February 5, 1951, without her knowledge or consent, a surgeon cut out two samples of tissue from Henrietta Lacks' cervix and gave them to Dr. George Gey, the head of tissue culture research at Johns Hopkins. *Id.* ¶¶ 3, 42–43. Dr. Gey cultivated her cells in a laboratory, touting an "immortal" cell line for use in medical research. *See id.* ¶¶ 45–47. These cells, which continue to replicate today, came to be known as "HeLa cells." *See id.* ¶ 6. Henrietta Lacks died of cervical cancer on October 4, 1951. *Id.* ¶ 45.

HeLa cells have been used in medical research for decades. *Id.* ¶ 47. This research has contributed to major medical advancements, including the first polio vaccine, treatment for sickle cell anemia, gene-mapping, and in vitro fertilization. *Id.* ¶¶ 8, 47. To this day, HeLa cells enable the development of new drugs. *See, e.g.*, ¶ 68.

Ultragenyx is a pharmaceutical company that develops drugs to treat "orphan diseases." *Id.* ¶¶ 9, 19. An orphan disease is a disease that impacts so few people that developing treatments typically is not profitable. *See id.* ¶ 9. Much of Ultragenyx's drug development is focused on gene therapy. *Id.* ¶ 10. Gene therapy requires the manufacturing of adeno-associated virus ("AAV") vectors. *Id.* AAV vectors deliver into cells genetic material that facilitates the production of therapeutic proteins. *Id.* AAV vectors are very difficult to produce at scale. *Id.*

To produce AAV vectors at scale, Ultragenyx relies on HeLa cells. *Id.* ¶¶ 11–12, 14, 64. The company has developed a proprietary HeLa cell platform for that purpose. *See id.* ¶¶ 12, 54, 56. In the words of Ultragenyx's Chief Scientific Officer:

> The HeLa platform is the most advanced platform that we have. It is a highly engineered system for manufacturing AAV gene therapy vectors using HeLa cells. The elements of the platform are finely tuned to work in concert to produce AAV vectors at the scale and quality required for our products. . . . We like to think of this as letting biology do the work.

*Id.* ¶ 12. By working with HeLa cells, Ultragenyx has been able to research, develop, and manufacture a range of gene therapies. *See id.* ¶¶ 64–68. Ultragenyx also has monetized its HeLa cell platform through partnerships with other pharmaceutical companies, including a $200 million licensing deal with Daiichi Sankyo Company. *Id.* ¶ 58. And Ultragenyx has secured millions of dollars in federal funding for AAV vector development. *Id.* ¶ 67. In these ways, Ultragenyx "reap[s] huge profits that would never have been possible without Henrietta Lacks' cells." *Id.* ¶ 14; *see also id.* ¶¶ 53–55, 61, 64. In 2022, Ultragenyx reported total revenues of $363 million and a year-end cash balance of $896.7 million. *Id.* ¶ 23.

Ultragenyx has known the story behind the HeLa cell line "since the development of its manufacturing platform." *Id.* ¶ 51; *see also id.* ¶ 13. Ultragenyx acknowledges the HeLa cell line's origins on its website. *Id.* ¶ 51. On a page that promotes the HeLa cell platform, the company explains that when Henrietta Lacks "received treatment at then-segregated Johns Hopkins Hospital . . . tissue samples were collected and replicated without her knowledge." *Id.*; *see also id.* ¶ 13. The website further notes that HeLa cells have "helped scientists achieve numerous medical breakthroughs." *Id.* ¶ 51. Lacks alleges Ultragenyx never paid the real value of the HeLa cells it acquired, *id.* ¶ 78; never compensated the Lacks Estate for their possession or use, *id.* ¶ 70; and never sought or received the permission of the Estate to use them, *id.* ¶ 14.

Ultragenyx is a Delaware corporation headquartered in California. *Id.* ¶ 18. Some of the company's business takes place in Maryland. *See id.* ¶¶ 26–29. It has employees located in Maryland, including personnel based in Maryland who market the company's products to physicians in the state. *Id.* ¶ 29. To further its HeLa cell line production, Ultragenyx partners with biopharmaceutical companies headquartered in Maryland. *Id.* ¶ 26. One of these partnerships is with Regenxbio, a Maryland corporation with a $65 million, 132,000-square-foot gene therapy manufacturing facility in Rockville. *Id.* ¶ 27. The partnership has involved four exclusive worldwide licenses. *Id.* One of these licensing agreements gave Ultragenyx exclusive rights to Regenxbio's AAV vectors to develop and commercialize gene therapies. *Id.* Ultragenyx develops licensed products with the AAV vectors and pays Regenxbio fees as well as royalties on net sales of the products. *Id.* Ultragenyx conducts "extensive research" and has sponsored marketing events at Johns Hopkins Hospital in Baltimore. *Id.* ¶¶ 26, 28. Since 2018, Ultragenyx has paid over $1.1 million to doctors at Johns Hopkins to fund research and consulting. *Id.* ¶ 28. The company pays other doctors in Maryland for research, including payments related to Ultragenyx's efforts to commercialize HeLa cells. *Id.* Ultragenyx also recruits patients and conducts clinical trials at the National Institutes of Health Clinical Center in Bethesda. *Id.* ¶ 26.

Lacks asserts a claim of unjust enrichment. *Id.* ¶¶ 73–79. He seeks disgorgement of Ultragenyx's net profits from its commercialization of the HeLa cell line, a permanent injunction to prevent the company from using HeLa cells without the Lacks Estate's permission, and a constructive trust in favor of the Lacks Estate on all HeLa cells in Ultragenyx's possession, related intellectual property, and proceeds related to its use of the cells. *Id.* at 19–20.

### B.  Motion to Dismiss

Ultragenyx moved to dismiss Lacks' complaint for failure to state a claim. ECF 6. The company argued that Lacks failed to plead an unjust enrichment claim under Maryland law and that the claim was time-barred under Maryland's three-year statute of limitations. *See id.* The Court held that Lacks had plausibly alleged an unjust enrichment claim under Maryland law. *See* ECF 46, at 56–75. The Court also held that under § 5-204 of Maryland's Courts and Judicial Proceedings Article, Ultragenyx, a foreign corporation, could not benefit from a statute of limitations defense if Ultragenyx was engaged in intrastate business in Maryland without having qualified or registered to do so. *See id.* at 9–18. The Court found that Lacks has alleged Ultragenyx does intrastate business in Maryland, and the Court took judicial notice of the fact that Ultragenyx had not qualified or registered with the state. *Id.* at 14–18. Because Lacks plausibly stated an unjust enrichment claim and because Ultragenyx was unable to establish a statute of limitations defense, the Court denied the motion to dismiss. ECF 46 & 47. Ultragenyx answered the complaint. ECF 55.

### C.  Motion for Judgment on the Pleadings

Not long after the Court denied the motion to dismiss, Ultragenyx moved for judgment on the pleadings, arguing that § 5-204 is unconstitutional and thus the statute cannot deny Ultragenyx the benefit of the statute of limitations defense.[1] ECF 57 & 57-1. Lacks opposed the motion, ECF

---

[1] Ultragenyx also moved to stay discovery pending the resolution of its motion for judgment on the pleadings. ECF 63 & 63-1. Lacks opposed the motion, ECF 65, and Ultragenyx replied, ECF 72. Because the motion for judgment on the pleadings is denied, the motion to stay discovery is denied as moot. The Court will issue a proposed scheduling order and schedule a Rule 16 conference.

71, and the Maryland Attorney General filed a brief to defend the constitutionality of § 5-204, ECF

70.[2] Ultragenyx replied. ECF 75. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023).

## II.    Standard of Review

"After the pleadings are closed—but early enough not to delay trial—a party may move

for judgment on the pleadings." Fed. R. Civ. P. 12(c). A 12(c) motion is "assessed under the same

standard that applies to a Rule 12(b)(6) motion." *Walker v. Kelly*, 589 F.3d 127, 139 (4th Cir.

2009). A 12(c) motion "should 'only be granted if, after accepting all well-pleaded allegations in

the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in

the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of

his claim entitling him to relief.'" *People for the Ethical Treatment of Animals v. U.S. Dep't of

Agric.*, 861 F.3d 502, 506 (4th Cir. 2017) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231,

244 (4th Cir. 1999)).

On a 12(c) motion, like a 12(b)(6) motion, the court "generally cannot reach the merits of

an affirmative defense, such as the defense that the plaintiff's claim is time-barred." *See Goodman

v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc). The court may reach a defense only

"in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are

alleged in the complaint." *See id.*; *see also Demetry v. Lasko Prods., Inc.*, 284 F. App'x 14, 15 (4th

Cir. 2008) (per curiam) (explaining on a Rule 12(c) motion that "[a] district court may reach the

merits of an affirmative defense when ruling on a motion to dismiss 'if all facts necessary to the

affirmative defense clearly appear on the face of the complaint'" (quoting *Goodman*, 494 F.3d at

---

[2] Pursuant to Rule 5.1(a) of the Federal Rules of Civil Procedure, Ultragenyx notified the Maryland Attorney General about the constitutional question raised in its motion. ECF 58. The Maryland Attorney General moved to intervene for the purpose of defending the constitutionality of § 5-204. ECF 68. The Court granted the motion. ECF 69.

464)); *United States v. Google, LLC*, 692 F. Supp. 3d 583, 591 (E.D. Va. 2023) ("Like a Rule 12(b)(6) motion, a Rule 12(c) motion 'generally cannot reach the merits of an affirmative defense.'" (quoting *Goodman*, 494 F.3d at 464)).

## III.    Discussion

Ultragenyx argues that § 5-204 of Maryland's Courts and Judicial Proceedings Article violates the Constitution's Commerce Clause. If the statute is unconstitutional, it does not bar Ultragenyx from invoking a statute of limitations defense. If Ultragenyx may invoke the defense, Ultragenyx insists that the Court must dismiss Lacks' unjust enrichment claim because it was filed outside the three-year statute of limitations period.

Section 5-204 is constitutional. Lacks has alleged that Ultragenyx is a foreign corporation doing intrastate business in Maryland without having qualified or registered to do so. If Lacks ultimately proves those allegations, § 5-204 denies Ultragenyx the benefit of the statute of limitations defense. Ultragenyx is not entitled to judgment on the pleadings.[3]

### A.  Maryland's Corporation Registration Requirements

Under Maryland law, domestic and foreign corporations must comply with registration requirements to do business in the state.

To form a domestic corporation in Maryland, the incorporators must file articles of incorporation with the State Department of Assessments and Taxation ("the Department"). *See* Md. Code Ann., Corps. & Ass'ns § 2-102. The articles of incorporation must include the corporation's name and purposes, the address of the corporation's principal office, the name and

---

[3] Lacks argues that Ultragenyx's motion for judgment on the pleadings is really a motion for reconsideration of the Court's ruling on the motion to dismiss. It is not. Ultragenyx did not challenge the constitutionality of § 5-204 in the motion to dismiss briefing, and the Court did not rule on the statute's constitutionality. The constitutionality of § 5-204 is properly before the Court.

address of the corporation's resident agent, the names and addresses of the incorporators, the number and names of the directors, and details about authorized shares of stock. *Id.* § 2-104. When the Department accepts the articles of incorporation, the proposed corporation "becomes a body corporate." *Id.* § 2-102(b)(1). "[A]cceptance of the articles for record by the Department is conclusive evidence of the formation of the corporation." *Id.* § 2-102(b)(2). Once formed, domestic corporations must maintain a resident agent. *Id.* § 2-108. They also must pay initial and annual fees and file annual reports. *See id.* § 1-203(b); Md. Code Ann., Tax-Prop. § 11-101(a). If a domestic corporation does not file annual reports with the Department, the corporation's charter is "repealed, annulled, and forfeited" after a notice period. *See* Corps. & Ass'ns § 3-503(c), (d).

Foreign corporations are organized under the laws of other states or a foreign country. *Id.* § 1-101(o). If foreign corporations elect to do business in Maryland, they too must comply with certain state registration requirements. Before a foreign corporation may conduct "intrastate business" in Maryland, the corporation "shall qualify with the Department." *Id.* § 7-203(a). Before a foreign corporation may conduct "interstate or foreign business" in Maryland, the corporation "shall register with the Department." *Id.* § 7-202(a). To qualify or register, the requirements are the same. The foreign corporation must (1) certify the corporation's address and the name and address of the corporation's resident agent in the state and (2) provide proof of good standing in the jurisdiction where the corporation is organized. *See id.* §§ 7-202(b), 7-203(b). A foreign corporation that qualifies or registers to do business in Maryland also must maintain a resident agent, *see id.* §§ 7-202(c), 7-203(c)(1), 7-205; file an annual tax report, *see* Tax-Prop. § 11-101(a); and in some cases, pay certain fees, such as a $100 fee to qualify to do intrastate business and a $300 filing fee for annual reports, *see* Corps. & Ass'ns § 1-203(b)(3).

If a foreign corporation required to qualify or register to do business fails to do so, the state imposes consequences. One consequence is that the unqualified or unregistered foreign corporation may not maintain a lawsuit in Maryland. Corps. & Ass'ns § 7-301. Another consequence is that the unqualified or unregistered foreign corporation may not benefit from a statute of limitations defense. Md. Code Ann., Cts. & Jud. Proc. § 5-204.

Section 5-204 states, in relevant part:

> A foreign corporation . . . required by law to qualify or register to do business in the State . . . may not benefit from any statute of limitations in an action at law or suit in equity: . . . (2) [i]nstituted while the foreign corporation . . . is doing intrastate or interstate or foreign business in the State without having qualified or registered.

*Id.* This statute is implicated here because Ultragenyx, an unregistered foreign corporation that allegedly conducts intrastate business in Maryland, seeks to benefit from the statute of limitations in this case. Ultragenyx argues § 5-204 violates the Commerce Clause.[4]

### B.  The Dormant Commerce Clause

The Commerce Clause states that Congress has the power "[t]o regulate Commerce with foreign nations, and among the several States, and with the Indian tribes." U.S. Const. art. I, § 8, cl. 3. "'Although the [Commerce] Clause is framed as a positive grant of power to Congress,' [the Supreme Court] ha[s] long held that this Clause also prohibits state laws that unduly restrict interstate commerce." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019) (citation omitted) (quoting *Comptroller of the Treasury v. Wynne*, 575 U.S. 542, 548 (2015)).

---

[4] Section 5-204 applies to foreign corporations "required by law to qualify or register to do business." The requirements "to qualify or register" are the same. *See* Corps. & Ass'ns §§ 7-202(b), 7-203(b). Because there is no meaningful difference between registering and qualifying to do business for purposes of the Commerce Clause analysis, the Court uses throughout this opinion, for ease of reference, only the terms "register" and "registration requirements" (and not "qualify" or "qualification requirements"). If the difference between "registering" to do business and "qualifying" to do business bears on the Court's analysis, it will be noted.

"'This "negative" aspect of the Commerce Clause' prevents the States from adopting protectionist measures and thus preserves a national market for goods and services." *Id.* (quoting *New Energy Co. v. Limbach*, 486 U.S. 269, 273 (1988)). The implied constraint on the states' power to legislate in a manner that burdens interstate commerce is known as the dormant Commerce Clause. The dormant Commerce Clause "vindicates a fundamental aim of the Constitution: fostering the creation of a national economy and avoiding the every-State-for-itself practices that had weakened the country under the Articles of Confederation." *Mallory v. Norfolk S. Ry.*, 600 U.S. 122, 157 (2023) (Alito, J., concurring in part and concurring in the judgment); *see also Granholm v. Heald*, 544 U.S. 460, 472 (2005) (The dormant Commerce Clause "reflect[s] a central concern of the Framers that . . . the new Union would have to avoid the tendencies toward economic Balkanization." (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979))).

"[S]tate laws offend the Commerce Clause when they seek to 'build up . . . domestic commerce' through 'burdens upon the industry and business of other States.'" *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (quoting *Guy v. Baltimore*, 100 U.S. 434, 443 (1880)); *see also Granholm*, 544 U.S. at 472 ("States may not enact laws that burden out-of-state producers or shippers simply to give a competitive advantage to in-state businesses."). "The dormant Commerce Clause is implicated by burdens placed *on the flow of interstate commerce*— the flow of goods, materials, and other articles of commerce across state lines." *Brown v. Hovatter*, 561 F.3d 357, 364 (4th Cir. 2009). At its core, the dormant Commerce Clause "prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 665 (4th Cir. 2024) (quoting *New Energy Co.*, 486 U.S. at 273–74). Importantly, "[t]he Clause does not purport

to restrict or limit intrastate commerce, nor protect the participants in intrastate or interstate markets, nor the participants' chosen way of doing business." *Brown*, 561 F.3d at 364.

Dormant Commerce Clause analysis has evolved over the years. Under the current framework, "[t]he analysis for determining whether a state law violates the dormant Commerce Clause proceeds on two tiers." *Id.* at 363. First, the court "inquires whether the state law *discriminates* against interstate commerce." *Id.* "Unless discrimination is demonstrably justified by a factor unrelated to economic protectionism, a 'discriminatory law is virtually *per se* invalid.'" *Id.* (quoting *Dep't of Revenue v. Davis*, 553 U.S. 328, 338 (2008)). Then, "[i]f there is no discrimination, a court will consider on the second tier whether the state law[] 'unjustifiably . . . burden[s] the interstate flow of articles of commerce.'" *Id.* (quoting *Or. Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 98 (1994)). To determine whether the law unjustifiably burdens interstate commerce, courts generally apply the balancing test from *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). *See Brown*, 561 F.3d at 363. The *Pike* test asks "whether any of the law's incidental burdens on interstate commerce might still be 'clearly excessive in relation to [its] putative local benefits.'" *See Colon Health Ctrs. of Am., LLC v. Hazel* (*"Colon Health Ctrs. II"*), 813 F.3d 145, 155 (4th Cir. 2016) (quoting *Sandlands C & D LLC v. County of Horry*, 737 F.3d 45, 53 (4th Cir. 2013)).

Before this modern-day framework was developed, the Supreme Court decided *Eli Lilly & Co. v. Sav-On-Drugs, Inc.*, 366 U.S. 276 (1961)—a dormant Commerce Clause case that controls the outcome here.

### 1. *Eli Lilly*

In *Eli Lilly*, the Supreme Court found constitutional a New Jersey statute that imposed a litigation-related consequence on foreign corporations that were engaged in intrastate business in

New Jersey but had not complied with the state's foreign corporation registration requirements. Even though *Eli Lilly* was decided nearly 65 years ago and its analysis does not fit neatly into the framework of modern-day dormant Commerce Clause analysis, *Eli Lilly* remains the law. Applying *Eli Lilly* here, the Court concludes that § 5-204 is constitutional.

In *Eli Lilly*, Eli Lilly and Company ("Eli Lilly"), a pharmaceutical company incorporated in Indiana, filed suit in New Jersey against Sav-On-Drugs, Inc. ("Sav-On"), a New Jersey corporation. 366 U.S. at 276–77. Eli Lilly asked the state court to enjoin Sav-On from selling Eli Lilly's products in New Jersey at prices lower than the fixed minimum retail prices that it had agreed on with New Jersey drug retailers. *Id.* Sav-On moved to dismiss the complaint under a New Jersey law "that denie[d] a foreign corporation transacting business in the State the right to bring any action in New Jersey upon any contract made there" until the corporation "file[d] with the New Jersey Secretary of State a copy of its charter together with a limited amount of information about its operations and obtain[ed] from him a certificate authorizing it to do business in the State."[5] *Id.* at 277 (footnote omitted). Eli Lilly had not filed the necessary information with the secretary of state or obtained a certificate to do business in New Jersey. *See id.* at 277–78. Thus, Eli Lilly had not complied with New Jersey's "statute which require[d] the registration of foreign corporations." *See id.* at 283. Yet Eli Lilly insisted those failures did not matter because the statute was unconstitutional. *Id.* at 277. The out-of-state company argued that "its business in New Jersey was entirely in interstate commerce" and "that the attempt to require it to file the necessary

---

[5] To obtain a certificate of authority, a foreign corporation transacting business in New Jersey had to disclose: "(1) the amount of the corporation's authorized capital stock; (2) the amount of stock actually issued by the corporation; (3) the character of the business which the corporation intends to transact in New Jersey; (4) the principal office of the corporation in New Jersey; and (5) the name and place of abode of an agent upon whom process against the corporation may be served." *Eli Lilly*, 366 U.S. at 277 n.2 (citing N.J. Rev. Stat. § 14:15–3).

information and obtain a certificate for its New Jersey business was forbidden by the Commerce Clause of the Federal Constitution." *Id.* The trial court disagreed. It granted Sav-On's motion to dismiss, "stating as its ground that 'the conclusion [was] inescapable that the plaintiff (Lilly) was in fact doing business in this State at the time of the acts complained of and was required to, but did not, comply with'" the certificate of authority requirement. *See id.* at 278 (quoting *Eli Lilly & Co. v. Sav-On Drugs, Inc.,* 154 A.2d 650, 656 (N.J. Super. Ct. Ch. Div. 1959) *aff'd*, 31 N.J. 591, 158 A.2d 528 (1960), *aff'd*, 366 U.S. 276 (1961)). The New Jersey Supreme Court "affirmed the judgment upholding the statute, relying entirely upon the opinion of the trial court." *Id.*

At the United States Supreme Court, the constitutionality of the New Jersey statute turned entirely on whether Eli Lilly was engaged in intrastate business in New Jersey. Before resolving that fact-intensive question, the Supreme Court identified two "well established" and "well settled" Commerce Clause principles. *Id.* at 278–79. The Court did not elaborate on these principles in the opinion—presumably because they were not subject to debate—but they are worthy of elaboration here.

The first principle was that states cannot impose a registration requirement on a foreign corporation that conducts only interstate commerce in the state. In *Eli Lilly*'s words: If Eli Lilly's "participation in [the New Jersey pharmaceutical] trade [wa]s limited to its wholly interstate sales to New Jersey wholesalers," then "New Jersey [could not] require Lilly to get a certificate of authority to do business in the State." *Id.* at 278. In support of this "well established" principle, the Court cited cases in which it found unconstitutional state laws that required foreign corporations to register to conduct interstate business in the state: *Crutcher v. Kentucky*, *International Text-book Co. v. Pigg*, and *Sioux Remedy Co. v. Cope*. *Id.* at 278 n.7. In *Crutcher v. Kentucky*, the Court held that Kentucky could not require a New York company to obtain a license to transport goods

into Kentucky because interstate commerce was "manifestly the principal object of" the New York company in Kentucky and "a state law is unconstitutional and void which requires a party to take out a license for carrying on interstate commerce." 141 U.S. 47, 48, 58–59 (1891). In *International Text-book Co. v. Pigg*, the Court held that Kansas could not require a Pennsylvania company conducting business in Kansas that "was interstate in its nature" to obtain a certificate from the secretary of state before the company could enforce in Kansas courts its contracts for the interstate sale of textbooks. 217 U.S. 91, 102–03, 111–12 (1910). Because Kansas was effectively requiring a license to engage in interstate commerce, the Supreme Court determined that Kansas was "impos[ing] a *condition* upon a corporation of another state seeking to do business in Kansas, which, in the case of interstate business, is a regulation of interstate commerce and directly burdens such commerce." *Id.* at 111. And in *Sioux Remedy Co. v. Cope*, the Court held that a South Dakota statute violated the Commerce Clause because it required an Iowa corporation to file its charter or articles of incorporation with the secretary of state, to appoint a resident agent that would "subject it[] to the jurisdiction of the courts of the state in general," and to pay a fee before it could sue to enforce a contract for merchandise sold in interstate commerce. 235 U.S. 197, 204–05 (1914). The Court explained that "a state may restrict the right of a foreign corporation to sue in its courts" and "a state may restrict the right of such corporations to engage in business within its limits." *Id.* at 203. But South Dakota's restrictions went too far. The state's requirements applied to a foreign corporation "go[ing] into a state other than that of its origin to collect . . . the purchase price of merchandise which it has lawfully sold therein in interstate commerce." *See id.* at 204–05. The Court found that the South Dakota statute "obstruct[ed] or hamper[ed]" interstate commerce. *See id.*

15

The second principle that *Eli Lilly* observed was that states may impose a registration requirement on a foreign corporation that conducts both interstate and intrastate business in the state. In *Eli Lilly*'s words: "[I]f Lilly [wa]s engaged in intrastate as well as interstate aspects of the New Jersey drug business, the State [could] require it to get a certificate of authority to do business. In such a situation, Lilly could not escape state regulation merely because it [was] also engaged in interstate commerce." *Eli Lilly*, 366 U.S. at 279. In support of this principle, the Court cited two of its prior decisions holding that a state may require an out-of-state corporation to obtain a license to engage in intrastate business in the state: *Railway Express Co. v. Virginia* and *Union Brokerage Co. v. Jensen*. In *Railway Express Co. v. Virginia*, the Supreme Court upheld the Virginia Corporation Commission's order denying a Delaware railroad corporation a permit to conduct "intrastate express business" in the state. 282 U.S. 440, 443–44 (1931). The state commission denied the permit because the corporation had not complied with the state constitution's requirement to obtain a state charter. *Id.* The Supreme Court held that Virginia's state charter requirement did not violate the Commerce Clause. *Id.* at 444. It was a lawful exercise of the state's power because Virginia was "simply . . . refusing to grant a foreign corporation a permit to transact local business without taking out a charter from the jurisdiction within which that business must be done." *Id.* And in *Union Brokerage Co. v. Jensen*, the Supreme Court upheld a Minnesota law that prohibited a North Dakota corporation from suing in Minnesota courts because the corporation had not obtained a certificate of authority to conduct business in the state. *See* 322 U.S. 202, 203, 211–12 (1944). Minnesota could require a foreign corporation that had "localized its business" in the state to get a certificate of authority and could cut off the corporation's access to state courts if it failed to do so. *Id.* at 210–12. Although "the business of [the North Dakota corporation] [wa]s related to the process of foreign commerce," it was not "a case of a foreign corporation merely

coming into Minnesota to contribute to or to conclude a unitary interstate transaction." *Id.* at 211. The business of the North Dakota corporation was "localized in Minnesota, and Minnesota, in the requirement before [the Court], merely [sought] to regularize its conduct." *Id.*

These cases establish two important Commerce Clause principles that govern a state's ability to impose registration requirements on foreign corporations. First, it is "not . . . within the province of the state legislature *to exact conditions on which [a corporation] should carry on [interstate commerce], nor to require them to take out a license therefor.*" *See Int'l Text-book*, 217 U.S. at 109 (quoting *Crutcher*, 141 U.S. at 57). Second, a state can "giv[e] needful protection to its citizens in the course of their contacts with businesses conducted by outsiders when the legislation by which this is accomplished is general in its scope, is not aimed at interstate or foreign commerce, and involves merely burdens incident to effective administration." *Union Brokerage*, 322 U.S. at 212. These well-established principles confirm the following: A state cannot require a foreign corporation that does only interstate business in the state to register to do business in the state. But a state may require a foreign corporation that does intrastate business in the state to register, provided the registration requirement is "not aimed at interstate or foreign commerce" and "involves merely burdens incident to effective administration." *See id.*

Against the backdrop of these well-settled principles, the *Eli Lilly* Court considered the factual record to determine whether Eli Lilly was engaged in solely interstate commerce in New Jersey or whether it was engaged in both interstate and intrastate commerce in the state. 366 U.S. at 279. The Court found that Eli Lilly was engaged in both. Eli Lilly maintained an office in New Jersey and employed several "detailmen" in New Jersey who marketed products "not to the wholesalers, Lilly's interstate customers, but to the physicians, hospitals and retailers who buy those products in intrastate commerce from the wholesalers." *Id.* at 280–81. At times, the

detailmen "even directly participate[d] in the intrastate sales themselves." *Id.* at 281. The Court

found that "Lilly was, as a matter of fact, engaged in local intrastate business in New Jersey." *Id.*

at 283–84. The New Jersey law that prohibited an unregistered foreign corporation doing intrastate

business in the state from suing to enforce a contract in the state did not violate the dormant

Commerce Clause. *See id.* at 284.

The New Jersey statute in *Eli Lilly* closely resembles Maryland's § 5-204. Just as New

Jersey required foreign corporations engaged in intrastate business to register to do business in the

state, Maryland requires the same. And just as New Jersey imposed a consequence on foreign

corporations that did not comply with the registration requirements, Maryland does as well.[6]

To be sure, there are differences between Maryland's § 5-204 and the New Jersey statute

in *Eli Lilly*. None is consequential.

One difference is that the New Jersey statute did not apply to foreign corporations engaged

solely in interstate commerce. In contrast, the text of § 5-204 indicates that it applies to foreign

corporations engaged solely in interstate commerce. However, this apparent facial defect does not

necessarily mean the statute is unconstitutional. Maryland courts have interpreted a statute with

similar language—Maryland's "door-closing" statute, § 7-301 of Maryland's Corporations and

Associations Article—to apply only to foreign corporations doing intrastate business in Maryland.

---

[6] *Eli Lilly* applies to this case for another reason. In *Eli Lilly*, the developed factual record established that the foreign corporation was engaged in intrastate business in New Jersey. Here, there is no factual record yet, but the Court has found that Lacks sufficiently alleges in his complaint that Ultragenyx was engaged in intrastate business in Maryland. *See* ECF 46, at 14–18. Lacks alleges that Ultragenyx has Maryland employees and that some Maryland employees market its products to Maryland physicians. ECF 1, ¶ 29. He also alleges that Ultragenyx does research in Maryland, sponsors marketing events in Maryland, recruits patients for clinical trials conducted in Maryland, and partners with biopharmaceutical companies headquartered in Maryland. *Id.* ¶¶ 26–28. If these allegations are proven, Ultragenyx conducts at least as much intrastate business activity in Maryland as Eli Lilly conducted in New Jersey.

Door-closing statutes like Maryland's § 7-301 and the New Jersey statute in *Eli Lilly* prevent foreign corporations from maintaining a lawsuit in the forum state if they do not comply with the state's corporation registration requirements. Maryland's door-closing statute provides:

> If a foreign corporation is doing or has done any intrastate, interstate, or foreign business in this State without complying with the requirements of Subtitle 2 of this title, neither the corporation nor any person claiming under it may maintain a suit in any court of this State unless it shows to the satisfaction of the court that:
>
> (1) The foreign corporation or the person claiming under it has paid the penalty specified in § 7-302 of this subtitle; and
>
> (2) Either:
>
>> (i) The foreign corporation or a foreign corporation successor to it has complied with the requirements of Subtitle 2 of this title; or
>>
>> (ii) The foreign corporation and any foreign corporation successor to it are no longer doing intrastate, interstate, or foreign business in this State.

Corps. & Ass'ns § 7-301. Subtitle 2 includes the requirements to register or qualify to do business in Maryland. *See id.* §§ 7-202, 7-203. Thus, the text of § 7-301 bars an unregistered foreign corporation from filing a lawsuit in Maryland if the corporation "is doing or has done any intrastate, interstate, or foreign business in this State." *See id.* § 7-301. If the text is applied literally, the door-closing statute would violate the Commerce Clause because it would prevent foreign corporations engaged solely in interstate commerce in Maryland from maintaining a suit in Maryland. That would be a problem under *Eli Lilly*.

To avoid this constitutional problem, the Maryland Supreme Court has not interpreted § 7-301 literally. *See Yangming Marine Transport Corp. v. Revon Prods. U.S.A., Inc.*, 536 A.2d 633, 636 (Md. 1988) (explaining the court "has not given § 7-301 an entirely literal construction"). The state's highest court "has not construed § 7-301 as listing three, disjunctive factors, any one of which, if present, could bar an unregistered or unqualified corporation from suing in Maryland courts." *Id.* Instead, the court has construed § 7-301 to apply only if the corporation is "doing

business" in Maryland. *Id.*; *see also G.E.M., Inc. v. Plough, Inc.*, 180 A.2d 478, 480 (Md. 1962) (interpreting "the words 'doing . . . intrastate or interstate or foreign business in this State'" in § 7-301's predecessor as "no broader than the words 'doing business'" in Maryland); *S. A. S. Pers. Consultants, Inc. v. Pat-Pan, Inc.*, 407 A.2d 1139, 1142 (Md. 1979) (affirming that "doing business" for purposes of § 7-301 "rests . . . on the nature and extent of the business and activities which occur in the forum state"). A foreign corporation is "doing business" in Maryland if "the [foreign] corporation [is] engaged in a substantial amount of localized business activity in Maryland." *See Yangming*, 536 A.2d at 637.[7]

In *Yangming Marine Transport Corp. v. Revon Products U.S.A.*, the Maryland Supreme Court applied the "doing business" test to an unregistered foreign corporation that filed suit in Maryland. *Id.* at 634–35. The *Yangming* Court determined that the foreign corporation was not "doing business" in Maryland and that § 7-301 did not prevent it from maintaining suit in Maryland. *Id.* at 639–40. The court "acknowledged that [its] construction and applications of the Maryland statutory scheme . . . obviously are influenced by constitutional considerations" and "are in accord with the principle that a court will, whenever reasonably possible, construe and apply a statute to avoid casting serious doubt upon its constitutionality." *Id.* at 640. Because the *Yangming* Court construed the statute to avoid a constitutional problem, the court did not decide whether § 7-301, as applied to the plaintiff's action, violated the Commerce Clause. *Id.* Still, the court cautioned that the United States Supreme Court "has consistently taken the position that a 'closed-

---

[7] The "doing business" test applies to Corporations and Associations Article § 7-202, which is the registration requirement for foreign corporations "doing any interstate or foreign business" in Maryland, and to Corporations and Associations Article § 7-203, which is the qualification requirement for foreign corporations "doing any intrastate business" in Maryland. *See Yangming*, 536 A.2d at 640 (describing how "doing business" has been "con[s]trued by the [Maryland Supreme] Court" for §§ 7-202, 7-203, and 7-301).

door' statute such as § 7-301 cannot, under the Commerce Clause, apply to unregistered or unqualified foreign corporations engaged in wholly interstate or foreign commerce." *Id.* (citing, *e.g.*, *Eli Lilly*, 366 U.S. 276, and *Int'l Text-book*, 217 U.S. at 109–15). The court affirmed that its "application of § 7-301 . . . is consistent with numerous decisions throughout the country" that "have held . . . 'closed-door' statutes [are] inapplicable to unregistered or unqualified foreign corporations engaged in wholly interstate or foreign commerce." *Id.* at 640 n.9.

Just as the Maryland Supreme Court has interpreted § 7-301 to avoid a Commerce Clause problem, this Court interprets § 5-204 to avoid the same problem. A literal interpretation of § 5-204 would deprive an unregistered foreign corporation engaged solely in interstate commerce of a statute of limitations defense. That would pose a constitutional problem. To avoid that problem, the Court finds that § 5-204, like § 7-301, applies only to foreign corporations that are "doing business" in Maryland. *See Turner v. Smalis, Inc.*, 622 F. Supp. 248, 254 (D. Md. 1985), *aff'd sub nom. Turner v. Byers*, 813 F.2d 403 (4th Cir. 1986) (Table) (relying on the Maryland Supreme Court's interpretation of § 7-301 and construing § 5-204 to apply only to foreign corporations "doing business" in Maryland). Maryland's "doing business" requirement is an intrastate activity requirement. *See Champion Spark Plug Co. v. T.G. Stores, Inc.*, 356 F.2d 462, 462–63 (4th Cir. 1966) (considering the Maryland Supreme Court's interpretation of "doing business" in the state to determine what constitutes "intrastate business" for Maryland's qualification requirement); *Turner*, 622 F. Supp. at 253 (Maryland's "doing business" test "requires . . . typical indicia of doing intrastate business" (citing *Pat-Pan*, 407 A.2d at 1142)); *cf. Eli Lilly*, 366 U.S. at 283 ("The only reasonable inference from these findings is that the trial court interpreted the phrase 'transacting business' in the New Jersey statute to mean transacting local intrastate business and concluded from the facts it found that Lilly was transacting such business."). Thus, § 5-204, as

construed by this Court, and the New Jersey statute in *Eli Lilly* apply only to foreign corporations doing intrastate business in the state.[8]

Another difference between § 5-204 and the New Jersey statute in *Eli Lilly* is the consequence imposed on the foreign corporation if it does not comply with the state registration requirements. In *Eli Lilly*, an unregistered foreign corporation was not allowed to bring a lawsuit in New Jersey. Under § 5-204, an unregistered foreign corporation is not allowed to benefit from a statute of limitations. Ultragenyx argues this difference matters. It says *Eli Lilly* does not apply to this case because door-closing statutes like the New Jersey statute in *Eli Lilly* "are inherently different from . . . Section 5-204." ECF 75, at 6–7. According to Ultragenyx, door-closing statutes apply to corporations who "*cho[se] to initiate* a lawsuit in a state's courts" whereas § 5-204 applies to corporations "involuntarily haled into a foreign state's courts." *Id.* at 7.

Ultragenyx misunderstands *Eli Lilly* and the cases on which it relies. In *Eli Lilly*, *Union Brokerage*, and *International Text-book*, the Supreme Court did not judge the burden on interstate commerce by referring to the nature of the sanctions for not complying with state registration statutes. Rather, the Court judged the burden on interstate commerce by referring to the requirements of the registration statutes and by assessing whether they were imposed on companies engaged solely in interstate commerce. As Justice Rehnquist explained:

> Although the result of [the] failure to comply with the qualification statute is a drastic one, [Supreme Court] decisions hold that the burden imposed on interstate

---

[8] Maryland's "doing business" test requires more intrastate business activity by a foreign corporation to trigger the state's registration requirements than the amount of intrastate business activity the *Eli Lilly* Court found sufficient to satisfy the Commerce Clause. *See Champion Spark Plug*, 356 F.2d at 463 (observing *Eli Lilly* "would permit Maryland broader jurisdictional limits" for "what constitutes intrastate business" if "it chose[] to exercise its constitutional rights to the maximum"); *see also United Merchs. & Mfrs., Inc. v. David & Dash, Inc.*, 439 F. Supp. 1078, 1087 n.9 (D. Md. 1977) ("Maryland has yet to extend its reach under § 7-203 [the requirement for foreign corporations doing intrastate business to qualify] as far as *Eli Lilly* has indicated may be permissible . . . .").

> commerce by such statutes is to be judged with reference to the measures required
> to comply with such legislation, and not to the sanctions imposed for violation of
> it.

*Allenberg Cotton Co. v. Pittman*, 419 U.S. 20, 41–42 (1974) (Rehnquist, J., dissenting) (footnote

omitted) (first citing *Eli Lilly*, 366 U.S. at 282–83; and then citing *Railway Express*, 282 U.S. at

444).[9]

    *International Text-book* illustrates this point. Recall that in *International Text-book* a

Kansas statute prohibited a foreign corporation from maintaining an action in Kansas courts unless

it obtained a certificate to do business in the state. *See* 217 U.S. at 103. To obtain a certificate, the

foreign corporation had to file a statement with information about the company's financial

condition, stockholders, and corporate personnel. *See id.* at 102–03. The statement acted as "a

condition precedent to the right of the plaintiff to maintain an action in the courts of Kansas." *Id.*

at 112. The Supreme Court determined that International Text-book's business in Kansas "was

interstate in its nature." *Id.* at 107. Thus, the Court held that the statute violated the Commerce

Clause because it required International Text-book to obtain a certificate to do interstate business

in the state. *Id.* The Court found that "the requirement of the statement . . . impose[d] a direct

burden on the plaintiff's right to engage in interstate business." *Id.* at 112. As this line makes clear,

---

[9] Even though this point was made in the dissent, it is an accurate description of precedent that the *Allenberg* majority followed. In *Allenberg*, the Supreme Court confirmed *Eli Lilly*'s holding that "[s]ince [Eli Lilly] was engaged in an intrastate business it could be required to obtain a license even though it also did an interstate business." 419 U.S. at 32. But *Allenberg* came out differently. Applying the well-settled Commerce Clause principles described in *Eli Lilly*, the *Allenberg* Court found Mississippi's door-closing statute unconstitutional as applied to a Tennessee cotton merchant whose "contacts with Mississippi d[id] not exhibit the sort of localization or intrastate character which [the Court] ha[s] required in situations where a State seeks to require a foreign corporation to qualify to do business." *See id.* at 22, 33–34. In so holding, the majority did not disagree with Justice Rehnquist's uncontroversial point in his dissent that "the burden imposed on interstate commerce by [qualification statutes] is to be judged with reference to the measures required to comply with such legislation, and not to the sanctions imposed for violation of it." *See id.* at 42 (Rehnquist, J., dissenting).

it was the statement requirement that burdened interstate commerce—not the sanction imposed on International Text-book for not complying with the requirement. In fact, the portion of the statute that imposed the sanction was struck only because it was "so dependent upon and connected with" the statement requirement that it was "meaningless when standing alone." *Id.* at 114. Like *International Text-book*, *Eli Lilly* did not judge the burden on interstate commerce by referring to the sanction for violating the New Jersey statute. The Court judged the burden on interstate commerce by referring to the statute's requirement that foreign corporations transacting business in New Jersey must obtain a certificate of authority to do so and by evaluating whether the foreign corporation had transacted intrastate business in New Jersey. *See* 366 U.S. at 277–79 & n.2.

Here, as in *Eli Lilly*, Maryland's foreign corporation registration requirements do not burden interstate commerce. In Maryland, foreign corporations engaged in intrastate commerce must certify their address and resident agent in the state, provide proof of good standing, pay initial and annual fees, and file annual reports. These requirements are no more onerous than the requirements that the *Eli Lilly* Court found did not burden interstate commerce. In *Eli Lilly*, to obtain a certificate of authority to do business in the state, the foreign corporation had to file a copy of its charter and provide even more information than Maryland requires: the amount of authorized and issued stock, the character of the business the corporation intended to transact, its principal office in the state, and the name and address of a resident agent. *Eli Lilly*, 366 U.S. at 277 & n.2. If New Jersey's minimal registration requirements did not burden interstate commerce, neither do Maryland's. Through these statutes, New Jersey and Maryland "giv[e] needful protection to [their] citizens in the course of their contacts with businesses conducted by outsiders"—a lawful exercise of a state's regulatory power. *See Union Brokerage*, 322 U.S. at 212.

Even if, as Ultragenyx argues, the penalty for not registering to do business were relevant to the dormant Commerce Clause analysis, it would not change the outcome. The penalty imposed by § 5-204 is less burdensome on interstate commerce than the penalty imposed by the New Jersey statute in *Eli Lilly*. Under the New Jersey statute, an unregistered foreign corporation could not sue to enforce a contract in New Jersey. Under § 5-204, an unregistered foreign corporation may not benefit from the statute of limitations. "The barring of a litigant from raising a specific defense is, obviously, a less drastic burden on interstate commerce than closing the courthouse doors completely in its face." *Turner*, 622 F. Supp. at 254. Maryland may enforce its registration requirements by denying noncompliant corporations the benefit of a statute of limitations defense. *Cf. G. D. Searle & Co. v. Cohn*, 455 U.S. 404, 408 (1982) ("[Statutes of limitation] represent a public policy about the privilege to litigate. . . . [T]he history of pleas of limitation shows them to be good only by legislative grace and to be subject to a relatively large degree of legislative control." (quoting *Chase Sec. Corp. v. Donaldson*, 325 U.S. 304, 314 (1945))). So even if the penalty imposed on an unregistered foreign corporation factored into the Commerce Clause analysis, § 5-204 would survive constitutional scrutiny. Its penalty is less burdensome than the penalty imposed by the New Jersey statute the *Eli Lilly* Court found constitutional.

Under *Eli Lilly*, Maryland's § 5-204 does not violate the Commerce Clause. Just as New Jersey could close the courthouse doors to foreign corporations that conducted intrastate business without a certificate of authority, Maryland may deny the benefit of the statute of limitations defense to foreign corporations that conduct intrastate business without registering to do so.

### 2.  Modern Dormant Commerce Clause Framework

*Eli Lilly* controls the outcome of this case. Even though *Eli Lilly* does not speak in terms of the current analytical framework of dormant Commerce Clause cases, it is entirely consistent

25

with recent Supreme Court and Fourth Circuit caselaw. Applying the modern-day analytical framework here, the Court finds that § 5-204 does not discriminate against or unduly burden interstate commerce. *See Yamaha Motor Corp., U.S.A. v. Jim's Motorcycle, Inc.*, 401 F.3d 560, 567 (4th Cir. 2005) ("Analysis of a dormant Commerce Clause challenge to a state statute proceeds on two tiers, a discrimination tier and an undue burden tier.").

### i.  Discrimination

In *National Pork Producers Council v. Ross*, the Supreme Court explained that

> antidiscrimination . . . lies at the "very core" of [the Court's] dormant Commerce Clause jurisprudence. In its "modern" cases, th[e] Court has said that the Commerce Clause prohibits the enforcement of state laws "driven by . . . 'economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'"

598 U.S. at 369 (citations omitted) (first quoting *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 581 (1997); and then quoting *Davis*, 553 U.S. at 337–38). "Discrimination" in the dormant Commerce Clause context means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *See Just Puppies*, 123 F.4th at 666 (quoting *Or. Waste Sys.*, 511 U.S. at 99). A state law discriminates against interstate commerce if it "seeks to advantage in-state firms or disadvantage out-of-state rivals." *See Nat'l Pork Producers*, 598 U.S. at 370.

To determine whether a state law discriminates against interstate commerce, courts ask whether the law "discriminate[s] 'facially, in its practical effect, or in its purpose.'" *Colon Health Ctrs. of Am., LLC v. Hazel* ("*Colon Health Ctrs. I*"), 733 F.3d 535, 543 (4th Cir. 2013) (quoting *Env't Tech. Council v. Sierra Club*, 98 F.3d 774, 785 (4th Cir.1996)). Ultragenyx concedes that § 5-204 does not have a discriminatory purpose. *See* ECF 57-1, at 15. It was not enacted "with intent to discriminate against out-of-state economic interests." *See Just Puppies*, 123 F.4th at 668.

So the remaining question is: does § 5-204 discriminate "facially" or "in its practical effect" against interstate commerce. *See Colon Health Ctrs. I*, 733 F.3d at 543 (quoting *Env't Tech. Council*, 98 F.3d at 785).

Ultragenyx argues that § 5-204 facially discriminates against interstate commerce because the text of the statute applies only to foreign corporations. Ultragenyx is incorrect. The New Jersey statute upheld in *Eli Lilly* applied only to foreign corporations and that statute did not violate the dormant Commerce Clause. *See Eli Lilly & Co.*, 154 A.2d at 656 (identifying the relevant statute as part of the "foreign corporation provisions of [the] Corporation Act"), *aff'd*, 158 A.3d 528 (N.J. 1960), *aff'd*, 366 U.S. 276 (1961). Moreover, Maryland requires foreign and domestic corporations to register to do business in the state.[10] The requirements are similar but not identical because Maryland can exercise more control over domestic corporations, which are formed under its laws, than it can over foreign corporations, which are formed under the laws of other jurisdictions. To form a corporation in Maryland, incorporators must file articles of incorporation, which include the incorporators' names and addresses, the corporation's name and purposes, a principal office address, the name and address of a resident agent, the number and names of the directors, and authorized stock details. Corps. & Ass'ns § 2-104. A corporation formed under the laws of another jurisdiction must provide Maryland with the corporation's address, its resident agent in Maryland, and proof of good standing in its home jurisdiction before it may conduct business in Maryland.

---

[10] The registration requirements for domestic and foreign corporations appear in different statutes. The Court may consider the state's broader corporation regulatory scheme to determine whether § 5-204 is constitutional. *See Gregg Dyeing Co. v. Query*, 286 U.S. 472, 480 (1932) ("There is no demand in th[e] Constitution that the state shall put its requirements in any one statute. It may distribute them as it sees fit, if the result, taken in its totality, is within the state's constitutional power."); *see also W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 201 (1994) (looking at state's "program as a whole" because "[i]t [wa]s the entire program . . . that simultaneously burden[ed] interstate commerce and discriminate[d] in favor of local producers").

*Id.* §§ 7-202, 7-203. Foreign corporations, like domestic corporations, must maintain a resident agent, file tax reports, and pay fees. *Compare id.* § 7-205, *with id.* § 2-108; *see also id.* § 1-203(b); Tax-Prop. § 11-101(a). So in Maryland, foreign and domestic corporations must submit similar information to the state, and both have similar ongoing obligations under state law. When it comes to corporation registration requirements, Maryland does not "advantage" domestic corporations or "disadvantage" foreign corporations. *See Nat'l Pork Producers*, 598 U.S. at 370.

Ultragenyx insists that Maryland discriminates against interstate commerce because the state denies foreign corporations the benefit of a statute of limitations defense if they do not comply with the state's registration requirements and it does not impose the same sanction on noncompliant domestic corporations. The consequences for noncompliance with the state's registration requirements may differ between foreign and domestic corporations, but that difference does not mean § 5-204 discriminates against interstate commerce. A domestic corporation faces severe consequences if it does not comply with Maryland law. If its incorporators do not properly file articles of incorporation, the corporation does not exist. If a corporation does not exist, it is denied the benefits of the corporate structure, including the opportunity to raise capital and limit liability. *See generally Austin v. Mich. Chamber of Com.*, 494 U.S. 652, 658–59 (1990) ("State law grants corporations special advantages—such as limited liability, perpetual life, and favorable treatment of the accumulation and distribution of assets—that enhance their ability to attract capital and to deploy their resources in ways that maximize the return on their shareholders' investments."), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010); *see also Brown v. Hovatter*, 516 F. Supp. 2d 547, 554 (D. Md. 2007), *aff'd in part, rev'd in part on other grounds*, 561 F.3d 357 (4th Cir. 2009). After a domestic corporation is formed, Maryland may declare its corporate charter forfeited if it does not comply

with the annual reporting requirement. Corps. & Ass'ns § 3-503(c), (d). If the corporate charter is forfeited, "the powers conferred by law on the corporation[] are inoperative, null, and void," *id.* § 3-503(d), including the power to sue, *Stein v. Smith*, 751 A.2d 504, 507 (Md. 2000).

The consequences for noncompliant foreign corporations are different because Maryland's power to regulate foreign corporations is limited. Maryland certainly has the authority to require foreign corporations to register to conduct intrastate business within its borders. *See Eli Lilly*, 366 U.S. at 279. But if a foreign corporation does not register, Maryland may not deny its corporate existence as it does for domestic corporations. If a foreign corporation registers but does not comply with the annual reporting requirement, Maryland may not force the corporation to forfeit its corporate charter as it does for domestic corporations; the state merely may declare that its right to do intrastate business in the state is forfeited. *See* Corps. & Ass'ns § 7-304(a). Upon forfeiture, the foreign corporation is subject "to the same rules, legal provisions, and sanctions as if it had never qualified or been licensed to do business" in the state. *See id.* § 7-304(d). Because Maryland's power to enforce its registration requirements as to foreign corporations is more constrained than its power to enforce them as to domestic corporations, Maryland invokes a different enforcement mechanism for foreign corporations: It withholds from them the benefit of a statute of limitations defense. This sanction is within the state's legislative power. A statute of limitations defense is a creature of state law—it "represent[s] a public policy about the privilege to litigate" and is "good only by legislative grace and . . . subject to a relatively large degree of legislative control." *G. D. Searle & Co.*, 455 U.S. at 408 (quoting *Chase Sec. Corp.*, 325 U.S. at 314). Maryland has exercised its legislative authority to deny the benefit of a statute of limitations defense to unregistered foreign corporations. Thus, § 5-204 targets foreign corporations, not domestic corporations, because denying unregistered foreign corporations a statute of limitations

defense is one of few options available to Maryland to enforce its registration requirements against foreign corporations.[11] Section 5-204 does not target foreign corporations "to benefit in-state economic interests by burdening out-of-state competitors." *See Nat'l Pork Producers*, 598 U.S. at 369 (quoting *Davis*, 553 U.S. at 338). So even though § 5-204 applies only to foreign corporations, it does not discriminate on its face against interstate commerce.

The statute also does not have a discriminatory effect. It certainly does not "prohibit the flow of interstate goods" or "place added costs upon them." *See Just Puppies*, 123 F.4th at 666 (quoting *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 126 (1978)). Nor does it "'distinguish between in-state and out-of-state companies' in the market." *See id.* (quoting *Exxon Corp.*, 437 U.S. at 126). Maryland requires both domestic and foreign corporations to provide basic corporate information, maintain a resident agent, file annual tax reports, and pay fees, and Maryland sanctions both if they fail to do so. Finally, § 5-204, "if enforced," would not "negatively impact interstate commerce to a greater degree than intrastate commerce." *See Colon Health Ctrs. I*, 733 F.3d at 543 (quoting *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 335 (4th Cir. 2001)). As discussed earlier, the statute applies to foreign corporations engaged in *intra*state commerce; it does not apply to foreign corporations engaged solely in *inter*state commerce. Thus, the statute does not negatively impact interstate commerce to a greater degree than intrastate commerce. It has no discriminatory effect on interstate commerce.

Section 5-204 does not "'build up . . . domestic commerce' through 'burdens upon the industry and business of other States.'" *See Nat'l Pork Producers*, 598 U.S. at 369 (quoting *Guy*, 100 U.S. at 443). It does not "burden out-of-state [companies] simply to give a competitive

---

[11] Foreign corporations face other penalties if they fail to register: a $200 fine and the inability to sue in Maryland. *See* Corps. & Ass'ns §§ 7-301, 7-302. Neither penalty is at issue here.

advantage to in-state businesses." *See Granholm*, 544 U.S. at 472. And it does not give "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *See Just Puppies*, 123 F.4th at 666 (quoting *Or. Waste Sys.*, 511 U.S. at 99). Section 5-204 does not discriminate against interstate commerce.

### ii. Undue Burden

"If, as here, there is no discrimination, courts then consider whether the state law[]'unjustifiably . . . burden[s] the interstate flow of articles of commerce.'" *N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 496–97 (4th Cir. 2025) (quoting *Brown*, 561 F.3d at 363). To answer that question, courts generally apply the *Pike* balancing test. The aim of the *Pike* balancing test is to determine whether "a law's practical effects may also disclose the presence of a discriminatory purpose." *See Nat'l Pork Producers*, 598 U.S. at 377.

*Eli Lilly* was decided a decade before *Pike*. So of course, the *Eli Lilly* Court did not engage in the *Pike* balancing test or anything like it. No matter. "*Pike* and its progeny" do not "depart from the antidiscrimination rule that lies at the core of our dormant Commerce Clause jurisprudence." *See id.* That core dormant Commerce Clause jurisprudence includes *Eli Lilly*. And the question that *Pike* aims to answer—whether the practical effect of § 5-204 discloses a discriminatory purpose behind the law—has been answered here. It does not. The practical effect of § 5-204 is to encourage foreign corporations doing intrastate business in the state to register to do business and to penalize them if they do not. That effect does not reveal an intent to discriminate against *interstate* commerce. It reveals an intent to ensure foreign corporations that choose to conduct intrastate business in Maryland comply with Maryland's corporation registration requirements. That was the intent of the New Jersey statute that the *Eli Lilly* Court found constitutional. Like that statute, § 5-204 does not discriminate against interstate commerce. With the *Pike* question

31

answered, it is unnecessary to engage in the *Pike* balancing test. Even so, under *Pike*, § 5-204 is constitutional.

In *Pike*, the Supreme Court held that "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." 397 U.S. at 142. "The putative benefits of a challenged law are evaluated under the rational basis test, though 'speculative' benefits will not pass muster." *Colon Health Ctrs. I*, 733 F.3d at 545 (citation omitted) (quoting *Medigen of Ky., Inc. v. Pub. Serv. Comm'n*, 985 F.2d 164, 167 (4th Cir. 1993)). The burden inquiry is "deferential but not toothless." *Id.* It requires a "closer examination" than courts conduct when they assess the law's purported benefits, "especially when the burdens fall predominantly on out-of-state interests." *Id.* (quoting *Yamaha*, 401 F.3d at 569). The party challenging the state law must establish that the burden on interstate commerce outweighs the local benefits. *See Colon Health Ctrs. II*, 813 F.3d at 157. Often, the *Pike* balancing test is fact-intensive and employed after discovery. *See Colon Health Ctrs. I*, 733 F.3d at 546–47. Here, however, Ultragenyx does not argue discovery is necessary. It asks the Court to engage in the *Pike* balancing test at the pleadings stage.

Start with the burden on interstate commerce. In its motion for judgment on the pleadings, Ultragenyx did not identify any burden that § 5-204 imposes on interstate commerce. In its reply, Ultragenyx argues that the burdens are the requirements that foreign corporations must pay initial and annual fees, maintain a registered agent, and file annual reports. Ultragenyx does not explain how these requirements burden *inter*state commerce. They do not. These requirements are imposed

only on foreign corporations engaged in intrastate commerce. Ultragenyx has not identified a burden on interstate commerce.[12]

Next consider the law's local benefits. Section 5-204 and the corporation registration requirements it seeks to enforce have several local benefits. The requirement that foreign corporations must file annual reports advances the state's interest in collecting taxes. *See Cloverfields Improvement Ass'n v. Seabreeze Props., Inc.*, 373 A.2d 935, 938 (Md. 1977) (confirming that "the provision relative to annual reports . . . and forfeiture of charters came into the law as a tax measure"). And the requirements that an out-of-state corporation doing intrastate business must provide an address, identify a resident agent, show proof of good standing in its home jurisdiction, and file annual reports allow Maryland to monitor foreign corporations doing in-state business and to protect it citizens from fraud by out-of-state companies. *See, e.g.*, *Union Brokerage*, 322 U.S. at 209 ("[A] State has a legitimate interest in the regulation of those engaged in the brokerage business within its borders.").

Ultragenyx has no answer to these local benefits. Instead, Ultragenyx argues the only local benefit is the ability to serve foreign corporations with process through a resident agent. On

---

[12] Ultragenyx makes a last-ditch effort to identify a burden. It argues that § 5-204 "forces foreign corporations to hedge their bets by registering in Maryland—whether required to or not—because, absent registration, they may, like Ultragenyx, be unable to challenge a time-barred claim at the pleadings stage." ECF 75, at 11. That may be a consequence of the statute, but that does mean the statute burdens interstate commerce. As the Court has explained, the statute applies only to foreign corporations engaged in substantial localized business, not merely interstate commerce, in Maryland. If Lacks' allegations are true, Ultragenyx chose to conduct research in Maryland, to employ people in Maryland who market Ultragenyx's products to Maryland doctors, to engage Maryland clinicians for research and consulting, and to partner with Maryland companies. If these allegations are proven, it can hardly be said that Ultragenyx stumbled unawares into this level of intrastate activity. That Ultragenyx apparently did not know about Maryland's foreign corporation registration requirements—and the consequences for not complying with them—is no reason to find the statute burdens interstate commerce. Foreign corporations engaged in intrastate business in Maryland should not be surprised when they are required to play by the state's rules.

Ultragenyx's account, that local "benefit vanished when Maryland enacted a long-arm statute in response to *International Shoe*." ECF 75, at 15. It is true that after *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), long-arm statutes may confer personal jurisdiction over out-of-state defendants that have sufficient contacts with the forum state. Long-arm statutes have made it easier to hale into court foreign corporations that do not have a physical presence or resident agent in the forum state. But the availability of a long-arm statute, which Maryland has, does not eliminate the benefit of maintaining a resident agent in the state. Maryland's resident agent requirement makes service of process on out-of-state corporations easier for Marylanders. *See Garber v. Menendez*, 888 F.3d 839, 845 (6th Cir. 2018) ("When an in-state defendant moves out of the State . . ." the defendant 'remains potentially difficult to locate' and 'may not be so easy to find and serve.'" (quoting *G. D. Searle & Co.*, 455 U.S. at 410)); *Honda Motor Co. v. Coons*, 469 U.S. 1123, 1126 (1985) (Rehnquist, J., dissenting from denial of certiorari) ("[T]he enactment of the New Jersey long-arm statute has not fully relieved the difficulty facing residents injured by absent defendants."). Facilitating service of process on out-of-state defendants is a valid local benefit of § 5-204 and the corporation registration requirements the statute aims to enforce.

The law's local interests—tax enforcement, monitoring businesses engaged in intrastate commerce, and facilitating service of process—are more than "speculative" and easily pass muster under the court's deferential review. *See Colon Health Ctrs. I*, 733 F.3d at 545 (quoting *Medigen*, 985 F.2d at 167).

Having identified the statute's burdens and its local benefits, the Court considers whether the "burdens clearly exceed its benefits." *Yamaha*, 401 F.3d at 573. The Fourth Circuit has recognized that "*Pike* balancing frequently requires judges to make highly subjective calls." *Colon Health Ctrs. II*, 813 F.3d at 155. As Justice Scalia observed, *Pike* "balancing" is "more like judging

whether a particular line is longer than a particular rock is heavy." *Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 897 (1988) (Scalia, J., concurring in the judgment); *see also Colon Health Ctrs. II*, 813 F.3d at 155–56 (describing how *Pike* balancing "[s]ometimes . . . 'is a matter not of weighing apples against apples, but of deciding whether three apples are better than six tangerines'" (quoting *Davis*, 553 U.S. at 360 (Scalia, J., concurring in part))).

In this case, the *Pike* balancing act is less fraught. Ultragenyx has not demonstrated that § 5-204 burdens interstate commerce. And even if the minimal corporation registration requirements burden interstate commerce, the burden is negligible. The purported burden of the registration requirements does not clearly exceed the statute's local benefits of enforcing taxes, monitoring companies engaged in intrastate business, and simplifying service of process on out-of-state defendants. Ultragenyx has not shown the burden on interstate commerce is "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. Even under the *Pike* balancing test, § 5-204 is constitutional.

Maryland's corporation registration requirements and § 5-204 are designed to regulate the intrastate business activities of corporations formed under the laws of another jurisdiction. Section 5-204 is a valid exercise of the state's power to regulate business conducted within its borders. This lawful state power was recognized by the Supreme Court in *Union Brokerage* over eighty years ago and was recently reaffirmed by the Supreme Court in *National Pork Producers*: "[The] Court has recognized the usual 'legislative power of a State to act upon persons and property within the limits of its own territory.'" *Nat'l Pork Producers*, 598 U.S. at 375 (quoting *Hoyt v. Sprague*, 103 U.S. 613, 630 (1881)); *see Union Brokerage*, 322 U.S. at 212. If a foreign corporation conducts intrastate business in Maryland and does not comply with Maryland's corporation registration

requirements, Maryland has the power to deny the corporation the benefit of a statute of limitations defense.

Under *Eli Lilly* and recent Supreme Court and Fourth Circuit decisions, § 5-204 does not violate the Commerce Clause.

### 3. *Bendix*

In a bid to evade *Eli Lilly*, Ultragenyx insists that the Supreme Court's decision in *Bendix Autolite Corp. v. Midwesco Enterprises, Inc.*, 486 U.S. 888 (1988), controls. It does not.

In *Bendix*, the Supreme Court struck down as unconstitutional an Ohio law that tolled the statute of limitations for any period that an out-of-state corporate defendant had not designated a resident agent—a designation that operated as consent to the general jurisdiction of the Ohio courts. 486 U.S. at 890, 894–95. The tolling provision applied even if the foreign corporation engaged solely in interstate commerce. *See id.* at 890–92 & nn. 1–2. The Court found that "the burden imposed on interstate commerce by the tolling statute exceeds any local interest that the State might advance." *Id.* at 891. The burden was "significant" because the out-of-state corporation, which had been sued for breach of contract in an Ohio court, had no corporate office in Ohio, "[was] not registered to do business there, and [had] not appointed an agent for service of process in the State." *Id.* at 891–92. "To gain the protection of the limitations period," the foreign corporation "would have had to appoint a resident agent for service of process in Ohio and subject itself to the general jurisdiction of the Ohio courts." *Id.* at 892. Remarkably, this "jurisdiction would extend to any suit against [the foreign corporation], whether or not the transaction in question had any connection with Ohio." *Id.* In effect, that would "subject[] the foreign corporation to the general jurisdiction of the Ohio courts in matters to which Ohio's tenuous relation would not otherwise extend." *Id.* at 892–93. The Court found:

> The Ohio statutory scheme thus forces a foreign corporation to choose between exposure to the general jurisdiction of Ohio courts or forfeiture of the limitations defense, remaining subject to suit in Ohio in perpetuity. Requiring a foreign corporation to appoint an agent for service in all cases and to defend itself with reference to all transactions, including those in which it did not have the minimum contacts necessary for supporting personal jurisdiction, is a significant burden.

*Id.* at 893. The tolling statute "impose[d] a greater burden on out-of-state companies than it d[id] on Ohio companies, subjecting the activities of foreign and domestic corporations to inconsistent regulations." *Id.* at 894. The Court acknowledged Ohio's interest in promoting "[t]he ability to execute service of process on foreign corporations." *Id.* However, "it [wa]s conceded by all parties that the Ohio long-arm statute would have permitted service . . . throughout the period of limitations." *Id.* at 894. Given the availability of long-arm service and the "significant burden" the tolling statute imposed on interstate commerce, "Ohio [could not] justify its statute as a means of protecting its residents from corporations who become liable for acts done within the State but later withdraw from the jurisdiction." *Id.* The *Bendix* Court concluded that "[t]he State may not withdraw" a statute of limitations defense—"an integral part of the legal system . . . relied upon to project the liabilities of persons and corporations active in the commercial sphere"—"on conditions repugnant to the Commerce Clause." *Id.* at 893.

Maryland's § 5-204 is nothing like the Ohio statute in *Bendix.* Whereas the Ohio statute forced a foreign corporation, doing only interstate business in Ohio, to choose between forfeiture of a limitations defense and consent to the general jurisdiction of the Ohio courts, § 5-204 does nothing of the sort. Section 5-204 applies only to foreign corporations doing intrastate business in Maryland, and even then, it does not require those corporations to consent to the general jurisdiction of Maryland courts on pain of forfeiting a statute of limitations defense. Section 5-204 merely requires that foreign corporations doing intrastate business in Maryland register to do so. Registering to do business in Maryland does not subject a foreign corporation to the state courts'

general jurisdiction, as the unconstitutional Ohio statute did in *Bendix*. *See* Corps. & Ass'ns § 7-210 ("With respect to any cause of action on which a foreign corporation would not otherwise be subject to suit in this State, compliance with this subtitle: (1) [d]oes not of itself render a foreign corporation subject to suit in this State; and (2) [i]s not considered as consent by it to be sued in this State."). Maryland, unlike Ohio in *Bendix*, does not require foreign corporations to defend themselves "with reference to all transactions, including those in which it [does] not have the minimum contacts necessary for supporting personal jurisdiction." *Bendix*, 486 U.S. at 893. And Maryland, unlike Ohio in *Bendix*, does not "impose[] a greater burden on out-of-state companies than it does on [in-state] companies." *See id.* at 894. So Maryland, unlike Ohio in *Bendix*, does not "withdraw" a statute of limitations defense from foreign corporations "on conditions repugnant to the Commerce Clause." *Id.* at 893–94.[13]

　　*Eli Lilly*, not *Bendix*, governs this case.

*     *     *

　　Under *Eli Lilly* and the Supreme Court precedent on which *Eli Lilly* rests, § 5-204 is constitutional. If Lacks can prove that Ultragenyx was required to register to do intrastate business in Maryland when he filed this lawsuit, Ultragenyx may not benefit from the statute of limitations. Ultragenyx's motion for judgment on the pleadings is denied.

---

[13] In further support of its position, Ultragenyx cites several appellate court decisions that apply *Bendix*. In those cases, courts of appeal have held unconstitutional state statutes that force foreign corporations to choose between forfeiting a statute of limitations defense and either maintaining a physical presence in the state for the limitations period, *see, e.g.*, *Bottineau Farmers Elevator v. Woodward-Clyde Consultants*, 963 F.2d 1064, 1074 (8th Cir. 1992), or potentially submitting to a state court's general jurisdiction, *see Juzwin v. Asbestos Corp.*, 900 F.2d 686, 691 (3d Cir. 1990). Section 5-204 does not force foreign corporations into making either of those choices. *Bendix* does not apply here, and neither do these out-of-circuit decisions.

### C.  Interlocutory Appeal

Ultragenyx requests that the Court certify for interlocutory appeal any order denying its motion for judgment on the pleadings. The request is denied.

The federal courts of appeals generally have jurisdiction over "final decisions of the district courts of the United States." 28 U.S.C. § 1291. However, a district court may certify an order for interlocutory appeal where "[(1)] such order involves a controlling question of law as to which there is substantial ground for difference of opinion and . . . [(2)] an immediate appeal from the order may materially advance the ultimate termination of the litigation." *Id.* § 1292(b). Courts may find substantial ground for difference of opinion "[i]f 'controlling law is unclear.'" *Int'l Refugee Assistance Project v. Trump*, 404 F. Supp. 3d 946, 950 (D. Md. 2019) (quoting *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010)). There may be substantial ground for difference of opinion "where the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented." *Id.* (quoting *Couch*, 611 F.3d at 633). "[A] party's disagreement with the decision of the district court, no matter how strong, does not create substantial grounds." *Id.*

"[I]nterlocutory appeal is an exception to the general rule that appellate review must await final judgment." *Nutraceutical Corp. v. Lambert*, 586 U.S. 188, 196 (2019). The Fourth Circuit "ha[s] cautioned 'that § 1292(b) should be used sparingly and thus that its requirements must be strictly construed.'" *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330, 340 (4th Cir. 2017) (quoting *Myles v. Laffitte*, 881 F.2d 125, 127 (4th Cir. 1989)).

Ultragenyx believes there is a substantial ground for difference of opinion on whether this case is governed by *Eli Lilly* or *Bendix*. The Court disagrees. For the reasons explained in this

memorandum opinion, *Eli Lilly* governs this case, not *Bendix*. Section 5-204 is constitutional for the same reasons the New Jersey statute was constitutional in *Eli Lilly*. Section 5-204 bears no resemblance to the unconstitutional Ohio statute struck down in *Bendix*. *Bendix* does not apply here. *Eli Lilly* clearly controls this case. There is no substantial ground for a difference of opinion.

The constitutionality of § 5-204 is not "a controlling question of law as to which there is substantial ground for difference of opinion." *See* 28 U.S.C. § 1292(b). The Court declines to certify for interlocutory appeal its order denying Ultragenyx's motion for judgment on the pleadings.

### IV.    Conclusion

Section 5-204 of Maryland's Courts and Judicial Proceedings Article is constitutional. If Lacks can prove that Ultragenyx conducted intrastate business in Maryland without registering to do so, Ultragenyx may not benefit from the statute of limitations. Ultragenyx's motion for judgment on the pleadings is denied. The Court will not certify for interlocutory appeal the order denying the motion for judgment on the pleadings. Ultragenyx's motion to stay discovery is denied as moot. A separate Order follows.

Date: March 3, 2025

Deborah L. Boardman
United States District Judge